UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————————

| | | |
|---|---|---|
| LA RÉUNION AÉRIENNE | ) | |
| | ) | |
| | ) | Civil Action No. 05-01932 (HHK) |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| SOCIALIST PEOPLE'S LIBYAN | ) | |
| ARAB JAMAHIRIYA, LIBYAN EXTERNAL | ) | |
| SECURITY ORGANIZATION, MUAMMAR | ) | **Hearing Requested** |
| QADHAFI, ABDALLAH SENOUSSI, AHMED | ) | |
| ABDALLAH ELAZRAGH, IBRAHIM NAELI, | ) | |
| ARBAS MUSBAH, ISSA ABDELSALAM | ) | |
| SHIBANI AND ABDELSALAM HAMMOUDA | ) | |
| EL AGELI | ) | |
| | ) | |
| Defendants. | ) | |

———————————————————————————

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

September 22, 2006

COZEN O'CONNOR
1627 I Street, NW
11th Floor
Washington, D.C. 20006
(202) 912-4800
(202) 912-4830 (facsimile)
*Attorney for Plaintiff*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

FACTS ..................................................................................................................1

ARGUMENT ........................................................................................................3

I.    Collateral Estoppel ....................................................................................3

II.   The Court Has Subject Matter Jurisdiction Over Libya.............................8

III.  The Court Has Jurisdiction to Hear Claims Asserted by LRA ..................10

IV.   The Court Has Subject Matter Jurisdiction Over Claims By Interlease ...................12

V.    The Court May Constitutionally Assert Personal Jurisdiction Over
      the Individual Defendants ..........................................................................16

VI.   The Court Has Personal Jurisdiction Over Libya ......................................17

VII.  Qadhafi Should Not Enjoy Head of State Immunity..................................17

VIII. Punitive Damages Are Available ...............................................................18

IX.   The Individual Defendants Are Liable in their Personal Capacity...........................19

X.    LRA Has Adequately Pled Causes of Action ...........................................21

XI    Defendants' *Forum Non Conveniens* Argument Must Be Rejected......................24

XII.  The Individual Defendants, in their Personal Capacity, Were
      Properly Served...........................................................................................25

CONCLUSION....................................................................................................27

## TABLE OF AUTHORITIES

Cases

\* *Acree v, Republic of Iraq,*
370 F.3d 41 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 1928 (2005) .................9, 21, 22

\* *Ali Baba Co. v. Wilco, Inc.,*
482 A.2d 418 (D.C. 2004) ..........................................................3, 4, 5, 6, 7

*Arizonans for Official English v. Arizona,*
520 U.S. 43, 69 (1997)..............................................................20

*Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,*
133 F. Supp.2d 162 (E.D.N.Y. 2001) ...............................................19

*Carr v. District of Columbia,*
646 F.2d 599 (D.C. Cir. 1980) .....................................................4, 6

*Cicippio-Puelo v. Islamic Republic of Iran,*
353 F.3d 1025 (D.C. Cir. 2004) ....................................................13

*Cicippio-Puleo v. Islamic Republic of Iran,*
CA 01-01496 (HHK) (D.D.C. Oct. 7, 2005) .........................................23

*Collett v. Socialist People's Libyan Arab Jamahiriya,*
362 F. Supp.2d 230 (D.D.C. 2005) .................................................17

*Dammarell v. Islamic Republic of Iran,*
281 F. Supp.2d 105 (D.D.C. 2003) .................................................22

*Dammarell v. Islamic Republic of Iran,*
2005 U.S. Dist. LEXIS 5343 (D.D.C. March 29, 2005)...............................23

*Doe v. State of Israel,*
400 F. Supp.2d 86 (D.D.C. 2005) ..................................................20

*Faucett v. AT&T,*
744 F.2d 118 (D.C. Cir. 1984), *cert. denied*, 469 U.S. 1196 (1985) ........................4, 6

*Foreign Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,*
462 U.S. 611 (1983).................................................................22

*Hafer v. Melo,*
502 U.S. 21 (1991)..................................................................20

\* *Hartford Fire Insurance Co., et al. v. The Socialist People's Libyan
Arab Jamahiriya, et al.,*
Civil Action No. 98-3096 (D.D.C. Sept. 22, 1999) .......................3, 11, 12, 18

*Hassan El-Fadl v. Central Bank of Jordan,*
    75 F.3d 668 (D.C. Cir. 1996)................................................................20, 24

*I.T. Consultants, Inc. v. Republic of Pakistan,*
    351 F.3d 1184 (D.C. Cir. 2003) ....................................................................25

\*     *Kilburn, et. al. v. Islamic Republic of Iran, et al.,*
    Civil Action No. 01-1301 (D.D.C. July 26, 2006)......................................3, 9

*Kilburn v. Republic of Iran,*
    277 F. Supp.2d 24 (D.D.C. 2003) ................................................................22

*Lockheed Aircraft Corp. v. United States,*
    460 U.S. 190 (1983)......................................................................................12

*Nemarian v. Fed. Democratic Republic of Ethiopia,*
    315 F.3d 390 (D.C. Cir. 2003) ....................................................................25

*Newell v. District of Columbia,*
    741 A.2d 28 (D.C. 1999) ...............................................................................5

*Park v. Shin,*
    313 F.3d 1138 (9th Cir. 2002) ......................................................................20

\*     *Parklane Hosiery Co. v. Shore,*
    439 U.S. 322 (1979).............................................................................4, 5, 6, 7

\*     *Price v. Socialist People's Libyan Arab Jamahiriya,*
    294 F.3d 82 (D.C. Cir. 2002)..........................................................16, 17, 23

\*     *Pugh v. Socialist People's Libyan Arab Jamahiriya, et al.,*
    290 F. Supp.2d 54 (D.D.C. 2003)...........................................3, 12, 13, 16, 24

\*     *Pugh v. Socialist People's Libyan Arab Jamahiriya, et al.,*
    2006 WL 2384915 (D.D.C. May 11, 2006)......................................... *passim*

*Republic of Austria v. Altman,*
    541 U.S. 677 (2004)......................................................................................17

*Rio Props., Inc. v. Rio Int'l Interlink,*
    284 F.3d 1007 (9th Cir. 2002) ......................................................................26

*Smith v. Islamic Emirate of Afghanistan,*
    2001 WL 1658211 (S.D.N.Y. 2001)..............................................................26

*United Mine Workers v. Gibbs,*
    383 U.S. 715 (1966)......................................................................................15

*United States v. Padilla*,
    2002 WL 471838 (E.D. Cal. 2002).............................................................26

*United States v. Yellow Cab Co.*,
    340 U.S. 543 (1951).................................................................................12

*Urban Industries, Inc. v. Thevis*,
    1981 U.S. App. LEXIS 20340 (6th Cir. Feb. 9. 1981) ...............................19

