UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
LA RÉUNION AÉRIENNE                      )      Civil Action No. 05-01932 (HHK)
                                        )
                                        )
                                        )
                    Plaintiff,           )
        v.                               )
                                        )
SOCIALIST PEOPLES LIBYAN                 )
ARAB JAMAHIRIYA, LIBYAN EXTERNAL         )
SECURITY ORGANIZATION, MUAMMAR           )
QADHAFI, ABDALLAH SENOUSSI, AHMED        )
ABDALLAH ELAZRAGH, IBRAHIM NAELI,        )
ARBAS MUSBAH, ISSA ABDELSALAM            )
SHIBANI AND ABDELSALAM HAMMOUDA          )
EL AGELI                                 )
                                        )
                                        )
                    Defendants.          )
_____)


**PLAINTIFF'S MOTION AND INCORPORATED MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**


September 22, 2006


COZEN O'CONNOR
1627 I Street, NW
11th Floor
Washington, D.C. 20006
(202) 912-4800
(202) 912-4830 (facsimile)
*Attorney for Plaintiff*

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................1

STATEMENT OF FACTS .........................................................................................3

ARGUMENT ............................................................................................................5

I.    The Insurers, On Whose Behalf Plaintiff La Réunion Aérienne Acts,
Have Standing As The Assignees And Subrogees Of The Claims
Asserted Against Defendants By The *Pugh* Plaintiffs .........................................5

II.  Plaintiff's Motion For Summary Judgment Against
Six Individual Defendants In Their Personal Capacities
Should Be Granted On Collateral Estoppel Grounds .........................................7

i.    The Principles Of Collateral Estoppel .......................................................7

ii.    Application Of Collateral Estoppel With Regard
To The Rulings In Pugh..............................................................................12

III.    Summary Judgment Should Be Granted Against Libya,
LESO And The Individual Defendants In Their Official Capacities................................17

i.    Plaintiff's State Law Claims Should Be Governed By The Law Of The
Specific Domicile Of Each Decedent And Interlease........................................17

ii.  Plaintiff's Motion For Summary Judgment Should Be Granted Because
It Has Sufficiently Pled State Law Causes Of Action Against Libya And LESO.............18

iii.  In The Alternative, The Pugh Court's Choice Of State Law Should
Also Be Determinative In This Matter.........................................................20

CONCLUSION.......................................................................................................21

## TABLE OF AUTHORITIES

Cases

\*   *Acree v, Republic of Iraq,*
    370 F.3d 41 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 1928 (2005) .......................19, 20

\*   *Ali Baba Co. v. Wilco, Inc.,*
    482 A.2d 418 (D.C. 2004) ..............................................................8, 9, 10, 11

*Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,*
    133 F. Supp.2d 162 (E.D.N.Y. 2001) ...........................................................14

*Carr v. District of Columbia,*
    646 F.2d 599 (D.C. Cir. 1980)....................................................................8, 11

*Cicippio-Puleo v. Islamic Republic of Iran,*
    CA 01-01496 (HHK) (D.D.C. Oct. 7, 2005) ................................................17

*Dammarell v. Islamic Republic of Iran,*
    281 F. Supp.2d 105 (D.D.C. 2003) .............................................................19

*Dammarell v. Islamic Republic of Iran,*
    2005 U.S. Dist. LEXIS 5343 (D.D.C. March 29, 2005).................................18

*Faucett v. AT&T,*
    744 F.2d 118 (D.C. Cir. 1984), *cert. denied*, 469 U.S. 1196 (1985) ....................8, 9, 10

*Foreign Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,*
    462 U.S. 611 (1983)..................................................................................19

*Great Lakes Transit Corp. v. Interstate S.S. Co.,*
    301 U.S. 646, 654 (1937) ............................................................................5

\*   *Hartford Fire Insurance Co., et al. v. The Socialist People's*
  *Libyan Arab Jamahiriya, et al.,*
    Civil Action No. 98-3096 (D.D.C. Sept. 22, 1999) ............................6, 7, 8, 9

*In Re Air Crash Near Nantucket Island,*
    392 F.Supp.2d 461, 469 (E.D.N.Y. 2005) ...................................................7

*Kilburn, et. al. v. Islamic Republic of Iran, et al.,*
    Civil Action No. 01-1301 (D.D.C. July 26, 2006).........................................8, 9

*Kilburn v. Republic of Iran,*
    277 F. Supp.2d 24 (D.D.C. 2003) ..............................................................19

*National Union Fire Ins. Co. v. Riggs Nat'l Bank*,
    646 A.2d 966, 968 (D.C. 1994) ...............................................................5, 7

*Newell v. District of Columbia*,
    741 A.2d 28 (D.C. 1999) ...........................................................................10

\*    *Parklane Hosiery Co. v. Shore*,
    439 U.S. 322 (1979)...........................................................8, 9, 10, 11, 12

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 82 (D.C. Cir. 2002)....................................................................18

*Pugh v. Socialist People's Libyan Arab Jamahiriya, et al.*,
    290 F. Supp.2d 54 (D.D.C. 2003) .................................................1, 2, 4, 5

\*    *Pugh v. Socialist People's Libyan Arab Jamahiriya, et al.*,
    2006 WL 2384915 (D.D.C. May 11, 2006)............1, 2, 3, 5, 7, 12, 13, 15, 16

