UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
LA RÉUNION AÉRIENNE )
) Civil Action No. 05-01932 (HHK)
                    Plaintiff, )
   v. )
)
SOCIALIST PEOPLE'S LIBYAN )
ARAB JAMAHIRIYA, LIBYAN EXTERNAL )
SECURITY ORGANIZATION, MUAMMAR )
QADHAFI, ABDALLAH SENOUSSI, AHMED )
ABDALLAH ELAZRAGH, IBRAHIM NAELI, )
ARBAS MUSBAH, ISSA ABDELSALAM )
SHIBANI AND ABDELSALAM HAMMOUDA )
EL AGELI )
)
                    Defendants. )
_____)

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

    Pursuant to Local Civil Rule 7(h), Plaintiff La Réunion Aérienne respectfully submits the following statement of material facts as to which it contends there is no genuine issue:

    1.     La Réunion Aérienne is an economic interest group, organized pursuant to French law, which acts on behalf of its member insurance companies.  See Exhibit A, *Declaration of Thibaut de Mallmann* at ¶ 3.

    2.     Interlease, Inc. ("Interlease") is a Georgia corporation which owned a certain DC-10 Aircraft, bearing registration number N. 54 629 (hereafter "the Aircraft").  See Exhibit B, *Bill of Sale of Aircraft*.

    3.     The group of insurers on whose behalf La Réunion Aérienne acts, insured certain risks in connection with the Aircraft.  See Exhibit C, *Excerpt From Insurance Policy No.*

*89/18.636 Regarding Insurance of Aircraft Hull* and Exhibit D, *Excerpt From Insurance Policy No. 89/18493 Regarding Passenger Liability*.

4. The group of insurers on whose behalf La Réunion Aérienne acts, issued policies of insurance, numbered No. 89/18.636 and No. 89/18493 to Interlease. See Exhibit C, *Excerpt From Insurance Policy No. 89/18.636 Regarding Insurance of Aircraft Hull* and Exhibit D, *Excerpt From Insurance Policy No. 89/18493 Regarding Passenger Liability*.

5. On September 19, 1989, the Aircraft, operated by the French airline Union de Transports Aériens ("UTA") as Flight 772, exploded in mid-air over the Tenere Desert in Niger while en route from Brazzaville, Congo to Paris, France, killing all 170 persons on board. See Exhibit E, *Pugh v. Socialist People's Libyan Arab Jamahiriya, et al.*, 290 F.Supp. 2d 54, 54 (D.D.C. 2003).

6. The explosion was extensively investigated by French authorities. See Exhibit E, *Pugh*, 290 F.Supp. 2d 54, 56.

7. The explosion was the subject of civil and criminal proceedings in the French courts. See Exhibit E, *Pugh*, 290 F.Supp. 2d 54, 56.

8. The investigation by French authorities and the proceedings in the French courts culminated in a determination that the explosion was the result of an act of terrorism committed by agents and officials of the Socialist People's Libyan Arab Jamahiriya. See Exhibit E, *Pugh*, 290 F.Supp. 2d 54, 56.

9. The French courts concluded that Libya was responsible for bombing the Aircraft, and that it had used the individual defendants named in this matter to plan and coordinate the explosion. See Exhibit E, *Pugh*, 290 F.Supp. 2d 54, 56.

10. The U.S. Department of State also concluded that Libya was responsible for the bombing. See Exhibit F, *Court's May 11, 2006 Memorandum Opinion and Order in Pugh v. Socialist People's Libyan Arab Jamahiriya, et al.,* 2006 WL 2384915 (D.D.C. 2006), Page 3, (hereafter "*Pugh II*").

11. Among the dead were seven Americans, Bonnie Barnes Pugh, James E. Turlington, Sr., Margaret Elizabeth Schutzius, Patrick Wayne Huff, Donald J. Warner, Mihai Alimanestianu and Mark E. Corder (the "Decedents"). See Exhibit E, *Pugh*, 290 F.Supp. 2d 54, 56.

12. The Decedents were domiciled in various states of the United States, namely Virginia, Texas, New York and Montana. See Exhibit G, *New York Times article* dated September 23, 1989; Exhibit H, "*Seven Americans Killed In Crash*," *Associated Press*, 1989.

13. The estates of the seven Decedents were probated in Virginia, Texas, New York and Montana. See Exhibit I, *Pugh Plaintiffs' Amended Complaint,* at ¶¶ 103, 110, 121, 127, 135, 140, 149.

14. Following the explosion of the Aircraft, the group of insurers, on whose behalf La Réunion Aérienne acts, reimbursed $34,000,000.00 to Interlease and its lenders for the loss of the Aircraft in accordance with the terms of the policies of insurance. See Exhibit J, *Proof Of Loss And Release And Discharge.*

15. The group of insurers, on whose behalf La Réunion Aérienne acts, also paid the survivors and estates of the seven American victims of the Aircraft crash $2,011,172.42, as nearly as can now be computed. See Exhibit A at ¶ 5.

16. Interlease and all of the Decedents' representatives and estates expressly assigned all of their claims against the parties responsible for the explosion to the group of insurers on

3

whose behalf La Réunion Aérienne acts, to the extent of the insurers' payments to them.  See Exhibit A at ¶ 6 and Exhibit K, *Sample Release Of All Claims*.