*Verlinden B.V. v. Central Bank of Nigeria*,
    647 F.2d 320 (2d Cir. 1981)......................................................................22

*Yamaha Corp. of America v. United States*,
    961 F.2d 245 (D.C. Cir. 1992) ....................................................................5


Statutes and Rules

18 U.S.C. § 2333.............................................................................................13, 14

28 U.S.C. § 1367.............................................................................................14, 15

28 U.S.C. § 1367(a) ............................................................................................14

28 U.S.C. § 1605(a)(7).................................................................................. *passim*

28 U.S.C. § 1605(a)(7)(B)(ii) ..........................................................................8, 11

28 U.S.C. § 1606...............................................................................................22

Fed. R. Civ. P. 4(f)(3) .......................................................................................25

Fed. R. Civ. P. 12(e) ........................................................................................25


Other

71 Fed. Reg. 31909 (May 12, 2006) ......................................................................9

H.R. Rep. No. 104-383, 104th Cong., 1st Sess. (1995)......................................12

1 MOORE'S FEDERAL PRACTICE § 3.03[2] (3d ed.) .............................................26

RESTATEMENT (SECOND) OF JUDGMENTS § 27(D) (1982)...................................4, 5

10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE:
CIVIL 2D § 2735 (2d ed. 1983) ............................................................................5

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff La Réunion Aérienne ("LRA") respectfully submits this memorandum of law in opposition to the Motion by all Defendants to dismiss on various jurisdictional grounds or, in the alternative, for failure to state a claim.[1]

Many of Defendants' arguments have been the subject of prior opinions which rejected the identical arguments by these same or similarly situated defendants. Indeed, this Court has already rejected many of Defendants' arguments in a case involving them and arising out of the same tragic circumstances as here. Other of Defendants' arguments are based on a blatant misreading of unambiguous statutory language. Defendants' Motion should be denied in its entirety.

**FACTS**

On September 19, 1989, an Aircraft previously owned by a Georgia corporation, Interlease and operated by the French airline Union de Transports Aériens ("UTA") as Flight 722, exploded in mid-air over the Tenere Desert in Niger while en route from Brazzaville, Congo to Paris, France, killing all 170 passengers on board. A subsequent extensive investigation by French authorities, and civil and criminal proceedings in the French courts, determined that the explosion resulted from an act of terrorism committed by agents and officials of the Socialist People's Libyan Arab Jamahiriya ("Libya") and various Libyan individuals.

Among the dead were seven Americans, Bonnie Barnes Pugh, James E. Turlington, Sr., Margaret Elizabeth Schutzius, Patrick Wayne Huff, Donald J. Warner, Mihai Alimanestianu and Mark E. Corder (the "Decedents"). Within a few months of the explosion, LRA, a *Groupment*

---

[1]    In a separate motion filed simultaneously herewith, LRA moves for summary judgment against all Defendants.

*D'Interet Economique* (a special partnership organized under French law), acting in the name of and on behalf of its member insurance companies who were the insurers of certain risks in connection with the Aircraft, paid to the survivors and estates of the Decedents the amount of $2,011,172.42 (as nearly as can now be computed), and to Interlease the insured value of the destroyed Aircraft, which was in excess of $34,000,000.  Upon payment, the group of insurers on whose behalf LRA acts took title to the Aircraft hull, and took an assignment of, and became subrogated to, the claims of the Decedent's representatives and estates and Interlease, the original owner of the hull, against the parties responsible for the wrongful deaths and damages.

On October 16, 2002, personal representatives and close relatives of the seven Decedents, along with the American owner of the Aircraft, initiated suit in this Court against Libya, its intelligence service (Libyan External Security Organization, hereinafter "LESO"), and seven individuals, including the Libyan head of state Muammar Qadhafi, for money damages on account of extrajudicial killings, aircraft sabotage and personal injuries.  *Pugh v. Socialist People's Libyan Arab Jamahiriya, et al.*, No. CIV .A. 02-2026(TPJ) (hereinafter "*Pugh*").  LRA sought to intervene in *Pugh*, but that motion was denied.  Consequently, it initiated this action against Libya and LESO, and against Muammar Qadhafi, Abdallah Senoussi, Ahmed Abdallah Elazragh, Ibrahim Naeli, Arbas Musbah, Issa Abdelsalam Shibani and Abdelsalam Hammouda El Ageli in both their official and personal capacities (collectively the "individual Defendants"), to recover all monies it paid as a result of the explosion of the Aircraft.

In the Complaint, the insurers on whose behalf LRA acts asserted claims for wrongful death and property damage as the assignees and subrogees of the personal representatives and estates of the Decedents and Interlease, for indemnity and contribution to recover the payments they made on account of the explosion of the Aircraft, and for conversion and trespass to

chattels, and also sought punitive damages against the individual Defendants in their personal capacities.

**ARGUMENT**

### I.    Collateral Estoppel.

Many of Defendants' arguments in their Motion to Dismiss are a rehash of arguments by these same Defendants in *Pugh*, and which were rejected therein by both Judge Jackson (hereinafter, "*Pugh I*", 290 F. Supp.2d 54 (D.D.C. 2003)) and Judge Kennedy ("*Pugh II*", 2006 WL 2384915 (D.D.C. May 11, 2006)).[2] Some of Defendants' arguments have also been rejected in other cases involving some of these same Defendants, particularly Libya. *See Kilburn, et. al. v. Islamic Republic of Iran, et al.*, Civil Action No. 01-1301 (D.D.C. July 26, 2006); *Hartford Fire Insurance Co., et al. v. The Socialist People's Libyan Arab Jamahiriya, et al.*, Civil Action No. 98-3096 (D.D.C. Sept. 22, 1999).

To the extent this Court, in *Pugh II*, granted summary judgment against the individual Defendants in their personal capacities, that ruling constitutes a final judgment on the merits, with collateral estoppel effect. *Ali Baba Co. v. Wilco, Inc.*, 482 A.2d 418 (D.C. 2004).[3] Thus, as a preliminary matter, LRA addresses the circumstances under which collateral estoppel applies and an issue is considered to have been conclusively determined.

Under the doctrine of collateral estoppel, once an issue of fact or law has been raised, litigated and actually and necessarily determined against a party by a court of competent jurisdiction, the court's determination is binding against that party in any subsequent proceeding

---

[2]    *Pugh* involved the same Defendants as herein.  In *Pugh I* the Court resolved the Defendants' motion to dismiss for lack of jurisdiction.  In *Pugh II* the Court partially resolved the parties' cross-motions for summary judgment.

[3]    As to the issues which have not yet been finally adjudicated in *Pugh*, the rulings in that and similar cases nevertheless constitute highly persuasive precedent.

involving that issue of fact or law. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979); *Carr v. District of Columbia*, 646 F.2d 599, 608 (D.C. Cir. 1980).