*Urban Industries, Inc. v. Thevis*,
    1981 U.S. App. LEXIS 20340 (6th Cir. Feb. 9. 1981) ..................................13

*Verlinden B.V. v. Central Bank of Nigeria*,
    647 F.2d 320 (2d Cir. 1981)......................................................................19

*Winkelmann v. Excelsior Ins. Co.*,
    650 N.E.2d 841, 843 (N.Y. 1995) ...............................................................6

*Yamaha Corp. of America v. United States*,
    961 F.2d 245 (D.C. Cir. 1992) ....................................................................9


Statutes and Rules

18 U.S.C.§2331(1) ..........................................................................................12, 13

18 U.S.C.§2333(a) ...............................................................................2, 4, 5, 7, 12

18 U.S.C.§1350.................................................................................1, 2, 4, 5, 7, 15, 16

28 U.S.C.§1605............................................................................1, 2, 4, 5, 7, 15, 16, 20

28 U.S.C.§1605(a)(7)..............................................................................6, 15, 16, 19

28 U.S.C.§1606................................................................................................19

<u>Other</u>

H.R. Rep. No. 104-383, 104th Cong., 1st Sess. (1995) ..........................................................8

RESTATEMENT (SECOND) OF JUDGMENTS §27(D) (1982) .....................................................8, 9

10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE:
CIVIL 2D §2735 (2d ed. 1983) ...............................................................................................9

## PLAINTIFF'S MOTION AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff La Réunion Aérienne respectfully submits this memorandum of law in support of its Motion for Summary Judgment against all Defendants.  The Court should grant Plaintiff's Motion for Summary Judgment with respect to the six individual Libyan Defendants in their personal capacities on the grounds of collateral estoppel.  The Court should also find liability on the applicable state law causes of action as pled in Plaintiff's Complaint, and then enter judgment on Plaintiff's Motion for Summary Judgment against Libya, the Libyan External Security Organization (hereafter "LESO") and the individual Defendants in their official capacities. Thereafter, Plaintiff requests that the Court promptly schedule a damages hearing so that this case can proceed to final judgment.

In this Court's May 11, 2006 Memorandum Opinion and Order ("*Mem. Op.*") in *Pugh v. Socialist People's Libyan Arab Jamahiriya, et al.*, 2006 WL 2384915 (D.D.C. 2006) ("*Pugh II*")[1] the Court first found that all the Defendants were complicit in the terrorist attack upon UTA Flight 772.  The Court then issued a liability finding with respect to the six individual Libyan Defendants in their personal capacities under a number of federal statutory causes of action, including the Flatow Amendment (28 U.S.C. § 1605 note), Torture Victim Protection Act (28 U.S.C. § 1350 note) (hereafter "TVPA") and 18 U.S.C. § 2333(a).  *Mem. Op.* at 17-20.  By virtue of collateral estoppel, this Court should grant Plaintiff La Réunion Aérienne's Motion for Summary

---

[1] *Pugh* involves the same Defendants as herein.  In *Pugh I* (290 F.Supp. 2d 54 (D.D.C. 2003)) this Court resolved the Defendants' motion to dismiss for lack of jurisdiction.  In *Pugh II* the Court resolved the parties' cross-motions for summary judgment.

1

Judgment against the six individual Libyan Defendants in their personal capacities in accordance with the May 11, 2006 Memorandum Opinion and Order.

As to Libya, LESO and the individual Defendants in their official capacities, La Réunion Aérienne in its Complaint does not rely on the Foreign Sovereign Immunities Act (hereafter 'FSIA') or the Flatow Amendment as the source of its claims against Libya or LESO, but on the states' common and statutory law. This Complaint provides the necessary specificity regarding choice-of-law determinations and causes of action, as directed by the Court in *Pugh II* in its May 11, 2006 Memorandum Opinion and Order. Plaintiff La Réunion Aérienne's Complaint is distinguishable from the *Pugh* Plaintiffs' Original Complaint which was filed October 16, 2002, because La Réunion Aérienne's Complaint contains specific allegations pertaining to state law bases of liability.

Although the *Pugh II* Court rejected federal statutory claims as a basis for liability against the Libyan state, it acknowledged that Plaintiffs likely had viable state causes of action against Libya, as well as against the individual Defendants. *Mem. Op.* at 28. The Court concluded, however, that the pleadings were insufficient to create a record on which the Court could rule as to applicable state law claims. *Id.* at 28-31. Accordingly, the Court allowed Plaintiffs to submit an Amended Complaint setting forth appropriate state law claims and a memorandum addressing those claims with specificity. The *Pugh* Plaintiffs subsequently filed an Amended Complaint on May 19, 2006 setting forth appropriate state law claims. In the current case before the Court, La Réunion Aérienne has sufficiently pled state law bases of liability in its Complaint. Because the Court has already found that all Defendants were involved in the attack, the Court should grant La Réunion Aérienne's Motion for Summary Judgment against these Defendants as well.

## STATEMENT OF FACTS

La Réunion Aérienne is an economic interest group, organized pursuant to French law, which acts in the name of and on behalf of its member insurance companies. *Plaintiff's Statement Of Undisputed Material Facts In Support Of Its Motion For Summary Judgment (*hereafter *"S.O.F."), ¶* 1. These insurers insured certain risks under policies of insurance, numbered No. 89/18.636 and No. 89/18493, in connection with a certain DC-10 aircraft, bearing registration number N. 54 629, (hereinafter the "Aircraft") owned by Interlease, a Georgia corporation. *S.O.F.* at ¶¶ 2-4.