17. Interlease's assignment of rights to the group of insurers on whose behalf La Réunion Aérienne acts, provided in pertinent part:

> In consideration of the payment to be made hereunder, the undersigned [Interlease] hereby assigns, sets over, transfers and subrogates to the Underwriters all the rights, claims, interests, causes and remedy of actions to the extent of the above amount [$34 million] which it may have against any party, person, corporation or governmental agency who may be liable for the loss and hereby authorizes the Underwriters, to sue, compromise or settle in its name or otherwise, and the Underwriters are hereby fully substituted in its place and subrogated to the rights which it may have to the amount so paid.
> See Exhibit J.

18. The assignment of rights by the Decedents' representatives and estates to the group of insurers on whose behalf La Réunion Aérienne acts, provided in pertinent part:

> Releasors hereby assign and set over by way of subrogation to Releasees, their successors and assigns, all of Releasors' rights and interests in any and all actions, claims and remedies that Releasors have or may have against any and all third parties who may be liable for the above described Accident and/or the destruction of the Aircraft accomplishing UTA Flight 772, to the extent of the amounts paid to Releasors pursuant to this Release. The Releasors hereby empower the subrogated Releasees to sue or settle in the place of the Releasors, and in the name of the latter or in the Releasees' own names in accordance with applicable law, in order for Releasees to recover for said loss against any and all such third parties.
> See Exhibit K.

19. Interlease also transferred title to the destroyed Aircraft to the group of insurers on whose behalf La Réunion Aérienne acts.  See Exhibit B.

20. On or about October 16, 2002, personal representatives and close relatives of the seven Decedents, along with Interlease, initiated suit in this Court against Libya, its intelligence service (Libyan External Security Organization, hereinafter "LESO"), and seven individuals, including the Libyan head of state Muammar Qadhafi, and Abdallah Senoussi, Ahmed Abdallah

Elazragh, Ibrahim Naeli, Arbas Musbah, Issa Abdelsalam Shibani amd Abdelsalam Hammouda El Ageli for money damages on account of extrajudicial killings, aircraft sabotage and personal injuries. The suit was captioned *Pugh v. Socialist People's Libyan Arab Jamahiriya, et al.*, No. CIV. A. 02-2026 (hereinafter "*Pugh*"). See Exhibit L, *Complaint*.

21.   On July 20, 2005, La Réunion Aérienne sought to intervene in *Pugh*, but its motion to intervene was denied by this Court on August 23, 2005. See Exhibits M and N.

22.   After its motion to intervene was denied, La Réunion Aérienne initiated the within action on September 30, 2005. The defendants named in this action are the same as the defendants in *Pugh*. Compare Exhibit I and Exhibit O.

23.   The *Pugh* Court found that it had jurisdiction over all defendants. See Exhibit E, *Pugh*, 290 F.Supp. 2d 54, 60. See also Exhibit F, *Pugh II*, 2006 WL 2384915, Page 10.

24.   Furthermore, in its Order dated October 27, 2003, the *Pugh* Court allowed Plaintiff Interlease to assert tort and 18 U.S.C.S. § 2333 claims against the individual defendants in their personal capacities. See Exhibit E, *Pugh*, 290 F.Supp. 2d 54, 60.

25.   In its Order granting in part and denying in part the parties' respective Motions for Summary Judgment, dated May 11, 2006, the Court held that the evidence "overwhelmingly establishes defendants' culpability and involvement in the bombing of UTA Flight 772." See Exhibit F, *Pugh II*, 2006 WL 2384915, Page 9.

26.   In *Pugh II*, the Court held that the individual defendants could be held liable in their personal capacities for actions taken pursuant to their official duties. See Exhibit F, *Pugh II*, 2006 WL 2384915, Page 14.

27. In *Pugh II*, the Court held that the action did not have to be dismissed as against Libya in order for it to proceed against the individual defendants in their personal capacities. See Exhibit F, *Pugh II*, 2006 WL 2384915, Page 12.

28. In *Pugh II*, the Court held that the bombing of the Aircraft satisfied the statutory definition of "international terrorism." See Exhibit F, *Pugh II*, 2006 WL 2384915, Page 19.

29. In *Pugh II*, the Court held that by virtues of the bombing, Interlease was deprived of its property, the Aircraft, and of the income associated with the long-term lease arrangement it had with UTA. See Exhibit F, *Pugh II*, 2006 WL 2384915, Page 20.

30. In *Pugh II*, the Court held that by virtue of the bombing, the Decedents were deprived of their lives. See Exhibit F, *Pugh II*, 2006 WL 2384915, Page 20.

31. As a result of the bombing, the group of insurers, on whose behalf La Réunion Aérienne acts, was deprived of the amount of the insurance proceeds they paid in connection with the crash of UTA Flight 772. See Exhibit A at ¶ 5.

32. In *Pugh II*, the Court held that six of the individual defendants[1] were liable under 28 USC § 2333(a). See Exhibit F, *Pugh II*, 2006 WL 2384915, Page 20.

33. The Court, in *Collett v. Socialist People's Libyan Arab Jamahiriya*, Civ No. 01-2103 (D.D.C.), has requested the view of the Attorney General as to whether Muammar Qadhafi is entitled to head-of-state immunity. To date, that view has not been submitted to the Court. See Exhibit P, Page 3. See also Exhibit F, *Pugh II*, 2006 WL 2384915, Page 16, footnote 12.

---

[1] The Court, in *Pugh*, reserved judgment as to Muammar Quadhafi, pending a determination whether head-of state immunity applied to him. *See* ¶ 33 below.

Date:  September 22,  2006                    Respectfully submitted,


  /S/ Christopher B. Kende
Christopher B. Kende, Esquire (D.C. 416487)
COZEN O'CONNOR
1627 I Street, NW
11th Floor
Washington, D.C. 20006
(202) 912-4800
(202) 912-4830 (facsimile)
*Attorney for Plaintiff*