The components of issue preclusion are: (1) whether the issue was actually litigated in the earlier action, meaning whether it was contested by the parties and submitted for determination by the court; (2) whether the issue was actually determined by a court of competent jurisdiction in the earlier action, and (3) whether the issue was necessarily determined in the first action, meaning whether the earlier determination was essential to the disposition of the first action. *Faucett v. AT&T*, 744 F.2d 118, 125 (D.C. Cir. 1984), *cert. denied*, 469 U.S. 1196 (1985).

As will be seen, many of the issues which LRA seeks to preclude from relitigation are identical to the issues decided in *Pugh*, the only difference between this case and *Pugh* being that the insurers on whose behalf LRA acts, as the assignees and subrogees, seek recovery as the real parties in interest to the extent that they indemnified the plaintiffs in *Pugh* case for their losses. The change in plaintiffs, however, does not introduce any factual or legal differences between the two cases such as could alter any of the specific issues that LRA seeks to preclude from relitigation, none of which is dependent on the identity of the plaintiff.

"An issue is actually litigated when it 'is properly raised, by the pleadings or otherwise, and is submitted for determination and is determined.'" *Ali Baba*, 482 A.2d at 422, *quoting* RESTATEMENT (SECOND) OF JUDGMENTS § 27(D) (1982); *Faucett*, *supra,* 744 F.2d at 125 (stating that an issue is actually litigated when it is "contested by the parties and submitted for determination by the court"). The issues sought to be precluded from relitigation herein were raised and actually litigated, and their determination was essential to the disposition of the motions to dismiss and for summary judgment in *Pugh* and other cases involving Defendants.

Courts have afforded collateral estoppel effect to decisions rendered on motions for summary judgment. For example, in one case before the District of Columbia Court of Appeals the Court held that the trial court had erred in not affording a prior summary judgment collateral estoppel effect, rejecting the trial court's theory that the issues contested had never been actually presented to a trier of fact to be decided on the merits. *Ali Baba Co.*, 482 A.2d 418, 422 (D.C. 1984) *citing* 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2735 (2d ed. 1983) ("summary judgment, of course, is a decision on the merits of the case. Thus, a [] motion will be granted on the basis of former adjudication when an earlier summary judgment has disposed of the same issues between sufficiently related parties"); *see also, e.g.*, RESTATEMENT 2D OF JUDGMENTS § 27 (d) and Ill. 10. (1982) ("[a]n issue may be submitted and determined on a motion to dismiss for failure to state a claim, a motion for judgment on the pleadings, a motion for summary judgment, a motion for directed verdict, or their equivalents, as well as on a judgment entered on a verdict").

While some courts have taken the position that offensive collateral estoppel should be invoked with restraint, *e.g.*, *Parklane*, 439 U.S. at 331, the "restraint" required is simply to ensure that a defendant is not unfairly treated; it is not to bar the application of collateral estoppel. *Id.*; *Yamaha Corp. of America v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (stating that "preclusion in the second case must not work a basic unfairness to the party bound by the first determination"). Within this framework, however, the courts possess broad discretion in deciding whether or not to allow the use of offensive collateral estoppel. *Newell v. District of Columbia,* 741 A.2d 28, 36 (D.C. 1999); *see also Parklane*, 439 U.S. at 331, 332 (discussing the fairness factors and the proper use of offensive collateral estoppel).

The factors which courts consider in evaluating fairness to the defendant include the following: (1) whether the defendant had an incentive to litigate the prior action fully and vigorously; (2) whether the decision being used to assert collateral estoppel is inconsistent with any other decision regarding the same issue in another action against the defendant; (3) whether there are any procedural opportunities available to the defendant that were not available in the first action, which may have the effect of changing the outcome in the subsequent litigation; and (4) whether the use of offensive collateral estoppel will reward a plaintiff who could have joined in the previous action, but, instead, chose to adopt a "wait and see" attitude so as to put itself in an advantageous position based on the outcome of the prior litigation. *Parklane,* 439 U.S. at 331, 332; *see also Faucett*, 744 F.2d at 125, 126.

It is irrefutable that the Defendants in this case had a huge incentive to litigate the *Pugh* case fully and vigorously, including the issues sought to be precluded from relitigation by LRA. Incentive to litigate fully and vigorously is often measured by "whether the first suit was for a trivial amount while the second is for a large amount." *Ali Baba Co.*, 482 A.2d at 423. For obvious reasons, the Defendants will have difficulty in arguing that the three billion dollar claim in the *Pugh* case did not provide sufficient incentive to litigate fully and vigorously.

Moreover it is clear that the Defendants in fact did fully and vigorously litigate the issues in *Pugh*, as the record shows that Defendants filed a motion to dismiss the complaint; appealed the adverse decision rendered on that motion; filed a timely answer to the complaint; diligently defended and cross-moved in response to the plaintiffs' motion for partial summary judgment; appealed the adverse rulings on that motion and continue to participate actively in the litigation of that case. *See, e.g.*, *Carr,* 646 F.2d at 606 (reviewing the actions taken by the defendant in the litigation as evidence that it had incentive to fully and vigorously litigate the prior action); *Ali*

*Baba Co.*, 482 A.2d at 423 (finding that the defendant had sufficient incentive to litigate the prior action by reviewing defendant's conduct in the prior litigation, which revealed that the defendant had filed papers to oppose a foreclosure sale and had refused to vacate the subject premises).

The second fairness factor typically considered by the courts is whether the assertion of collateral estoppel is based on one of conflicting judgments. *Ali Baba Co.*, 482 A.2d at 423. LRA is not aware of any such other judgment in the United States,[4] and insofar as *Pugh* is the only other legal action filed in the United States regarding the destruction of UTA Flight 772, it is unlikely that there exists any judgment that conflicts with the court's decisions *Pugh* to which LRA seeks to ascribe preclusive effect.

The third fairness factor that is often included in the equitable calculation is whether there are any procedural opportunities in the subsequent action that were not available to the defendants in prior action. *Ali Baba Co.*, 482 A.2d at 423**.** Because *Pugh* and LRA's action are being litigated in the same forum, applying the same rules of procedure, there are no differences in procedural protections that could prejudice the Defendants.

The last factor commonly considered by the courts in assessing whether the use of offensive collateral estoppel will work an unfairness to the defendant relates to the ease with which the party asserting collateral estoppel could have joined the prior action. *Parklane*, 439 U.S. at 331, 332. LRA commenced this action only after its motion to intervene was denied in *Pugh*.

In short, collateral estoppel is applicable here, and it should be used to bar Defendants from relitigating issues which they previously litigated to finality in the courts, and which already have been determined.

---

[4]    Several actions arising out of the UTA terrorist attack involving different parties, all non-US nationals, are pending in France and elsewhere.