On September 19, 1989, the Aircraft, operated by the French airline Union de Transports Aériens ("UTA") as Flight 772, exploded in mid-air over the Tenere Desert in Niger while en route from Brazzaville, Congo to Paris, France, killing all 170 persons on board. *S.O.F.* at ¶ 5. The explosion was extensively investigated by French authorities and was the subject of civil and criminal proceedings in the French courts. *S.O.F.* at ¶¶ 6-7. The French authorities, French courts and U.S. Department of State have all concluded that Libya was responsible, by act of terrorism, for bombing the Aircraft and that it had used the individual Defendants named in this matter to plan and coordinate the explosion. *S.O.F.* at ¶¶ 8-10. Among the dead were seven Americans, domiciled in various states of the United States, namely Virginia, Texas, New York and Montana and whose estates were probated in each of these respective four states (hereafter "Decedents"). *S.O.F.* at ¶¶ 11-13.

Following the explosion of the Aircraft, the insurers, on whose behalf La Réunion Aérienne acts, reimbursed $34,000,000.00 to Interlease and its lenders for the loss of the Aircraft and paid the survivors and estates of Decedents $2,011,172.42, as nearly as can now be computed. *S.O.F.* at ¶¶ 14-15. Interlease and all of the Decedents' representatives and estates expressly assigned

3

all of their claims against the parties responsible for the explosion to the insurers on whose behalf La Réunion Aérienne acts, to the extent of the insurers' payments to them; furthermore, Interlease transferred title to the destroyed Aircraft to the insurers on whose behalf La Réunion Aérienne acts. *S.O.F.* at ¶¶ 16-19.

On October 16, 2002, personal representatives and close relatives of the seven Decedents, along with Interlease, initiated an action in this Court, captioned *Pugh v. Socialist People's Libyan Arab Jamahiriya, et al.*, No. CIV. A. 02-2026 (hereafter "*Pugh*") for money damages on account of extrajudicial killings, aircraft sabotage and personal injuries against the same Defendants as named in the current matter before the Court. *S.O.F.* at ¶ 20. On July 20, 2005, La Réunion Aérienne filed a Motion to Intervene, which was denied by this Court on August 23, 2005. *S.O.F.* at ¶ 21. Subsequently, La Réunion Aérienne initiated the current action on September 30, 2005, naming the same Defendants as those named in *Pugh*. *S.O.F.* at ¶ 22.

In its decision dated October 27, 2003 (290 F.Supp. 2d 54), this Court found that it had jurisdiction over all Defendants. *S.O.F.* at ¶ 23-24. In a later Order, *Pugh II*, filed on May 11, 2006 (2006 WL 2384915), this Court found that all the Defendants were complicit in the terrorist attack upon UTA Flight 772. *S.O.F.* at ¶ 26. The Court also issued a liability finding with respect to the six individual Libyan Defendants in their personal capacities under a number of federal statutory causes of action, including the Flatow Amendment, TVPA and 18 U.S.C. § 2333(a). *Mem. Op.* at 17-20. The individual Defendants herein, who are the same as the Defendants in *Pugh*, are estopped from contesting that holding as it applies to them in their personal capacities.

## ARGUMENT

### I. THE INSURERS, ON WHOSE BEHALF PLAINTIFF LA RÉUNION AÉRIENNE ACTS, HAVE STANDING AS THE ASSIGNEES AND SUBROGEES OF THE CLAIMS ASSERTED AGAINST DEFENDANTS BY THE *PUGH* PLAINTIFFS

The *Pugh* Plaintiffs assigned their claims against the Defendants to a group of insurers, on whose behalf La Réunion Aérienne acts. Interlease's instrument of assignment, provides in pertinent part, "In consideration of the payment to be made hereunder, the undersigned [Interlease] hereby assigns, sets over, transfers and subrogates to the Underwriters all the rights, claims, interests, causes and remedy of actions to the extent of the above amount [$34 million]." See *S.O.F* at ¶ 17. The Decedents' survivors and representatives also expressly assigned their claims against the Defendants to the insurers on whose behalf La Réunion Aérienne acts, to the extent that the insurers indemnified them for their losses. The instrument executed by each of the Decedents' legal representatives, provides in pertinent part, "The Releasors hereby empower the subrogated Releasees to sue or settle in the place of the Releasors, and in the name of the latter or in the Releasees' own names in accordance with applicable law, in order for Releasees to recover for said loss against any and all such third parties." See *S.O.F* at ¶ 18.

Equity would in any event provide the group of insurers, on whose behalf La Réunion Aérienne acts, with a right of subrogation, even if the claims had not been assigned to them. Because they paid the claims, the insurers, on whose behalf La Réunion Aérienne acts, stand in the shoes of both Interlease and the Decedents' survivors for purposes of this litigation. See, e.g., *Great Lakes Transit Corp. v. Interstate S.S. Co.,* 301 U.S. 646, 654 (1937) ("[T]he equity of subrogation invests the underwriters with the rights of the assured against third persons." (citations omitted)); *National Union Fire Ins. Co. v. Riggs Nat'l Bank*, 646 A.2d 966, 968 (D.C.