**II.     The Court Has Subject Matter Jurisdiction Over Libya.**

Libya asserts that as a foreign state the only source for subject matter jurisdiction in a suit against it is the Foreign Sovereign Immunities Act of 1976, as amended in 1996 ("FSIA"). Specifically, the FSIA as amended sets forth an exception to sovereign immunity where money damages for certain acts are sought against a state that was designated by the Secretary of State as a state sponsor of terror. 28 U.S.C. § 1605(a)(7). Notwithstanding that its acts put it squarely within the exception to sovereign immunity, Libya puts forth several arguments why it should not be subject to the Court's jurisdiction. All of its arguments are unavailing. Indeed, they have already been rejected.

First, Libya contends that § 1605(a)(7) only creates a cause of action in favor of United States nationals, and that LRA is not a United States national. It purports to draw that requirement from the language of the 1996 Amendment to FSIA which provides for subject matter jurisdiction in the United States courts for causes of action arising out of acts of extrajudicial killing or aircraft sabotage, except in cases where "neither the plaintiff nor the victim was a national of the United States . . . when the act upon which the claim is based occurred," 28 U.S.C. § 1605(a)(7)(B)(ii). Incredibly, Libya reads this plainly disjunctive language as if it were worded in the conjunctive, and argues that the Court must decline to hear the claim unless the claimant and the injured party are United States nationals. That is not what the statute says or requires. The victims were all United States nationals, and that is all that is required in that regard in order to confer jurisdiction.

Next, Libya contends that the State Department's rescission of Libya's designation as a state sponsor of terror, by Presidential Determination on May 12, 2006, followed by its actual removal from the list of terrorist states on or about June 30, 2006, removed any jurisdiction

previously conferred under the FSIA. Once again, Libya's contention runs flatly afoul of the plain language of the statute it seeks to interpret. As Defendants themselves admit, elsewhere in their brief, section 1605(a)(7) requires only, in this regard, that the foreign state be designated as a state sponsor of terrorism *at the time of the incident complained of*, or that it later be designated as such on account of that act. Those conditions are met here. Libya was designated as a state sponsor of terrorism in 1979, and it remained so well past the time of the explosion, until 2006.

Simply stated, the recent delisting of Libya does not retroactively render the statute inapplicable. So long as Libya was designated as a state sponsor of terror at the time of the explosion, which is the case, it remains subject to jurisdiction under the FSIA without regard to subsequent events. *See Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 1928 (2005) ("the FSIA specifically provides that when a country, once designated as a state sponsor of terrorism, is subsequently restored to good standing, that country is still amenable to suit for acts that took place prior to the restoration of its sovereign immunity").

Indeed, Libya itself raised the identical contention in *Kilburn, et al. v. Islamic Republic of Iran, et al.*, Civil Action No. 01-1301 (D.D.C. July 26, 2006), an action involving hostage-taking, torture and extrajudicial killing in which Libya, along with Iran, was a defendant, and the Court flatly rejected the argument there. *See id.* at 6 ("the acts in question occurred while the defendant was designated as a state sponsor of terrorism, and the Presidential Determination does not divest the court of jurisdiction over the case").[5] Libya's persistent relitigation of an issue it

---

[5]    In *Kilburn* the Court also pointed out that Libya's position was inconsistent with the language of the Presidential Determination insofar as the Determination acknowledged the existence and continuation of suits against Libya and declared that the United States had secured a confirmation from Libya that it would "continue to respond in good faith to legal cases brought against it." *Kilburn* at 6, fn. 4, citing Presidential Determination No. 2006-14, 71 Fed. Reg. 31909 (May 12, 2006). The same can be said here.

previously argued, and which has already been determined against it, should not be countenanced. Its argument does not improve with repetition.

Libya also writes, without further explanation but in *italics* as if to give the point extra emphasis, that section 1605(a)(7) requires that a plaintiff first offer a defendant reasonable opportunity to arbitrate the matter. Libya's intent in emphasizing this point is unclear, as the arbitration provision is inapplicable in the within situation. By its very terms, the statute requires an attempt to arbitrate only if the incident complained of happened within the territory of the foreign defendant (*i.e.*, in Libya). Here, the incident took place either in the Congo or Niger, but not in Libya. Thus, any arbitration provision under the statute does not apply.

Libya's arguments that the Court lacks subject matter jurisdiction in this action are simply unavailing.

## III.    The Court Has Jurisdiction to Hear Claims Asserted by LRA.

Defendants assert that the Court lacks jurisdiction under section 1605(a)(7) as to any action brought by LRA against any Defendant because that statute only provides an exception to sovereign immunity in favor of a United States national for personal injury or death. Defendants argue that LRA fails to meet these conditions because: (1) LRA is not a United States national, (2) Libya is not an individual person, and (3) insofar as LRA is suing herein as an assignee and/or subrogee of the victims' representatives, it is not really suing for personal injury or death, but for money damages only. None of these contentions has any merit.[6]

---

[6]    Defendants also assert, in a footnote and without explanation or authority in support, that only an individual, and not a partnership such LRA, can bring a wrongful death action. By its very nature, a wrongful death action represents an attempt by a decedent's distributees to be compensated for the pecuniary value of the decedent's life. Unless barred by statute or rule (and Defendants cite none) such claim, like other monetary claims, may be assigned to any person or entity.

As noted above, section 1605(a)(7) does not require that the claimant be a United States national. Rather, the statute is fully satisfied if either the claimant or the victim was a national of the United States at the time of the act upon which the claim is based. § 1605(a)(7)(B)(ii). There simply is no requirement under the statute that the party bringing the suit be a United States national or, for that matter, an individual person. Here, all the victims are United States nationals, and that is all that is required. Thus, there is no impediment to LRA being the claimant.

Libya's other contention, that an action by an assignee or subrogee who seeks money damages is not an action for personal injury or death within the meaning of FSIA, is virtually identical to the argument it made in *Hartford Fire Insurance Co., et al. v. The Socialist People's Libyan Arab Jamahiriya, et al.*, Civil Action No. 98-3096 (D.D.C. Sept. 22, 1999), in which the Court rejected the argument. In *Hartford*, a case arising out of Libya's role in the infamous Pan Am bombing over Lockerbie, Scotland, the insurance companies settled the personal injury and death claims of the passengers and their families, and then brought a claim in subrogation against Libya, its Security Organization, Libyan Arab Airlines and two Libyan individuals, seeking indemnity and contribution. Libya moved to dismiss for lack of jurisdiction raising the identical argument as it raises here, which is that section 1605(a)(7) only confers jurisdiction in actions for personal injury or death, but not in actions for contribution and indemnity by third parties who had paid damages to the victims. The Court noted that the issue was one of first impression and, after reviewing the legislative history, determined that it had subject matter jurisdiction over the action:

> Although the House Report does not contain a discussion of contribution or indemnity, it does state the principal statutory purpose of the FSIA, which is to deter foreign states from sponsoring terrorist activities. The failure to permit insurance companies to sue for contribution would undermine this goal, as victims

> of a plane crash can usually obtain compensation more easily from an airline and
> its insurers for not providing proper safety than against a sponsoring state. Only
> if the airline and, in turn, its insurers, can *step into the shoes of the victims* does
> FSIA fulfill its statutory purpose of providing "an important economic and
> financial weapon against … outlaw states."