1994) ("Where one party has paid the debt of another, justice requires that the payor be able to recover his loss from the one who should have paid it, to prevent unjust enrichment. * * * The rights of the party who paid the debt in no way depend upon showing a contract provision or formal assignment; evidence of payment is sufficient." (Citations and footnote omitted)); *Winkelmann v. Excelsior Ins. Co.*, 650 N.E.2d 841, 843 (N.Y. 1995) ("Subrogation is the principle by which an insurer, having paid losses of its insured, is placed in the position of its insured so that it may recover from the third party legally responsible for the loss.").

As assignees and subrogees, the group of insurers, for whom La Réunion Aérienne acts, have the same rights that Interlease and the Decedents' survivors have against the Libyan Defendants.[2]  This group of insurers simply steps into the shoes of Interlease and the Decedents' survivors.  See, for example, *Hartford Fire Ins Co. v. Socialist People's Libyan Arab Jamahiriya*, 1999 U.S. Dist. LEXIS 15035, at *8 (D.D.C. Sept. 22, 1999).  In that case, Plaintiff insurers of Pan Am Airlines and Alert Management Systems paid claims totaling more than $485 million, as a result of a bombing that occurred on a Pan Am flight over Lockerbie, Scotland. Subsequently, the insurers filed an action against the government of Libya and others asserting claims in indemnity, unjust enrichment, and contribution for the damages paid.  In particular, insurers argued that § 1605(a)(7) should be read broadly, so as to encompass third-party claims for indemnity and contribution.  The Court noted in that case:

> Although the House Report does not contain a discussion of contribution or indemnity, it does state the principal statutory purpose of the FSIA, which is to deter foreign states from sponsoring terrorist activities. The failure to permit insurance companies to sue for contribution would undermine this goal, as victims of a plane crash can usually obtain compensation more easily from an airline and its insurers for not providing proper safety than against a sponsoring state.  Only if the airline and, in turn, its insurers, can step into the shoes of the victims does

---

[2] This point was not contested by the Defendants in their Opposition to La Réunion Aérienne's Motion to Intervene in the *Pugh* case.

6

> FSIA fulfill its statutory purpose of providing "an important economic and financial weapon against ... outlaw states."
> *Hartford, supra,* at 8.  Citing H.R. Rep. No. 383, 104th Cong., 1st Sess., 1995 at 181 (1995).  (emphasis added)

Consequently, the Court allowed the claims of the subrogated insurers.  See also *In Re Air Crash Near Nantucket Island*, 392 F.Supp.2d 461, 469 (E.D.N.Y. 2005), in which the Court applied standard subrogation principles in a case involving a challenge to jurisdiction under the FSIA.  "[A]s EgyptAir's subrogee, MISR is subject to jurisdiction under the waiver exception since it stands in EgyptAir's shoes."

Similar to the Court's holding in *Hartford*, the group of insurers for whom La Réunion Aérienne acts, are entitled to step into the shoes of Interlease and the Decedents' survivors in order to fulfill the FSIA's statutory purpose of providing an effective weapon against terrorists who commit mass murder.

### II. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST SIX INDIVIDUAL DEFENDANTS IN THEIR PERSONAL CAPACITIES SHOULD BE GRANTED ON COLLATERAL ESTOPPEL GROUNDS

**i. The Principles Of Collateral Estoppel**

In *Pugh II*, the Court issued a liability finding with respect to the liability of the six individual Libyan Defendants in their personal capacities[3] under a number of federal statutory causes of action, including the Flatow Amendment, the TVPA, and 18 U.S.C. § 2333(a).  *Id*. at 17-20.  Plaintiffs' Motion for Summary Judgment in this case should be granted against the six individual Libyan Defendants in their personal capacities, on the basis of collateral estoppel.

Under the doctrine of collateral estoppel, once an issue of fact or law has been raised, litigated and actually and necessarily determined against a party by a court of competent

---

[3] The Court also found the seventh individual, Muammar Qadhafi, complicit in the attack, but delayed issuing any finding of liability against him pending resolution of the question of head of state immunity.

jurisdiction, the court's determination is binding against that party in any subsequent proceeding involving that issue of fact or law. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979); *Carr v. District of Columbia*, 646 F.2d 599, 608 (D.C. Cir. 1980).

The components of issue preclusion are: (1) whether the issue was actually litigated in the earlier action, meaning whether it was contested by the parties and submitted for determination by the court; (2) whether the issue was actually determined by a court of competent jurisdiction in the earlier action, and (3) whether the issue was necessarily determined in the first action, meaning whether the earlier determination was essential to the disposition of the first action. *Faucett v. AT&T*, 744 F.2d 118, 125 (D.C. Cir. 1984), *cert. denied*, 469 U.S. 1196 (1985).

As will be seen, the issues which La Réunion Aérienne seeks to preclude from re-litigation are exactly the same issues as have already been decided in *Pugh* (and other cases involving these Defendants, such as *Kilburn, et. al. v. Islamic Republic of Iran, et al.*, Civil Action No. 01-1301 (D.D.C. July 26, 2006) and *Hartford Fire Insurance Co., et al. v. The Socialist People's Libyan Arab Jamahiriya, et al.*, Civil Action No. 98-3096 (D.D.C. Sept. 22, 1999)), the only difference between this case and *Pugh* being that the group of insurers on whose behalf La Réunion Aérienne acts, as the assignees and subrogated insurers, seek recovery as the real parties in interest to the extent that they indemnified the Plaintiffs in *Pugh* case for their losses. The change in Plaintiffs, however, does not introduce any factual or legal differences between the two cases such as could alter any of the specific issues that La Réunion Aérienne seeks to preclude from re-litigation, none of which is dependent on the identity of the Plaintiff.