*Hartford* at 5 (emphasis added, quoting H.R. Rep. No. 104-383, 104th Cong., 1st Sess. at 181

(1995), omission in original). That is precisely the situation with regard to LRA herein, which

seeks to step into the shoes of the personal representatives of the victims. Libya's argument was

rejected when it previously raised it, and it should be rejected again. It is just plain wrong.[7]

In addition to the deterrence aspect, there is an additional reason why Libya's argument

runs afoul of the statutory scheme, and that is because, under Libya's position, UTA's insurers,

and not the terrorist state that perpetrated the bombing, would end up paying the damages

awarded to the families of the victims and to Interlease. Such a result would be unconscionable

and would thwart the plain intent of Congress which was to provide "an important economic and

financial weapon against th[o]se outlaw states" that sponsor terrorist attacks against Americans.

H.R. Rep. No. 104-383, 104th Cong., 1st Sess. at 62 (1995).

The Court has jurisdiction over Defendants with regard to the claims at issue, whether

brought by the Decedents' representatives and Interlease (as in *Pugh*) or by their assignees and

subrogees (as in *Hartford* and here).

## IV. The Court Has Subject Matter Jurisdiction Over Claims By Interlease.

Defendants assert -- purportedly in reliance on *Pugh* I -- that even if the insurers on

whose behalf LRA acts may be subrogated to the rights of the Decedents' representatives against

Libya, LESO and the individual Defendants, that is only in regard to the personal injury and

---

[7]     *See also Lockheed Aircraft Corp. v. United States*, 460 U.S. 190 (1983) and *United States v. Yellow Cab Co.*, 340 U.S. 543 (1951), respectively allowing indemnity and contribution claims under the Federal Torts Claims Act, notwithstanding that the operative language of that Act provides only for jurisdiction over actions for money damages "for personal injury or death." That is the same language as found in the FSIA provision here at issue, which also is limited to actions for money damages "for personal injury or death."

wrongful death claims. However, Defendants argue, the insurers cannot be subrogated to the rights of Interlease against Libya, LESO and the individual Defendants in their official capacity,[8] as Interlease's claims are not for personal injury and wrongful death and, thus, are not within the section 1605(a)(7) exception to sovereign immunity.

While Defendants point to *Pugh I* in support of that position, the D.C. Circuit subsequently took an opposing view in *Cicippio-Puelo v. Islamic Republic of Iran*, 353 F.3d 1025 (D.C. Cir. 2004), a case erroneously cited by Defendants as supporting their position. In *Cicippio* the Court found no jurisdictional bar to children and siblings of a former hostage suing Iran and its Ministry of Information and Security for their own emotional distress and loss of solatium (clearly not damages for the victim's personal injury), remanding only in order to give the plaintiffs an opportunity to find some source in the law for the propositions that someone other than a spouse can assert a cause of action for loss of companionship, and that someone not present to see the victim's torment can recover for mental anguish, 353 F.3d at 1029-30, something the plaintiffs in that case had not done. 353 F.3d at 1036. As the Court held:

> As noted above, the District Court based its dismissal of the complaint on two grounds: Rule 12(b)(6) ("failure to state a claim upon which relief may be granted") and Rule 12(h)(3) ("the court lacks jurisdiction of the subject matter"). The second ground is inapposite, for it is clear that *the District Court had jurisdiction* pursuant to the statutory waiver of sovereign immunity under 28 U.S.C. § 1605(a)(7).

353 F.3d at 1030 (emphasis added).

We acknowledge that this Court in *Pugh I* barred Interlease's claims under 18 U.S.C. § 2333. However, while the Court barred that claim under that statute, it also stated:

> Plaintiffs concede that 28 U.S.C. § 1605(a)(7) does not, in and of itself, confer subject matter jurisdiction on this Court to entertain Interlease's claims, but

---

[8]     Defendants do not contend that the Court lacks subject matter jurisdiction to hear LRA's claims against the individual Defendants in their personal capacity, except that they complain that they were not properly served and that the suit against the individual Defendants in their personal capacity is redundant. Those contentions are addressed below.

> in conjunction with 28 U.S.C. § 1367, they say, once having acquired original jurisdiction of the subordinate "claim," (*i.e.* the claims of individual plaintiffs for personal injury or death of their respective decedents) which are cognizable in the § 1605(a)(7) "case," the Court may then exercise *supplemental* jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case. It is undisputed that Interlease's conversion and tortuous interference claims grow out of the same case or controversy as the individual plaintiff's claims.

290 F. Supp.2d at 60 (emphasis in original, footnote omitted). Thereafter, in its summation of the case, the Court specifically dismissed only the § 2333 claim against Libya, LESO and the individuals in their official capacity. It did not specifically dismiss the supplemental jurisdiction claim. *See* 290 F. Supp.2d at 61 ("ORDERED, that the defendants' motion to dismiss is denied in its entirety except as to any claims plaintiff Interlease may assert under 18 U.S.C. § 2333 against defendant Libya, LESO, and the individual defendants in their official capacities").[9]

The conclusion that the Court may maintain subject matter jurisdiction over Interlease's claims is in fact exemplified in the very language of the two statutory provisions at issue, 28 U.S.C. §1605(a)(7) and 28 U.S.C. §1367(a). Section 1605(a)(7) provides: "A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any *case* – (7)….in which money damages are sought against a foreign state for personal injury or death…." (emphasis supplied). Section 1367(a) provides; "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other *claims* that are so related to *claims* in the action within such original jurisdiction that they form part of the same *case* or controversy" (emphasis supplied).

---

[9]    We also acknowledge that in *Pugh II*, the Court wrote that Judge Jackson had dismissed Interlease's claims against Libya, LESO and the individual Defendants in their official capacity, but we note that that opinion, too, makes no mention of whether that dismissal applied to the supplemental jurisdiction claim under section 1367, or just to the claim under section 2333.

Congress has directed that once the Court has original jurisdiction over Libya to decide the claims of the families of the seven American victims, as it does under section 1605(a)(7), it "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367.  Here, it can hardly be questioned that LRA's claims are so related to the claims of the victims of Flight 772 as to form "the same case or controversy."

Congress further emphasized its unambiguous intent that federal district courts hearing claims against state sponsors of terrorism under section 1605(a)(7) also have jurisdiction to hear related claims against those foreign states when it employed the words "in any case" in section 1605(a).  If Congress had intended subject matter jurisdiction to be limited solely to personal injury or death claims arising under section 1605(a)(7), it would have so stated by employing the words "for any claims."  Instead, Congress made clear that foreign states "shall not be immune" from the jurisdiction of the federal courts "in any case" in which damages are sought for personal injury or death resulting from certain terrorist acts.