"An issue is actually litigated when it 'is properly raised, by the pleadings or otherwise, and is submitted for determination and is determined.'"*Ali Baba Co. v. Wilco, Inc.*, 482 A.2d 418, 422

(D.C. 2004), *quoting* RESTATEMENT (SECOND) OF JUDGMENTS §27(D) (1982); *Faucett, supra,* 744 F.2d at 125 (stating that an issue is actually litigated when it is "contested by the parties and submitted for determination by the court"). The issues sought to be precluded from re-litigation herein were raised and actually litigated, and their determination was essential to the disposition of the motions to dismiss and for summary judgment in *Pugh* and other cases involving Defendants.

Courts have afforded collateral estoppel effect to decisions rendered on motions for summary judgment. For example, in one case before the District of Columbia Court of Appeals, the Court held that the trial court had erred in not affording a prior summary judgment collateral estoppel effect, rejecting the trial court's theory that the issues contested had never been actually presented to a trier of fact to be decided on the merits. *Ali Baba Co.*, 482 A.2d 418, 422 (D.C. 1984) *citing* 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2735 (2d ed. 1983) ("summary judgment, of course, is a decision on the merits of the case. Thus, a [] motion will be granted on the basis of former adjudication when an earlier summary judgment has disposed of the same issues between sufficiently related parties"); *see also, e.g.*, RESTATEMENT 2D OF JUDGMENTS § 27 (d) and Ill. 10. (1982) ("[a]n issue may be submitted and determined on a motion to dismiss for failure to state a claim, a motion for judgment on the pleadings, a motion for summary judgment, a motion for directed verdict, or their equivalents, as well as on a judgment entered on a verdict").

While courts have taken the position that offensive collateral estoppel should be invoked with restraint, *e.g.*, *Parklane*, 439 U.S. at 331, the "restraint" required is simply to ensure that a Defendant is not unfairly treated; it is not to bar the application of collateral estoppel. *Id.*; *Yamaha Corp. of America v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (stating that

"preclusion in the second case must not work a basic unfairness to the party bound by the first determination"). Within this framework, however, the courts possess broad discretion in deciding whether or not to allow the use of offensive collateral estoppel. *Newell v. District of Columbia,* 741 A.2d 28, 36 D.C. 1999); *see also Parklane*, 439 U.S. at 331, 332 (discussing the fairness factors and the proper use of offensive collateral estoppel).

The factors which courts consider in evaluating fairness to the Defendant include the following: (1) whether the Defendant had an incentive to litigate the prior action fully and vigorously; (2) whether the decision being used to assert collateral estoppel is inconsistent with any other decision regarding the same issue in another action against the Defendant; (3) whether there are any procedural opportunities available to the Defendant that were not available in the first action, which may have the effect of changing the outcome in the subsequent litigation; and (4) whether the use of offensive collateral estoppel will reward a Plaintiff who could have joined in the previous action, but, instead, chose to adopt a "wait and see" attitude so as to put itself in an advantageous position based on the outcome of the prior litigation. *Parklane,* 439 U.S. at 331, 332; *see also Faucett*, 744 F.2d at 125, 126.

It is essentially irrefutable that the Defendants in this case had a huge incentive to litigate the *Pugh* case fully and vigorously, including the issues sought to be precluded from re-litigation by La Réunion Aérienne. Incentive to litigate fully and vigorously is often measured by "whether the first suit was for a trivial amount while the second is for a large amount." *Ali Baba Co.*, 482 A.2d at 423. For obvious reasons, the Defendants will have difficulty in arguing that the three billion dollar claim in the *Pugh* case did not provide sufficient incentive to litigate fully and vigorously.

Moreover it is clear that the Defendants in fact did fully and vigorously litigate the issues in *Pugh*, as the record shows that Defendants filed a motion to dismiss the Complaint; appealed the adverse decision rendered on that motion; filed a timely answer to the Complaint; diligently defended and cross-moved in response to the Plaintiffs' motion for partial summary judgment; appealed the adverse rulings on that motion and continue to participate actively in the litigation of that case. *See, e.g.*, *Carr,* 646 F.2d at 606 (reviewing the actions taken by the Defendant in the litigation as evidence that it had incentive to fully and vigorously litigate the prior action); *Ali Baba Co.*, 482 A.2d at 423 (finding that the Defendant had sufficient incentive to litigate the prior action by reviewing Defendant's conduct in the prior litigation, which revealed that the Defendant had filed papers to oppose a foreclosure sale and had refused to vacate the subject premises).

The second fairness factor typically considered by the courts is whether the assertion of collateral estoppel is based on one of conflicting judgments. *Ali Baba Co.*, 482 A.2d at 423. La Réunion Aérienne is not aware of any such other judgment in the United States against these Defendants, and insofar as *Pugh* is the only other legal action filed in the United States regarding the destruction of UTA Flight 772, it is unlikely that there exists any United States judgment that conflicts with the court's decisions in *Pugh II* to which La Réunion Aérienne seeks to ascribe preclusive effect.[4]

The third fairness factor that is often included in the equitable calculation is whether there are any procedural opportunities in the subsequent action that were not available to the Defendants in prior action. *Ali Baba Co.*, 482 A.2d at 423. Because *Pugh* and La Réunion

---

[4] Actions against Libya brought by other victims of UTA Flight 772, all non-U.S. nationals, are pending in courts in France and elsewhere.