Congress's intent is clear -- once subject matter jurisdiction is present, the Court may hear *all* claims arising out of the same set of facts.  *See United Mine Workers v. Gibbs*, 383 U.S. 715 (1966) (discussing district courts' ability to hear claims over which they do not have original jurisdiction under the doctrine of supplemental jurisdiction).  This is the situation here. Accordingly, this Court has jurisdiction to hear LRA's claims against Libya, LESO and the individual defendants in their official capacities.

**V.     The Court May Constitutionally Assert Personal Jurisdiction Over the Individual Defendants.**

In their motion papers, the individual Defendants engage in an extended discussion attempting to convince the Court that the exercise of personal jurisdiction over them would not meet constitutional minimal contacts requirements, citing numerous cases for the general principles they espouse.  The problem with Defendants' arguments is that while Defendants cited at great length to language stressing the importance of due process where applicable, they made no effort whatsoever to apply that laudable principle of American jurisprudence to the situation at hand.  Specifically, Defendants made no attempt to actually set forth how and why any right to due process is offended by haling into an American court foreign individuals who deliberately murdered a plane-load of innocent civilians, knowing that it was highly likely that some American nationals would be among them.

Defendants also fail to admit that their due process argument was addressed in *Pugh I* in the identical context and circumstances as presented here, and that it was held there that the individual Defendants in their personal capacity are amenable to the jurisdiction of the Court. *See Pugh I*, 290 F. Supp. at 58-60 (holding, in an action arising out of the same bombing as forms the basis of this action, that these very Defendants, in their personal capacities, had a presence in the United States by virtue of their acts that was equivalent to a minimum contact "sufficient under the Due Process Clause to render them amenable to a civil judgment for money damages in an American court").

Defendants also set up a straw-man, arguing at length that *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) did not rule, in contradistinction to its ruling with regard to foreign states, that foreign individuals are not entitled to due process.  That

is true, but the Court also did not rule that they were.  Thus, the reference to *Price* is, at best, a distraction.

In any event, insofar as the Court entered summary judgment in *Pugh II* against the individual Defendants in their personal capacities, basic principles of collateral estoppel prelude the Defendants from relitigating this very point.

## VI.     The Court Has Personal Jurisdiction Over Libya.

Libya concedes that this issue has been determined adversely to it in *Price v. Socialist People's Libyan Arab Jamahiriya* 294 F.3d 82 (D.C. Cir. 2002).  It states that it only raises the issue on this Motion in order to preserve it for potential further review, in light of some language in *Republic of Austria v. Altman*, 541 U.S. 677 (2004), where the Supreme Court noted that various considerations, including personal jurisdiction, limit the number of suits brought in American Court.  What bearing this non-specific truism has on this case is not clear, but in any event, it certainly does not address the holding in *Price*, which remains binding.

## VII.    Qadhafi Should Not Enjoy Head of State Immunity.

Defendant Qadhafi seeks the benefits of head of state immunity.  The question whether such immunity applies in cases of this sort has been raised in several recent cases, and it remains unresolved as pointed out in Defendants' papers.  Defendants also pointed out that in two recent cases, *Pugh II* and *Collett v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp.2d 230 (D.D.C. 2005), the Court requested the view of the Attorney General on the head of state immunity issue.  According to Defendants, the Attorney General is to submit his view to Judge Urbina in the *Collett* matter by September 30, 2006.  On that basis, the Court in *Pugh II* determined that it would be appropriate to await the submission by the Attorney General of his

views concerning the possibility of Qadhafi enjoying head of state immunity in regard to his role in the bombing of UTA Flight 722.

LRA agrees that it is appropriate to await the outcome of that inquiry, and it seeks leave to submit its argument as to that issue only, after the Attorney General has responded to this particular inquiry.

## VIII. Punitive Damages Are Available.

Libya and LESO next engage in an extended, and entirely pointless, argument as to why they should not subject to a claim for punitive damages. The argument is pointless, and Defendants' motivation in making it is entirely unclear, as LRA in its Complaint herein did not request punitive damages against these Defendants.[10]

The individual Defendants argue that punitive damages are not available against them, either in their official or personal capacities, because only the US victims, and not a subrogee and/or assignee, could be entitled to punitive damages. Putting aside the fact that LRA seeks damages against the individual Defendants in their personal capacities only, Defendants' argument is without support in the law. Not only have Defendants cited to no authority

---

[10] Defendants' argument in opposition to imposing punitive damages appears to have been lifted, virtually verbatim, from their recent brief in *Pugh* wherein the plaintiffs did seek punitive damages against LESO. Thus, Defendants may not have had any specific motivation in making the argument, but rather, may simply not have given any thought to the issue. In any event, Defendants' tactic of recycling their previous workproduct, without regard to whether it applies, appears to go hand in hand with their repeated rehashing of arguments they made in *Pugh* and other cases, without regard to whether those arguments have already been rejected by the courts.

In their argument on punitive damages, Defendants also attempt to show that LESO is not an agency or instrumentality of Libya within the meaning of FSIA, but rather, a department or subdivision within the Libyan government. LRA disagrees with Defendants' position on this issue, but insofar as its resolution has no relevance to anything at issue on this Motion, there is no point in addressing this issue herein. We note, parenthetically, that the question whether JSO (another name for LESO) is an agency or instrumentality of the Libyan government is presently at issue in *Hartford Fire Insurance Co., et al. v. The Socialist People's Libyan Arab Jamahiriya, et al.*, Civil Action No. 98-3096 (D.D.C.), where it has not yet been decided.

supporting their thesis, but the few cases dealing with the issue have allowed claims for punitive damages by subrogated insurers. In *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 133 F. Supp.2d 162 (E.D.N.Y. 2001), the court allowed a subrogated insurer to claim punitive damages, reasoning that to rule otherwise would allow the party causing the injury to avoid much of the damages for which it is liable merely because the losses it caused were covered by a third party. Such a result would both unjustly enrich the injuring party, and be inconsistent with the basic societal purposes that are served by punitive damages. 133 F. Supp.2d at 178. The reasoning in this opinion is straightforward and convincing, and should be adopted here. *See also Urban Industries, Inc. v. Thevis*, 1981 U.S. App. LEXIS 20340 (6th Cir. Feb. 9. 1981) (upholding award of punitive damages in favor of subrogated insurers).

## IX.    The Individual Defendants Are Liable in their Personal Capacities.

The individual Defendants argue that LRA can only claim against them in their personal capacities for acts not performed on behalf of the state. However, these Defendants claim, LRA has asserted the same claims against them in their official capacities as well, thus revealing, according to Defendants, that LRA's claim really is against Libya and its officials. These Defendants also argue that LRA never asserted that they acted out of personal gain or private motivation. Thus, the individual Defendants argue, the action against them in their personal capacities should be dismissed.