Aérienne's action are being litigated in the same forum, applying the same rules of procedure, there are no differences in procedural protections that could prejudice the Defendants.

The last factor commonly considered by the courts in assessing whether the use of offensive collateral estoppel will work an unfairness to the Defendant relates to the ease with which the party asserting collateral estoppel could have joined the prior action. *Parklane*, 439 U.S. at 331, 332. La Réunion Aérienne commenced this action only after its motion to intervene was denied in *Pugh*.

### ii.  Application Of Collateral Estoppel With Regard To The Rulings In Pugh

The *Pugh II* Court has already concluded that the record "stands undisputed and overwhelmingly establishes Defendants' culpability and involvement in the bombing of UTA Flight 773." *Id.* at 9.  Likewise, the Court held "the evidence provided by Plaintiffs makes clear that the bombing of UTA Flight 772 was carried out by the individual [Libyan official] Defendants while acting within the scope of their office and employment" and "under the authority of the Libyan state." *Id.* at 17-18.

The Court in the *Pugh II* case found the individual Defendants liable in their personal capacities under 18 U.S.C. § 2333(a)[5] because the bombing of the UTA Flight 772 satisfied the statutory definition of "international terrorism" under 18 U.S.C. § 2333(a).  "International terrorism" has been defined separately under 18 U.S.C. § 2331(1).[6]  The bombing was a violent act that

---

[5] 18 U.S.C. § 2333(a) provides that: "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefore in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorneys fees." 18 U.S.C. § 2333(a).

[6] "International terrorism," is defined to mean activities that: "(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United

would be a violation of the U.S. criminal code if committed within the United States, and it occurred outside the territorial jurisdiction of the United States. *Id.* at 19-20. Moreover, the court reasoned that by bombing UTA Flight 772, Interlease was deprived of its property, its aircraft, and the income associated with the long-term lease agreement with UTA, and the victims were deprived of their lives. *Id.* at 20.

Similarly, La Réunion Aérienne is entitled to a finding by the Court that the individual Defendants are liable for punitive damages under 18 U.S.C. § 2333(a). Although they are unusual, claims by subrogated insurers for punitive damages are not unheard of. For instance, the Sixth Circuit in the unreported decision of *Urban Industries, Inc. v. Thevis*, No. 78-3615, 1981 U.S. App. LEXIS 20340 (6th Cir. Feb. 9, 1981) upheld an award under Kentucky law of punitive damages of $400,000 in favor of subrogated insurers. In *Thevis*, the Defendant had arranged to have the building destroyed by arson. At trial, the jury awarded compensatory and punitive damages in favor of the subrogated insurance companies. On appeal, the Defendant in *Thevis* challenged the award of punitive damages to the insurers. Noting that there were "no Kentucky decisions directly on point" (Id. at *5), the Sixth Circuit upheld the award. The Court of Appeals stated:

> "The District court allowed punitive damages to both the insured and the insurer because the state case law, while uncertain, leaned toward allowing such awards, and no statute prohibited it. The district court noted that, although there was only one fire, it caused distinct and different injuries to each of the Plaintiffs. *** *The insurance companies suffered a loss of funds which they paid their insured, and in addition, have incurred expenses in investigating the circumstances surrounding the fire in order to determine who was responsible for*

---

States or of any State; (B) appear to be intended- (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by assassination or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." 18 U.S.C.§2331(1).

*its setting. Therefore, we uphold the punitive damage awards to the insurance companies.*" Id. at 6-7 (emphasis added).

Importantly, in this case, the group of insurers, for whom La Réunion Aérienne acts, were deprived of the insurance proceeds that they paid out in connection with the air crash, not limited to funeral expenses and repatriation of the remains of the Decedents in the amount of $2,011,172.42 and to Interlease and its lenders the insured value of the aircraft in excess of $34,000,000.00.

Furthermore, permitting La Réunion Aérienne to pursue claims for punitive damages would be consistent with the basic societal purposes served by punitive damages. At least one case has discussed the award of punitive damages to an insurer in this context. In *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 133 F. Supp. 2d 162 (E.D.N.Y. 2001), a subrogated health insurer was allowed to pursue claims for punitive damages. In that case, the health insurer sought to recover from cigarette manufacturers damages for the increased costs that it had incurred as a result of the alleged misrepresentations regarding the health effects of tobacco on the health of the insurer's subscribers. The Court noted that "[p]rinciples supporting punitive damage actions must be evaluated" in light of the facts at issue in that case – "an alleged massive fraud, huge numbers of claims, and extraordinarily high damages." *Blue Cross, supra, at 176.* The Court concluded that permitting the insurer "to proceed on its punitive damages claim in equitable subrogation is consistent – so far as can be determined at this early stage of the proceedings – with the basic societal purposes that are served by the imposition of punitive damages." *Blue Cross, supra, at 178.* Similarly, in this case Libya and LESO and the individual Defendants deliberately murdered all aboard UTA Flight 772. An award of punitive damages will aid in deterring Defendants and others from conducting similar terrorist attacks on civil

airliners in the future. Such an award will serve the basic societal purposes for punitive damages.