Defendants' argument is without substance. First, Defendants made the identical argument in *Pugh II* and the Court flatly rejected it there, holding that Defendants' assertions were *ipse dixit* and could not be sustained. Defendants should be estopped from attempting to relitigate this issue.

19

Further, the cases cited by Defendants, *Park v. Shin*, 313 F.3d 1138, 1144 (9th Cir. 2002), *Doe v. State of Israel*, 400 F. Supp.2d 86, 104 (D.D.C. 2005), and *Hassan El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996), deal with a distinctly different question. In those cases, the question was whether a suit against a government official in his personal capacity was really a suit against the foreign government asserting claims that were barred by sovereign immunity. *Park*, 313 F.3d at 1144; *Doe*, 400 F. Supp.2d at 104-05; *El-Fadl*, 75 F.3d at 671. Not remarkably, the Courts held that a plaintiff cannot circumvent the bar of sovereign immunity by targeting individual foreign government officials who carried out the action, That, however, only applies where the only things the officials are accused of doing are the sorts of ordinary government activities for which the foreign states enjoy sovereign immunity and the government officials enjoy individual immunity. *See, e.g., Doe*, 400 F. Supp. 2d at 104-05; *El Fadl*, 75 F.3d at 671.

That certainly is not the case here where there is no sovereign immunity for the acts at issue. *See* 28 U.S.C. § 1605(a)(7). Those acts would thus never properly be subject to a governmental immunity defense. Thus, both the individuals committing these heinous acts, and the foreign terrorist states that employ them, can be liable for such actions.

As *Pugh II* further held, the difference between official-capacity and personal-capacity suits turns on "the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." *Hafer v. Melo*, 502 U.S. 21, 26 (1991). The Supreme Court also has recognized that government officials may be liable "for damages in their personal capacities, however, even when the conduct in question relates to their official duties." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997). *See Pugh II*, 2006 WL 2384915 at *6.

Finally, as the Court in *Pugh II* also found, the Flatow Amendment -- which provides a cause of action against individuals acting within the scope of their office -- would be rendered a nullity by adopting Defendants' view that the individual Defendants cannot be held personally liable for actions taken for the furtherance of the then terrorist goals of the Libyan state. Actions under the Flatow Amendment, must be brought against individual officers in their personal capacities. *Acree v. Republic of Iraq*, 370 F.3d 41, 59 (D.C. Cir. 2004) ("Any suit against an official of a foreign state must be a suit in that official's *personal* capacity") (emphasis in original). Accepting defendants' argument that actions against foreign government officials undertaken pursuant to the directive of the foreign state must proceed as official-capacity suits only would preclude liability from ever being imposed under this statute. *See Pugh II*.

## X.    LRA Has Adequately Pled Causes of Action.

Defendants argue that it is insufficient to recite generic common law causes of action in a federal complaint, and that LRA should have identified specific state common law causes of action. Notably, LRA did not rely in its Complaint on generic common law, but specifically and repeatedly stated that the causes of action arose under the laws of the states where the Decedents were domiciled at the time of their death (Virginia, Texas, New York and Montana), and the state of Interlease's domicile (Georgia). Complaint ¶¶ 17, 22, 23, 25, 30.[11] Not surprisingly, the causes of action in the complaint, for wrongful death, personal injury, property damage (to the

---

[11]    Defendants also claim that LRA's Third Claim for Relief (for contribution) improperly asserts FSIA as a cause of action. The Third Claim for Relief asserts "the State's common and statutory law of contribution," as the source of this cause of action. Complaint, ¶ 30.

Defendants also claim that "LRA has also asserted a cause of action against Libya, LESO and the individual defendants in their official capacities," and then proceed to argue that treble damages are not available against those entities. It appears, once again, that Defendants simply lifted that argument from a brief they wrote in another case, without regard to whether it has any application here. LRA demanded treble damages only from "the Individual Defendants, in their personal capacities." Complaint, ¶ 36.

Aircraft), indemnity, contribution, conversion, trespass to chattels, exist under the laws of all states, as do claims for punitive damages.  This Court has previously held that a plaintiff bringing suit under section 1605(a)(7) may base his claim on conventional common law causes of action. *Kilburn v. Republic of Iran*, 277 F. Supp.2d 24, 35 (D.D.C. 2003).  And the Supreme Court has stated that "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances."  *Foreign Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 (1983).

Cases under the FSIA have followed this approach and allowed plaintiffs to use various sources of law against foreign states.  *See Dammarell v. Islamic Republic of Iran*, 281 F. Supp.2d 105, 194 (D.D.C. 2003) ("Courts have regularly concluded that common law claims for, *e.g.* wrongful death, survival, assault, and battery may be asserted against state sponsors of terrorism under the FSIA").  *See also* 28 U.S.C. § 1606 ("a foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances"); *Verlinden B.V. v. Central Bank of Nigeria*, 647 F.2d 320, 326 (2d Cir. 1981) (stating that when Congress created the FSIA, it did not intend to alter the substantive law of liability or "to create new federal causes of action," but sought only "to provide access to the courts in order to resolve ordinary legal disputes").

Defendants, in their papers cite to *Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir. 2004) for the proposition that a plaintiff in an action under FSIA must identify a cause of action arising out of a specific source of law.  The problem the plaintiffs in *Acree* had was that they "pointed to no source of liability other than § 1605(a)(7) and the Flatow Amendment."[12]  370 F.3d at 59.

---

[12]    While the Flatow Amendment provides a source of liability for individuals, it does not do so for foreign states.  At issue in *Acree* was whether the complaint stated a cause of action against Iraq.

Contrary to what Defendants intimate, the Court did not require that *the complaint* identify in detail the specific causes of action under the laws of specific states. To the contrary, the Court of Appeals noted that it had ordered the appellees to be prepared *at oral argument* to advance alternatives to FSIA and the Flatow Amendment as sources for their causes of action, but that the appellees failed to offer a "coherent alternative." *Id.* That problem obviously does not obtain here. LRA relies neither on FSIA nor the Flatow Amendment as the source of its claims against Libya or LESO, but on the states' common and statutory law.

Notably in this regard, the Court in *Pugh* has not yet decided how to determine which state's law will apply. Recently, in their Memorandum of Law Outlining Choice-of-Law Issues and State Law Causes of Action dated May 30, 2006, the plaintiffs in *Pugh* suggested that the Court can, consistent with settled choice of law principles, simplify its analysis by taking one of two approaches.

Firstly, the Court could look to the four states in which the estates of the seven American victims of the bombing of UTA Flight 772 were probated: Virginia, Texas, New York and Montana. There apparently is substantial overlap between these four states (which are also the states of domicile for the bombing victims) and the domiciles of the surviving family member plaintiffs at the time of the bombing in September 1989.