The *Pugh II,* Court further found the individual Defendants liable in their personal capacities under the Flatow Amendment because each of the prerequisites to imposing liability under the Flatow Amendment was satisfied in the case.[7]  *Id.* at 17.  Under the Flatow Amendment, the Court found that it was necessary to sue the individual Defendants in their personal capacities where an action was brought for acts that these state officials committed in their official roles.  *Id.* at 17-18.  Libya was at the time of the bombing designated as a state sponsor of terrorism; the evidence provided by Plaintiffs made clear that the bombing was carried out by the individual Defendants while acting within the scope of their office and employment; the victims at issue were all U.S. nationals at the time of the bombing; and the acts that underlay the case were acts for which the courts of the United States can maintain jurisdiction under section 1605(a)(7) of FSIA, namely extrajudicial killing and aircraft sabotage. *Id.* at 17-18.  Clearly, as assignees and subrogees to the claims of Plaintiff Decedents and of Interlease in *Pugh II*, the group of insurers, on whose behalf La Réunion Aérienne acts, may assert collateral estoppel when asserting the liability of the six individual Defendants under 28 U.S.C. § 1605.

---

[7] The Flatow Amendment provides in relevant part: "[a]n official, employee, or agent of a foreign state designated as a state sponsor of terrorism . . . while acting within the scope of his or her office, employment, or agency, shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee or agent for which the courts of the United States may maintain jurisdiction under 1605(a)(7)." 28 U.S.C. § 1605 note.

Finally, the *Pugh II* Court concluded that the undisputed evidence established that the six individual Defendants were liable in their personal capacities under the TVPA.[8] Congress defined "extrajudicial killing" to mean any deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people." §1350 note sec. 3(a). The *Pugh II* Court noted that "Here, there is no dispute that the individual Defendants acted under the authority of the Libyan state when they assisted with the bombing of UTA Flight 772. The undisputed evidence establishes that these actions were deliberately planned with knowledge that the death of those aboard Flight 772, including the seven Americans whose estates and families are Plaintiffs here, would result. Moreover, the victims were not convicted of any crime such that the killings were authorized or lawful. Consequently, the killings were extrajudicial and give rise to liability pursuant to the TVPA." *Id.* at 18.

The Plaintiff group of insurers, for whom La Réunion Aérienne acts, are "claimants" under the TVPA because they are the assignees and subrogees of the claims of Plaintiff Decedents in the *Pugh II* case. On this basis, because the Plaintiffs causes of action under the TVPA are identical to those that the individual Plaintiffs brought in *Pugh II* as required under the doctrine of collateral estoppel, the Court should grant Plaintiff La Réunion Aérienne's Motion for Summary Judgment against the six individual Defendants in their personal capacities.

In short, collateral estoppel is applicable here, and it should be used to bar Defendants from re-litigating the liability of the six individual Libyan Defendants they previously litigated in this and other Courts, and which already have been determined.

---

[8] The TVPA provides, in part, that: "an individual who, under actual or apparent authority, or color of law, of any foreign nation …(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." 28 U.S.C.§1350 note.

## III. SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST LIBYA, LESO AND THE INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES

### i.  Plaintiff's State Law Claims Should Be Governed By The Law Of The Specific Domicile Of Each Decedent And Interlease

This Court should apply the states' common and statutory law according to the specific domicile of each Decedent and Interlease.  In its Complaint, Plaintiff La Réunion Aérienne asserts that the explosion of the Aircraft gave rise to intentional torts under the states' common and statutory law, including but not limited to wrongful death statutes for each of the Decedents and of Interlease, according to the specific domicile of each Decedent and Interlease.  *S.O.F* at ¶ 22. The Decedents were domiciled in various states of the United States, namely Virginia, Texas, New York and Montana.  *S.O.F* at ¶ 12.

Although the Court in *Pugh* has not yet decided how to determine which state's law will apply, in their Memorandum of Law Outlining Choice-of-Law Issues and State Law Causes of Action dated May 30, 2006, the Plaintiffs in *Pugh* suggested that the Court can, consistent with settled choice of law principles, simplify its analysis by taking one of two approaches.  Primarily, the Court could look to the four states in which the estates of the seven American victims of the bombing of UTA Flight 772 were probated: Virginia, Texas, New York and Montana.  *Id.* at p. 5-6.  There apparently is substantial overlap between these four states (which are also the states of domicile for the bombing victims) and the domiciles of the surviving family member Plaintiffs at the time of the bombing in September 1989.  *Id.* at p. 6.  Next, the *Pugh* Plaintiffs suggested that, for those Plaintiffs for which there is no overlap, the Court may, as the Court has previously done, look to the law of the state in which each claimant was domiciled at the time of bombing. *Id.* at 12.  See *Cicippio-Puleo v. Islamic Republic of Iran*, CA 01-01496 (HHK) (D.D.C. Oct. 7, 2005), Slip Op. at 21-22; *Dammarell v. Islamic Republic of Iran*, 2005 U.S. Dist. LEXIS 5343

(D.D.C. March 29, 2005), at *59; *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp.2d 120, 133 (D.D.C. 2005). Based on the established precedent of such cases, Plaintiff submits that this Court should apply the states' common and statutory law according to the specific domicile of each Decedent and Interlease.