Secondly, the *Pugh* plaintiffs suggested that, for those plaintiffs for which there is no overlap, the Court may, as the Court has previously done, look to the law of the state in which each claimant was domiciled at the time of bombing. *Cicippio-Puleo v. Islamic Republic of Iran*, CA 01-01496 (HHK) (D.D.C. Oct. 7, 2005), Slip Op. at 21-22; *Dammarell v. Islamic Republic of Iran*, 2005 U.S. Dist. LEXIS 5343 (D.D.C. March 29, 2005), at *59; *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp.2d 120, 133 (D.D.C. 2005).

Once the Court in *Pugh* has made its determination with respect to which state's law to apply, it is respectfully suggested that this Court apply the same law in regard of the claims of the *Pugh* plaintiffs' assignee and subrogee, LRA.

## XI.  Defendants' *Forum Non Conveniens* Argument Must Be Rejected.

It is black letter law that a defendant seeking dismissal of an action based on *forum non conveniens* bears the burden of identifying a proposed alternative forum, and then showing why that forum is the more appropriate one for the resolution of the matter.  Indeed, before the court even gets to weighing the relative convenience of the suggested fora to the parties, the defendant must first identify an alternative forum and show that it is adequate.  *Hassan El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996) ("the defendant bears the burden of proving that there is an adequate alternative forum").  Defendants' argument, thus, fails at the outset.  Not only have Defendants failed to show why some other forum is both adequate and the more convenient one, they have not even identified the forum in which they believe this action should be brought.

In any event, LRA is entitled to the forum of its choice – and this is that forum – unless Defendants meet their going forward burden of proving that some identified forum is, in fact, adequate, something which Defendants have not attempted to do, and then proving that the specifically identified alternative forum is the more appropriate one, which they also have not attempted to do.

Further, it does not in fact appear that there is an adequate alternative forum in which jurisdiction would properly lie.  The only conceivable possibilities, had Defendants even suggested them, would be Libya or France (where much of the evidence and many witnesses are to be found).  Libya is not adequate for obvious reasons.  In *Pugh I* the Defendants raised a

*forum non conveniens* argument and proffered France as an alternative forum. The Court found

that France had not waived the sovereign immunity of the Libyan state and thus, that the

plaintiffs would not be able to bring their claims in France. 290 F. Supp.2d at 57. "An

alternative forum in which a plaintiff cannot recover is not an adequate alternative forum." *Id.*,

citing *Nemarian v. Fed. Democratic Republic of Ethiopia*, 315 F.3d 390, 395 (D.C. Cir. 2003).

The same, of course, is true here as well.[13] Defendants' *forum non conveniens* argument is

utterly lacking in merit.

## XII.    The Individual Defendants, in their Personal Capacities, Were Properly Served.

Fed. R. Civ. P. 4(f)(3), regarding service upon individuals located in foreign countries,

provides that such individual may be served by any means not prohibited by international

agreement "as may be directed by the court." In this case, after counsel for the individual

Defendants appeared for them in their official capacities, the Court directed that service upon

those very individual Defendants in their personal capacities may be effected by serving that

counsel with the pleadings. The individual Defendants, seeking to preserve the issue for appeal,

contend that allowing such service was contrary to precedent in this Circuit.

Defendants' purported authority, *I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d

1184 (D.C. Cir. 2003), is not even remotely on point. That case did not involve the issue of

whether service had been effected but, rather, whether an individual concededly not within the

---

[13]    Defendants ask, in the alternative, that the Court order LRA to provide a more definite
statement regarding its claimed activities before other tribunals, pursuant to Fed. R. Civ. P. 12(e).
Rule 12(e) provides, by its terms, that where a pleading to which a responsive pleading is
required "is so vague or ambiguous that a party cannot reasonably be required to frame a
responsive pleading," the party may move for a more definite statement. Rule 12(e) has no
applicability here, where there is no claim that the pleading is vague or ambiguous. Stated
otherwise, the Rule is intended to enable a defendant to understand a complaint sufficiently in
order to be able to answer it; it is not intended as a discovery device in aid of a defendant's
fishing expedition in a hopeful attempt to bolster a defense it would like to assert.

long-arm jurisdiction of the court could be deemed to be a "foreign state" for purposes of jurisdiction under the FSIA.  The Court held that the plaintiff's determination to sue the individual in his personal capacity only, and not in his official capacity, precluded an attempt to reclassify him as a foreign state or an agency or instrumentality of a foreign state for purposes of jurisdiction.

At issue here, however, is whether service was properly effected.  That is a totally different question, which does not turn on the long-arm statute, or the FSIA or the Flatow Amendment, but only upon whether service was in conformity with the Rule which has as its goal providing a defendant with notice of the charges against it, while preserving a plaintiff's right to bring suit, in light of all the circumstances.  1 MOORE'S FEDERAL PRACTICE § 3.03[2] (3d ed.).  Notably in that regard, court-ordered service has been deemed particularly useful when dealing with elusive international defendants, and few restrictions have been imposed on a court's creativity in crafting alternative means of service.  *See, e.g., Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1018 (9th Cir. 2002) (alternative service, including service on an American attorney consulted by defendant, justified when "faced with an international scofflaw"); *Smith v. Islamic Emirate of Afghanistan*, 2001 WL 1658211, at *3 (S.D.N.Y. 2001) (permitting alternative service, consisting of publication in local newspapers and local radio and television stations, on Osama Bin Laden and Al Qaeda); *United States v. Padilla*, 2002 WL 471838, at *1 (E.D. Cal. 2002) (authorizing service on defendant's family members and the attorney representing him in another matter).

In this case, the Court directed service by means similar to but even more effective than the service authorized in *Rio* and *Padilla*, namely service on the parties' attorney of record in this matter.  Unlike the situation in *Rio* and *Padilla*, in which service was authorized on an attorney

not involved in the case at issue, service of the Summons and Complaint herein on Mr. Dabiri constituted service on the very attorney retained by the individual Defendants in their official capacities to enter an appearance in this action.  Insofar as the individual Defendants are one and the same persons, whether sued in their official capacities or in their personal capacities, there can be no question but that service on the attorney who represents them was adequate to put them on notice of the charges against them.  More is not required.

## <u>CONCLUSION</u>

For all the reasons set forth herein, the Court should deny Defendants' Motion in its entirety and enter an Order declaring that it has subject matter and personal jurisdiction over Libya, LESO and the individual Defendants, in both their official and personal capacities, for all the counts against them, as asserted in the Complaint herein.

Date:  September 22, 2006                     Respectfully submitted,


     /S/ Christopher B. Kende    
Christopher B. Kende, Esquire (D.C. 416487)
COZEN O'CONNOR
1627 I Street, NW
11th Floor
Washington, D.C. 20006

(202) 912-4800
(202) 912-4830 (facsimile)
*Attorneys for Plaintiff*