**ii.   Plaintiff's Motion For Summary Judgment Should Be Granted Because It Has Sufficiently Pled State Law Causes Of Action Against Libya And LESO**

Defendants allege in their Motion to Dismiss, filed July 25, 2006, that it is insufficient to recite generic common law causes of action in a federal Complaint and that Plaintiff's Complaint has failed to assert any specific cause of action arising out of the specific common law of a state as required by the District of Columbia Circuit courts. *Id.* at p. 28-29. This is clearly an incorrect statement. Notably, La Réunion Aérienne did not rely in its Complaint on generic common law, but specifically and repeatedly stated that the causes of action arose under the laws of the states where the Decedents were domiciled at the time of their death (Virginia, Texas, New York and Montana), and the state of Interlease's domicile (Georgia). *S.O.F.* at ¶ 22. Not surprisingly, the causes of action in the Complaint, for wrongful death, personal injury, property damage (to the Aircraft), indemnity, contribution, conversion, trespass to chattels, exist under the laws of all states, as do claims for punitive damages. This court has previously held that a Plaintiff bringing suit under section 1605(a)(7) may base his claim on conventional common law causes of action. *Kilburn v. Republic of Iran*, 277 F. Supp.2d 24, 35 (D.D.C. 2003). And the Supreme Court has stated that "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances." *Foreign Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 (1983).

Cases under the FSIA have followed this approach and allowed Plaintiffs to use various sources of law against foreign states. *See Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 194 (D.D.C. 2003) ("Courts have regularly concluded that common law claims for, *e.g.* wrongful death, survival, assault, and battery may be asserted against state sponsors of terrorism under the FSIA"). *See also* 28 U.S.C. § 1606 ("a foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances"); *Verlinden B.V. v. Central Bank of Nigeria*, 647 F.2d 320, 326 (2d Cir. 1981) (stating that when Congress created the FSIA, it did not intend to alter the substantive law of liability or "to create new federal causes of action," but sought only "to provide access to the courts in order to resolve ordinary legal disputes").

Defendants, in their papers on their motion to dismiss cite to *Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir. 2004) for the proposition that a Plaintiff in an action under FSIA must identify a cause of action arising out of a specific source of law. The problem the Plaintiffs in *Acree* had was that they "pointed to no source of liability other than § 1605(a)(7) and the Flatow Amendment."[9] 370 F.3d at 59. Contrary to what Defendants intimate, the Court did not require that *the Complaint* identify in detail the specific causes of action under the laws of specific states. To the contrary, the Court of Appeals noted that it had ordered the appellees to be prepared *at oral argument* to advance alternatives to FSIA and the Flatow Amendment as sources for their causes of action, but that the appellees failed to offer a "coherent alternative." *Id.* That problem obviously does not obtain here. La Réunion Aérienne relies neither on FSIA nor the Flatow Amendment as the source of its claims against Libya or LESO, but on the states' common and statutory law, as pleaded in La Réunion Aérienne's Complaint.

---

[9] While the Flatow Amendment provides a source of liability for individuals, it does not do so for foreign states. At issue in *Acree* was whether the Complaint stated a cause of action against Iraq.

### iii.    In The Alternative, The Pugh Court's Choice Of State Law Should Also Be Determinative In This Matter

In the event that this Court does not hold that Plaintiffs state law claims should be governed by the law of the specific domicile of each decedent and Interlease, Plaintiff asks the Court to apply to this case whatever decision is reached in *Pugh,* regarding choice-of-law rules and applicable state law, to each state law cause of action.

In the *Pugh* matter, on May 30, 2006, Plaintiffs filed a Memorandum of Law Outlining Choice-of-Law Issues and State Law Causes of Action.  The Court has not yet ruled on this matter.  Firstly, Plaintiffs suggested that the Court either look to the four states in which the estates of the seven American victims were probated.  This reasoning was suggested in part because there is substantial overlap between these states (which are the states of domicile for the bombing victims) and the domiciles of the surviving family member Plaintiffs at the time of the bombing.  Alternatively, the *Pugh* Plaintiffs suggest that for those Plaintiffs for whom there is no overlap, the Court may look to the law of the state in which each claimant was domiciled at the time of the bombing.  As regards to which choice-of-law rules apply, Plaintiffs suggest that there is no significant conflict between District of Columbia rules and the federal conflicts law set forth in the Restatement (Second) of the Conflict of Laws.  Accordingly, the Plaintiffs suggest that the framework in the Restatement (Second) of the Conflict of Laws can be utilized to identify the states whose substantive rules are applicable.

Accordingly, the ruling as to the applicable state law that the Court decides upon in *Pugh* should be applied in this case.  As assignees and subrogees, the group of insurers, on whose behalf La Réunion Aérienne acts, stands in the shoes of the *Pugh* Plaintiffs and therefore the applicable state laws should be identical in regards to its claims against Libya, LESO and the individual Defendants in their official capacities.

## **CONCLUSION**

For all the reasons set forth herein, the Court should grant Plaintiff's Motion for Summary Judgment in its entirety.


Date:  September 22,  2006                Respectfully submitted,




                                           /S/ Christopher B. Kende____
                                          Christopher B. Kende, Esquire (D.C. 416487)
                                          COZEN O'CONNOR
                                          1627 I Street, NW
                                          11th Floor
                                          Washington, D.C. 20006
                                          (202) 912-4800
                                          (202) 912-4830 (facsimile)
                                          *Attorney for Plaintiff*