# Exhibit L

**FILED**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

OCT 1 6 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

_____

ROBERT L. PUGH
  Individually on his own behalf and
  as Executor of the Estates of
  Bonnie Barnes Pugh and Malcolm
  R. Pugh
  1822 Stinson Creek Road
  Columbus, Mississippi 39705

ANNE CAREY
  Individually on her own behalf and
  As Executrix of the Estate of Harvey
  Mills Coverley
  6 Woods Edge Court
  Saratoga Springs, NY 12866

SALLY CHISHOLM JOHNSON
  Individually on her own behalf and
  as Executrix of the Estate of
  Georgia Mae Chisholm
  1397 Andre Road
  Brawley, California 92227

DEBORAH VAUGHN SCHOOLING,
  Individually on her own behalf and
  as Executrix of the Estate of
  James E. Turlington, Sr.
  2803 Dunaway Street
  Amarillo, Texas 79103

JANA ELIZABETH TURLINGTON
  1156 Terrace Street
  Pampa, Texas 79065

JIMMY BRUCE TURLINGTON
  2803 Dunaway
  Armarillo, Texas 79103

CHRISTOPHER DARWYN TURLINGTON
  2502a West 4th Street

CASE NUMBER  1:02CV02026

JUDGE: Thomas Penfield Jackson

DECK TYPE: Personal Injury/Malpractice

DATE STAMP: 10/16/2002

Civil Action No. _____

**COMPLAINT FOR
COMPENSATORY AND
PUNITIVE DAMAGES
PURSUANT TO THE
FOREIGN SOVEREIGN
IMMUNITIES ACT, AS
AMENDED AND STATE
AND FEDERAL LAW**

Armarillo, Texas 79106 )
 )
DAVID ONLEY TURLINGTON )
 1156 Terrace Street )
 Pampa, Texas 79065 )
 )
JAMES ELDEE TURLINGTON, JR. )
 1205 West 9th Street )
 Armarillo, Texas 79102 )
 )
EDDIE DON TURLINGTON )
 2220 Peachtree Street )
 Armarillo, Texas 79109 )
 )
JOYCE WRIGHT )
 Individually on her own behalf and )
 as Executrix of the )
 Estate of Elvee Turlington )
 733 North Narda Street )
 Pampa, Texas 79065 )
 )
RUSSELL TURLINGTON )
 502 N. Johnson Avenue )
 Odessa, Texas 79763 )
 )
MARY KATHRYN HASSETT )
 Individually on her own behalf and )
 as Executrix of the Estate of )
 Margaret Elizabeth Schutzius )
 1603 Oakleaf Lane )
 Charlottesville, Virginia 22903 )
 )
WILLIAM CARL SCHUTZIUS )
 3444 Stettinus Avenue )
 Cincinnati, Ohio 45208 )
 )
CATHERINE ALEXANDRIA SCHUTZIUS )
 1032 S. Clinton Street )
 Oak Park, Illinois 60304 )
 )
CHRISTOPHER MATTHEW SCHUTZIUS )
 1506 Wm. Howard Taft Street )
 Cincinnati, Ohio 45206 )
 )

JOHN BENEDICT SCHUTZIUS              )
   1904 Lagrande Street              )
   Alexandria, Virginia 22301        )
                                      )

ERMINE HAILEY                       )
   Individually on her own behalf and )
   as Executrix of the Estate of     )
   Patrick Wayne Huff                )
   262 County Road                   )
   Realitos, Texas 78376             )
                                        )

JAN PATILLO                         )
   Individually on her own behalf and )
   as Executrix of the Estates of James )
   E. Huff and Janice Huff           )
   Route 3, Box 716                  )
   FM 2096                           )
   Franklin, Texas 77856             )
                                        )

MICHAEL HUFF                        )
   1303 Bravo Cuernavaca Drive       )
   Austin, Texas 78733               )
                                        )

AMANDA HILL                         )
   248 Addie Roy Road, Suite B-106   )
   Austin, Texas 78746               )
                                        )

JARED HILL                          )
   388 E. 720 N.                     )
   Orem, Utah 84057                  )
                                        )

JANET WARNER                        )
   Individually on her own behalf and )
   as Executrix of the Estates of    )
   Donald J. Warner and Alvin Warner )
   810 Logan Avenue                  )
   Terry, Montana 59349              )
                                        )

SUSAN WARNER                        )
   13162 Terrace View, #66           )
   Old Highway 8                     )
   El Cajon, CA 92021                )
                                        )

SHERRY WARNER                       )

208 South 5th Street )
Miles City, Montana 59301 )
)
IOANA ALIMANESTIANU )
  Individually on her own behalf and )
  as Executrix of the Estate of )
  Mihai Alimanestianu )
  109 E. 88th Street, Apt. 5C )
  New York, NY 10128 )
)
IRINA ALIMANESTIANU )
  226 3rd Avenue Road )
  Venice, California 90291 )
)
JOANNA ALIMANESTIANU )
  55 Barker's Island Road )
  Southampton, NY 11968 )
)
NICHOLAS ALIMANESTIANU )
  55 Barker's Island Road )
  Southampton, NY 11968 )
)
ALEXANDER ALIMANESTIANU )
  27 Lincoln street )
  Larchmont, NY 10538 )
)
SERBAN ALIMANESTIANU )
  120 John Thomas Road )
  Eastham, MA 02642 )
)
CALIN ALIMANESTIANU )
  4370 Community Drive )
  West Palm Beach, Florida 33409 )
)
PAULINE ALIMANESTIANO )
  as Executrix of the Estate of )
  Constantin Alimanestiano )
  2015 Blowing Rock )
  Boone, North Carolina 28607 )
)
CARLA J. MALKIEWICZ )
  Individually on her own behalf and )
  as Executrix of the Estate of Mark E. )
  Corder )

16002 Koenig Lane                                   )
Conroe, Texas 77384                                 )
                                                    )
THERESE CODDINGTON                                  )
   Individually on her own behalf and      )
   as Executrix of the Estate of Edward A.  )
   Corder                                   )
   99 N. Madison Avenue                     )
   Greenwood, Indiana 46142                 )
                                                    )
MICHAEL J. CORDER                                   )
   4702 N. Mitchner Avenue                  )
   Lawrence, Indiana                        )
                                                    )
INTERLEASE, INC.                                    )
   1266 West Paces Ferry Road               )
   Suite 514                                )
   Atlanta, Georgia 30327                   )
                                                    )
                  Plaintiffs,        )
                                                    )
     v.                                 )
                                                    )
THE SOCIALIST PEOPLE'S                              )
LIBYAN ARAB JAMAHIRIYA                              )
   Ministry of Foreign Affairs              )
   Tripoli, Libya                           )
                                                    )
LIBYAN EXTERNAL SECURITY                            )
ORGANIZATION, a/k/a Jamahiriya                      )
Security Organization                               )
   Ministry of Foreign Affairs              )
   Tripoli, Libya                           )
                                                    )
MUAMMAR QADHAFI                                     )
c/o LIBYAN EXTERNAL SECURITY                        )
   ORGANIZATION, a/k/a Jamahiriya           )
   Security Organization                    )
   Ministry of Foreign Affairs              )
   Tripoli, Libya                           )
                                                    )
ABDALLAH SENOUSSI                                   )
   c/o LIBYAN EXTERNAL SECURITY             )
   ORGANIZATION, a/k/a Jamahiriya           )

Security Organization )
Ministry of Foreign Affairs )
Tripoli, Libya )
)
AHMED ABDALLAH ELAZRAGH )
c/o LIBYAN EXTERNAL SECURITY )
ORGANIZATION, a/k/a Jamahiriya )
Security Organization )
Ministry of Foreign Affairs )
Tripoli, Libya )
)
IBRAHIM NAELI )
c/o LIBYAN EXTERNAL SECURITY )
ORGANIZATION, a/k/a Jamahiriya )
Security Organization )
Ministry of Foreign Affairs )
Tripoli, Libya )
)
ARBAS MUSBAH )
c/o LIBYAN EXTERNAL SECURITY )
ORGANIZATION, a/k/a Jamahiriya )
Security Organization )
Ministry of Foreign Affairs )
Tripoli, Libya )
)
ISSA ABDELSALAM SHIBANI )
c/o LIBYAN EXTERNAL SECURITY )
ORGANIZATION, a/k/a Jamahiriya )
Security Organization )
Ministry of Foreign Affairs )
Tripoli, Libya )
)
and )
)
ABDELSALAM HAMMOUDA EL AGELI )
c/o LIBYAN EXTERNAL SECURITY )
ORGANIZATION, a/k/a Jamahiriya )
Security Organization )
Ministry of Foreign Affairs )
Tripoli, Libya )
)
Defendants. )
_____ )

Plaintiffs bring this action seeking damages arising out of the September 19, 1989 terrorist bombing of Union de Transports Aeriens ("UTA") Flight 772 over Niger, Africa. Plaintiffs seek judgment against Defendants the Socialist People's Libyan Arab Jamahiriya, the Libyan External Security Organization, Muammar Qadhafi, in his official and individual capacities, Abdallah Senoussi, in his official and individual capacities, Ahmed Adbdallah Elazragh, in his official and individual capacities, Ibrahim Naeli, in his official and individual capacities, Arbas Musbah, in his official and individual capacities, Issa Abdelsalam Shibani, in his official and individual capacities, and Abdelsalam Hammouda El Ageli, in his official and individual capacities, jointly and severally, and in support of their Complaint, allege as follows:

## JURISDICTION AND VENUE

1.    Jurisdiction over the subject matter of this case arises under 28 U.S.C. § 1330(a). Defendants the Socialist People's Libyan Arab Jamahiriya, and the Libyan External Security Organization, Abdallah Senoussi, in his official capacity, Ahmed Adbdallah Elazragh, in his official capacity, Ibrahim Naeli, in his official capacity, Arbas Musbah, in his official capacity, Issa Abdelsalam Shibani, in his official capacity, and Abdelsalam Hammouda El Ageli, in his official capacity, are subject to suit in the courts of the United States for various federal and state causes of action pursuant to the Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605(a)(7), and related statutes.

2.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

## THE PARTIES

3.    Plaintiff Bonnie Barnes Pugh was, at the time of the acts alleged herein, a United States citizen.  Ms. Pugh was killed by the terrorist bombing of UTA Flight 772.  Pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1) and (3), Ms. Pugh was a victim of (1) "extrajudicial killing" as defined in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note); and (2) "aircraft sabotage" as defined in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation.  The Estate of Bonnie Barnes Pugh is represented by Robert L. Pugh, as Executor, for purposes of this lawsuit.

4.    Plaintiff Robert L. Pugh, currently domiciled in the state of Mississippi, is the widower of Bonnie Barnes Pugh, who was killed by the terrorist bombing of Flight 772.  At the time of his wife's death, Mr. Pugh was the United States Ambassador to Chad and was a career Foreign Service Officer.  Mr. Pugh is, and at all pertinent times was, a U.S. citizen. Robert L. Pugh, individually and on behalf of the Estates of Bonnie Barnes Pugh and Malcolm R. Pugh, suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

5.    Plaintiff Malcolm R. Pugh was, at the time of the acts alleged herein, a United States citizen.  Mr. Pugh is the son of Bonnie Barnes Pugh, who was killed by the terrorist bombing of UTA Flight 772.  Malcolm R. Pugh died subsequent to the bombing of UTA Flight 772 in 1991. The Estate of Malcolm R. Pugh is represented by Robert L. Pugh, as Executor, for purposes of this lawsuit.

6.      Plaintiff Anne Carey, currently domiciled in the state of New York, is the daughter of Bonnie Barnes Pugh, who was killed by the terrorist bombing of UTA Flight 772. Ms. Carey is, and at all pertinent times was, a U.S. citizen. Anne Carey, individually and on behalf of the Estate of Harvey Mills Coverley suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

7.      Plaintiff Harvey Mills Coverley was, at the time of the acts alleged herein, a United States citizen. Mr. Coverley is the father of Bonnie Barnes Pugh, who was killed by the terrorist bombing of UTA Flight 772. Mr. Coverley died subsequent to the bombing of UTA Flight 772. The Estate of Harvey Mills Coverley is represented by Mr. Coverely's granddaughter, Anne Carey, as Executrix, for purposes of this lawsuit.

8.      Plaintiff Georgia Mae Chisholm was, at the time of the acts alleged herein, a United States citizen. Ms. Chisolm was the mother of Bonnie Barnes Pugh, who was killed by the terrorist bombing of UTA Flight 772. Ms. Chisolm died subsequent to the bombing of UTA Flight 772. The Estate of Georgia Mae Chisholm is represented by Sally Chisolm Johnson, as Executrix, for purposes of this lawsuit.

9.      Plaintiff Sally Chisholm Johnson, currently domiciled in the state of California, is the sister of Bonnie Barnes Pugh, who was killed by the terrorist bombing of UTA Flight 772. Ms. Johnson is, and at all pertinent times was, a U.S. citizen. Sally Chisholm Johnson, individually and on behalf of the Estate of Georgia

Mae Chisholm, suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

  10. Plaintiff James E. Turlington, Sr. was, at the time of the acts alleged herein, a United States citizen. Mr. Turlington was killed by the terrorist bombing of UTA Flight 772. Pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1) and (3), Mr. Turlington was a victim of (1) "extrajudicial killing" as defined in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note); and (2) "aircraft sabotage" as defined in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation. The Estate of James E. Turlington, Sr. is represented by Deborah Vaughn Schooling, as Executrix, for purposes of this lawsuit.

  11. Plaintiff Deborah Vaughn Schooling, currently domiciled in the state of Texas, is the daughter of James E. Turlington, Sr., who was killed by the terrorist bombing of UTA Flight 772. Ms. Schooling is, and at all pertinent times was, a United States citizen. Deborah Vaughn Schooling, individually and on behalf of the Estate of James E. Turlington, Sr., suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

  12. Plaintiff Jana Elizabeth Turlington, currently domiciled in the state of Texas, is the daughter of James E. Turlington, Sr., who was killed by the terrorist bombing of UTA Flight 772. Ms. Turlington is, and at all pertinent times was, a

U.S. citizen. Jana Elizabeth Turlington suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

13. Plaintiff Jimmy Bruce Turlington, currently domiciled in the state of Texas, is the son of James E. Turlington, Sr., who was killed by the terrorist bombing of UTA Flight 772. Mr. Turlington is, and at all pertinent times was, a U.S. citizen. Jimmy Bruce Turlington suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

14. Plaintiff Christopher Darwyn Turlington, currently domiciled in the state of Texas, is the son of James E. Turlington, Sr., who was killed by the terrorist bombing of UTA Flight 772. Mr. Turlington is, and at all pertinent times was, a U.S. citizen. Christopher Darwyn Turlington suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

15. Plaintiff David Onley Turlington currently domiciled in the state of Texas, is the son of James E. Turlington, Sr., who was killed by the terrorist bombing of UTA Flight 772. Mr. Turlington is, and at all pertinent times was, a U.S. citizen. David Onley Turlington suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

16.    Plaintiff James Eldee Turlington, Jr., currently domiciled in the state of Texas, is the son of James E. Turlington, Sr., who was killed by the terrorist bombing of UTA Flight 772. Mr. Turlington is, and at all pertinent times was, a U.S. citizen. James Eldee Turlington suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

17.    Plaintiff Eddie Don Turlington currently domiciled in the state of Texas, is the son of James E. Turlington, Sr., who was killed by the terrorist bombing of UTA Flight 772. Mr. Turlington is, and at all pertinent times was, a U.S. citizen. Eddie Don Turlington suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

18.    Plaintiff Elvee Turlington was, at the time of the acts alleged herein, a United States citizen. Ms. Turlington was the mother of James E. Turlington, Sr., who was killed by the terrorist bombing of UTA Flight 772. Mrs. Turlington died subsequent to the bombing of UTA Flight 772. The estate of Elvee Turlington is represented by Joyce Wright, as Executrix, for purposes of this lawsuit.

19.    Plaintiff Joyce Wright, currently domiciled in the state of Texas, is the sister of James E. Turlington, Sr., who was killed by the terrorist bombing of UTA Flight 772. Ms. Wright is, and at all pertinent times was, a U.S. citizen. Joyce Wright, individually and on the behalf of the Estate of Elvee Turlington, suffered

"personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

20.    Plaintiff Russell Turlington, currently domiciled in the state of Texas, is the brother of James E. Turlington, Sr., who was killed by the terrorist bombing of UTA Flight 772.  Mr. Turlington is, and at all pertinent times was, a U.S. citizen. Russell Turlington suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

21.    Plaintiff Margaret Elizabeth Schutzius was, at the time of the acts alleged herein, a United States citizen.  Ms. Schutzius was killed by the terrorist bombing of UTA Flight 772.  Pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1) and (3), Ms. Schutzius was a victim of (1) "extrajudicial killing" as defined in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note); and (2) "aircraft sabotage" as defined in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation.  The Estate of Margaret Elizabeth Schutzius is represented by Mary Kathryn Hassett, as Executrix, for purposes of this lawsuit.

22.    Plaintiff Mary Kathryn Hassett, currently domiciled in the state of Virginia, is the mother of Margaret Elizabeth Schutzius, who was killed by the terrorist bombing of UTA Flight 772.  Ms. Hassett is, and at all pertinent times was, a U.S. citizen. Mary Kathryn Hassett, individually and on behalf of the Estate of Margaret Elizabeth Schutzius, suffered "personal injury" as defined in 28 U.S.C.

§ 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

23.    Plaintiff William Carl Schutzius, currently domiciled in the state of Ohio, is the father of Margaret Elizabeth Schutzius, who was killed by the terrorist bombing of UTA Flight 772. Mr. Schutzius is, and at all pertinent times was, a U.S. citizen. William Carl Schutzius suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

24.    Plaintiff Catherine Alexandria Schutzius, currently domiciled in the state of Illinois, is the sister of Margaret Elizabeth Schutzius, who was killed by the terrorist bombing of Flight 772. Ms. Schutzius is, and at all pertinent times was, a U.S. citizen. Catherine Alexandria Schutzius suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

25.    Plaintiff Christopher Matthew Schutzius currently domiciled in the state of Ohio, is the brother of Margaret Elizabeth Schutzius, who was killed by the terrorist bombing of UTA Flight 772. Mr. Schutzius is, and at all pertinent times was, a U.S. citizen. Christopher Matthew Schutzius suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

26.    Plaintiff John Benedict Schutzius, currently domiciled in the state of Virginia, is the brother of Margaret Elizabeth Schutzius, who was killed by the

terrorist bombing of UTA Flight 772. Mr. Schutzius is, and at all pertinent times was, a U.S. citizen. John Benedict Schutzius suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

27.    Plaintiff Patrick Wayne Huff was, at the time of the acts alleged herein, a United States citizen. Mr. Huff was killed by the terrorist bombing of UTA Flight 772. Pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1) and (3), Mr. Huff was a victim of (1) "extrajudicial killing" as defined in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note); and (2) "aircraft sabotage" as defined in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation. The Estate of Patrick Wayne Huff is represented by Ermine Hailey, as Executrix, for purposes of this lawsuit.

28.    Plaintiff Ermine Hailey, currently domiciled in the state of Texas. is the widow of Patrick Wayne Huff, who was killed by the terrorist bombing of UTA Flight 772. Ms. Hailey is, and at all pertinent times, was a United States citizen. Ermine Hailey, individually and on behalf of the Estate of Patrick Wayne Huff, suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

29.    Plaintiff Jan Patillo, currently domiciled in the state of Texas, is the sister of Patrick Wayne Huff, who was killed by the terrorist bombing of UTA Flight 772. Ms. Patillo is, and at all pertinent times was, a U.S. citizen. Jan Patillo, individually and on behalf of the Estates of James E. Huff and Janice Huff, suffered

"personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

30.    Plaintiff James E. Huff was, at the time of the acts alleged herein, a United States citizen. Mr. Huff is the father of Patrick Wayne Huff, who was killed by the terrorist bombing of UTA Flight 772. Mr. Huff died on December 24, 1989, subsequent to the bombing of UTA Flight 772. The Estate of James E. Huff is represented by his daughter, Jan Patillo, as Executrix, for purposes of this lawsuit.

31.    Plaintiff Janice Huff was, at the time of the acts alleged herein, a United States citizen. Mrs. Huff is the mother of Patrick Wayne Huff, who was killed by the terrorist bombing of UTA Flight 772. Mrs. Huff died in June 1992, subsequent to the bombing of UTA Flight 772. The Estate of Janice Huff is represented by her daughter, Jan Patillo, as Executrix, for purposes of this lawsuit.

32.    Plaintiff Michael Huff, currently a domiciled in the state of Texas, is the brother of Patrick Wayne Huff, who was killed by the terrorist bombing of UTA Flight 772. Mr. Huff is, and at all pertinent times was, a U.S. citizen. Michael Huff suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

33.    Plaintiff Amanda Hill, currently domiciled in the state of Texas and is the daughter of Patrick Wayne Huff, who was killed by the terrorist bombing of UTA Flight 772. Mr. Hill is, and at all pertinent times was, a U.S. citizen. Amanda Hill suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

34.    Plaintiff Jared Hill, currently domiciled in the state of Utah, is the son of Patrick Wayne Huff, who was killed by the terrorist bombing of UTA Flight 772. Mr. Huff is, and at all pertinent times was, a U.S. citizen. Jared Hill suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

35.    Plaintiff Donald J. Warner was, at the time of the acts alleged herein, a United States citizen. Mr. Warner was killed by the terrorist bombing of UTA Flight 772. Pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1) and (3), Mr. Warner was a victim of (1) "extrajudicial killing" as defined in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note); and (2) "aircraft sabotage" as defined in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation. The Estate of Donald J. Warner is represented by Janet Warner, as Executrix, for purposes of this lawsuit.

36.    Plaintiff Janet Warner, currently domiciled in the state of Montana, is the mother of Donald J. Warner, who was killed by the terrorist bombing of UTA Flight 772. Ms. Warner is, and at all pertinent times was, a U.S. citizen. Janet Warner, individually and on behalf of the Estates of Donald J. Warner and Alvin Warner, suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

37.    Plaintiff Alvin Warner was, at the time of the acts alleged herein, a United States citizen. Mr. Warner was the father of Donald J. Warner, who was

killed by the terrorist bombing of UTA Flight 772. Mr. Warner died subsequent to the bombing of UTA Flight 772. The Estate of Alvin Warner is represented by Janet Warner, as Executrix, for purposes of this lawsuit.

38.    Plaintiff Susan Warner, currently domiciled in the state of California, is the sister of Donald J. Warner, who was killed by the terrorist bombing of UTA Flight 772. Ms. Warner is, and at all pertinent times was, a U.S. citizen. Susan Warner suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

39.    Plaintiff Sherry Warner, currently domiciled in the state of Montana, is the sister of Donald J. Warner, who was killed by the terrorist bombing of UTA Flight 772. Ms. Warner is, and at all pertinent times was, a U.S. citizen. Sherry Warner suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

40.    Plaintiff Mihai Alimanestianu was, at the time of the acts alleged herein, a United States citizen. Mr. Alimanestianu was killed by the terrorist bombing of UTA Flight 772. Pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1) and (3), Mr. Alimanestianu was a victim of (1) "extrajudicial killing" as defined in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note); and (2) "aircraft sabotage" as defined in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation. The Estate of Mihai

Alimanestianu is represented by Ioana Alimanestianu, as Executrix, for purposes of this lawsuit.

41.    Plaintiff Ioana Alimanestianu, currently domiciled in the state of New York, is the widow of Mihai Alimanestianu, who was killed by the terrorist bombing of UTA Flight 772. Ms. Alimanestianu is, and at all pertinent times was, a U.S. citizen. Ioana Alimanestianu, individually and on behalf of the Estate of Mihai Alimanestianu, suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

42.    Plaintiff Irina Alimanestianu, currently domiciled in the state of California, is the daughter of Mihai Alimanestianu, who was killed by the terrorist bombing of UTA Flight 772. Ms. Alimanestianu is, and at all pertinent times was, a U.S. citizen. Irina Alimanestianu suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

43.    Plaintiff Joanna Alimanestianu, currently domiciled in the state of New York, is the daughter of Mihai Alimanestianu, who was killed by the terrorist bombing of UTA Flight 772. Ms. Alimanestianu is, and at all pertinent times was, a U.S. citizen. Joanna Alimanestianu suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

44.     Plaintiff Nicholas Alimanestianu, currently domiciled in the state of New York is the son of Mihai Alimanestianu, who was killed by the terrorist bombing of UTA Flight 772. Ms. Alianestianu is, and at all pertinent times was, a U.S. citizen. Nicholas Alimanestianu suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

45.     Plaintiff Alexander Alimanestianu, currently domiciled in the state of New York, is the son of Mihai Alimanestianu, who was killed in the terrorist bombing of UTA Flight 772. Mr. Alimanestianu is, and at all pertinent times was, a U.S. citizen. Alexander Alimanestianu suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

46.     Plaintiff Serban Alimanestianu, currently domiciled in the state of Massachusetts, is the brother of Mihai Alimanestianu, who was killed in the terrorist bombing of UTA Flight 772. Mr. Alimanestianu is, and at all pertinent times was, a U.S. citizen. Serban Alimanestianu suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

47.     Plaintiff Calin Alimanestianu, currently domiciled in the state of Florida, is the brother of Mihai Alimanestianu, who was killed by the terrorist bombing of UTA Flight 772. Mr. Alimanestianu is, and at all pertinent times was, a U.S. citizen. Calin Alimanestianu suffered "personal injury" as defined in 28 U.S.C.

§ 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

48.    Plaintiff Constantin Alimanestiano was, at the time of the acts alleged herein, a United States citizen.  Mr. Alimanestiano was the brother of Mihai Alimanestianu, who was killed by the terrorist bombing of UTA Flight 772.  Mr. Alimanestiano died subsequent to the bombing of UTA Flight 772.  The Estate of Constantin Alimanestiano is represented by Pauline Alimanestiano, as Executrix, for purposes of this lawsuit.

49.    Plaintiff Mark E. Corder was, at the time of the acts alleged herein, a United States citizen.  Mr. Corder was killed by the terrorist bombing of UTA Flight 772.  Pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1) and (3), Mr. Corder was a victim of (1) "extrajudicial killing" as defined in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note); and (2) "aircraft sabotage" as defined in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation.  The Estate of Mark E. Corder is represented by Carla J. Malkiewicz, as Executrix, for purposes of this lawsuit.

50.    Plaintiff Carla J. Malkiewicz, currently domiciled in the state of Texas, is the widow of Mark E. Corder, who was killed by the terrorist bombing of UTA Flight 772.  Ms. Malkiewicz is, and at all pertinent times was, a U.S. citizen.  Carla Malkiewicz suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

51.    Plaintiff Therese Coddington, currently domiciled in the state of Indiana, is the sister of Mark E. Corder, who was killed by the terrorist bombing of UTA Flight 772. Ms. Coddington is, and at all pertinent times was, a U.S. citizen. Therese Coddington suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

52.    Plaintiff Michael J. Corder, currently domiciled in the state of Indiana, is the brother of Mark E. Corder, who was killed by the terrorist bombing of UTA Flight 772. Mr. Corder is, and at all pertinent times was, a U.S. citizen. Michael Corder suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

53.    Plaintiff Edward A. Corder was, at the time of the acts alleged herein, a United States citizen. Mr. Corder was the father of Mark E. Corder, who was killed by the terrorist bombing of UTA Flight 772. Mr. Corder is, and at all pertinent times was, a U.S. citizen. Edward Corder suffered "personal injury" as defined in 28 U.S.C. § 1605(a)(7) as a direct result of Defendants' actions and activities, which caused the bombing of UTA Flight 772.

54.    Plaintiff Interlease, Inc. is a corporation organized under the laws of the State of Georgia. It owned and leased to UTA the DC-10 aircraft that was destroyed in the terrorist bombing which forms the basis of this lawsuit. Interlease suffered property loss as a result of an act of (1) "extrajudicial killing" as defined in

section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note); and

(2) "aircraft sabotage" as defined in Article 1 of the Convention for the Suppression

of Unlawful Acts Against the Safety of Civil Aviation.

55.    Defendant Socialist People's Libyan Arab Jamahiriya ("Libya") is a

foreign sovereign that since 1979 has been designated a state sponsor of terrorism

pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C.

§ 2405(j), and section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371.

56.    The Socialist People's Libyan Arab Jamahiriya has been held liable to

victims of state-sponsored terrorism, pursuant to 28 U.S.C.A. § 1605(a)(7).  *See Rein*

*v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748 (2d Cir. 1998).

57.    Defendant the Libyan External Security Organization ("LESO") is the

Libyan intelligence service, which functions both within and beyond Libyan

territory.  LESO, acting as an agent of Libya, performed acts within the scope of its

agency within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605 note,

which caused the bombing of UTA Flight 772.

58.    Defendant Muammar Qadhafi is, and at all relevant times was, the

head of state of Libya and thus an official and agent of Libya.  Acting within the

scope of his office, employment, and/or agency, Qadhafi ordered, caused, and/or

assisted in causing the terrorist bombing of Flight 772.

59.    Defendant Abdallah Senoussi is, and at all relevant times was, an

official and agent of Libya.  At the time of the relevant events, Senoussi was the

second highest-ranking official in LESO.  Acting within the scope of his office,

employment, and/or agency, Senoussi caused and/or assisted in causing the terrorist bombing of Flight 772.

60.    Defendant Abdallah Elazragh is, and at all relevant times was, an official and agent of Libya. At the time of the relevant events, Elazragh was the First Secretary at the Libyan embassy in Brazzaville, Congo, and a member of LESO. Acting within the scope of his office, employment, and/or agency, Elazragh caused and/or assisted in causing the terrorist bombing of Flight 772.

61.    Defendant Issa Abdelsalam Shibani is, and at all relevant times was, an official and agent of Libya. At the time of the relevant events, Shibani was the Head of Libya's Technical Administration of Domestic Security Services. Acting within the scope of his office, employment, and/or agency, Shibani caused and/or assisted in causing the terrorist bombing of Flight 772.

62.    Defendant Arbas Musbah is, and at all relevant times was, an official and agent of Libya. At the time of the relevant events, Musbah was an explosives and air transport expert with LESO. Acting within the scope of his office, employment, and/or agency, Musbah caused and/or assisted in causing the terrorist bombing of Flight 772.

63.    Defendant Ibrahim Naeli is, and at all relevant times was, an official and agent of Libya. At the time of the relevant events, Naeli was an explosives and air transport expert with LESO. Acting within the scope of his office, employment, and/or agency, Naeli caused and/or assisted in causing the terrorist bombing of Flight 772.

64.     Defendant Abdelsalam Hammouda El Ageli is, and at all relevant times was, an official and agent of Libya. At the time of the relevant events, Hammouda was an officer in LESO. Acting within the scope of his office, employment, and/or agency, Hammouda caused and/or assisted in causing the terrorist bombing of Flight 772.

## FACTUAL ALLEGATIONS

65.     Defendant Libya has a long history of engaging in and supporting terrorist acts. Since the early 1970s, Libyan leader Muammar Qadhafi has publicly announced support for extremist movements, and has established ties with dozens of terrorist organizations around the world. Terrorism became an important instrument in Libyan foreign policy and was frequently employed to advance Libya's agenda.

66.     Throughout the 1980s, Libya ran terrorist training camps and supported terrorist organizations. During this time, both directly and through material support provided to terrorist organizations including Hizbollah (also known as Islamic Jihad), a politico-paramilitary terrorist organization operating in Lebanon, Libya engaged in a concerted campaign of terrorist activities.

67.     In response to Libya's ongoing involvement in international terrorism, President Reagan ordered in January 1986 that all U.S. economic ties with Libya be severed and Libyan assets in the U.S. be frozen. He also called upon other countries to launch an economic boycott against Libya.

68.    Largely in response to these sanctions, Libya subsequently engaged in a concerted campaign of terrorism against the U.S. and other Western countries. In March 1986, American targets were struck in Lebanon, Italy and Germany. One of the most notable incidents of Libyan terrorism against Westerners was the bombing of a West Berlin discotheque, La Belle, which killed two U.S. servicemen and injured more than 200 people, most of them Westerners. In October 1996, German authorities issued arrest warrants for four Libyans suspected of initiating that bombing. On November 13, 2001, a German court found the four guilty and established a connection between the bombing and the Libyan government.

69.    In an effort to curtail this wave of state-sponsored terrorism, and in direct response to the bombing of La Belle, the U.S. took retaliatory military action against Libya. In April 1986, the U.S. launched air strikes on government and military installations in Benghazi and Tripoli, killing dozens of people, including Qadhafi's daughter.

70.    In December 1988, a Pan Am airliner, Flight 103, exploded over Lockerbie, Scotland, killing 270 people, including 189 Americans. The American and British authorities conducted an intensive investigation spanning several years, which implicated Libya in the bombing. They concluded that Libya ordered the bombing in revenge for the 1986 American air strikes.

71.    On September 19, 1989, UTA Flight 772, which was bound for Paris from Brazzaville, Congo, with a stopover in N'Djamena, Chad, exploded over the desert in southeastern Niger, killing all 170 aboard. Aboard the flight were

individuals from seventeen countries, including seven Americans: Bonnie Barnes Pugh, Margaret Schutzius, Mark Corder, James Turlington, Patrick Huff, Donald Warner, and Mihai Alimanestianu, whose estates are represented herein. The victims of the bombing died as a result of the blast, which caused, among other things, severe burns, a sudden drop in air pressure and a catastophic impact with the earth.

72.    Upon information and belief, the bombing of UTA Flight 772 was ordered and carried out by those in the highest levels of the Libyan government, including Defendants Qadahfi, Senoussi, Elazragh, Naeli, Musbah, Shibani, and Hammouda, in revenge for French support of the Chadian government in opposition to Libyan insurgents.

73.    The French authorities took the lead in the investigation. For two weeks after the bombing, French paratroopers scoured the desert collecting debris, which was scattered over 50 square miles, and began the painstaking task of piecing together evidence.

74.    Examination of the electronic flight data recorder and the cockpit voice recorder, which were retrieved on September 21, 1989, revealed that there were no technical problems that could have caused the destruction of Flight 772, and that there was no warning for the explosion. Investigators began to believe that the explosion was the result of a terrorist bombing.

75.    The French appointed their leading investigative terrorist magistrate, Magistrate Judge Jean-Louis Bruguiere, to direct the investigation and gather

evidence on behalf of the public prosecutor.  Judge Bruguiere officially began his

investigation on September 23, 1989.

76.    Although leads connecting the bombing to Iran, Syria and Lebanon

were actively pursued, as investigators began to piece together the evidence, the

trail leading to Libya became clearer.

77.    The investigators recovered approximately fifteen tons of wreckage,

which were sent to Paris for technical analysis.  Technicians from the Central

Laboratory of Paris analyzed pieces of the cargo hold of the aircraft and detected

traces of explosives.  The explosive was determined to be pentrite.  Given these

initial findings, the investigators began to pay particular attention to the forward

hold of the aircraft where the explosive charge appeared to have been lodged.  They

determined that the explosive device had been concealed in one of the four

containers that had been loaded in the forward cargo hold, in the front right portion

of the plane.

78.    Among the wreckage, explosive experts found a piece of a dark gray

Samsonite suitcase, the interior of which was covered with a layer of the explosive

pentrite, which had also been discovered on other portions of the aircraft.  They

concluded that the suitcase was the likely source of the explosion.  Having

pinpointed the location of the explosion, investigators were able to determine that

the suitcase containing the explosive must have been loaded in Brazzaville, Congo.

79.    Investigators also located a small piece of green colored printed circuit.

Specialized FBI agents, who were involved with the work of the French experts,

took particular notice of the circuit because it had sustained distortions identical to those noted in the in-flight explosion of Pan Am 103 over Lockerbie. They reported their findings to Judge Bruguiere.

80.    Investigators traced the circuit to a Taiwanese manufacturer. From there, investigators learned that a German company, Grasslin, had ordered several thousand electroplates of the same printed circuit board model, which were used for delay counters. Then, in 1989, HP Marketing Company purchased 100 delay counter models of the printed circuit from Grasslin, and specially modified them at the request of Defendant Shibani. The President of HP Marketing delivered the modified circuitry to Defendant Shibani in Tripoli, Libya on July 26, 1989. During this trip, the President of HP Marketing also met with Moussa Koussa, who was then Chief of the "Mathaba," a Libyan organization providing political and military training for liberation movements throughout the world. The circuit components found in the wreckage of UTA Flight 772 matched those bought by and delivered to Shibani.

81.    Investigators then obtained confessions from one of the terrorists who took part in the attack. Bernard Yanga, a Congolese opposition figure, told investigators that he helped Defendant Abdallah Elazragh recruit a fellow Congolese militant, Apollinaire Mangatany, to carry the suitcase bomb onto UTA Flight 772. According to Yanga, Defendant Elazragh supplied Mangatany with the gray Samsonite suitcase containing the explosives, which had been brought to the Congo in a Libyan diplomatic pouch. Investigators were able to confirm that the

Libyan People's Bureau of Brazzarille had received two diplomatic pouches of approximately 15 ½ pounds each on September 28 and 29, 1989.

82.     Investigators also spoke with another Lybian oppositionist who reported that another man, Whalil Jkik, had confided in him that he had been approached by Defendant Senoussi, who was accompanied by Defendants Naeli and Hammouda, to participate in a secret mission, which Mr. Jdik had understood to be the bombing of a French DC-10 airliner.  Ms. Jdik refused to participate.

83.     Another Congolese citizen, Marc Mvouka, who was arrested in the Paris airport for carrying narcotics, revealed that he had learned that Mangatany and Yanga had taken a training course in the handling of explosives in Libya, and that they were involved in the bombing of Flight 772.

84.     Investigators carefully verified the statements of Yanga and Mvouka through other sources and confirmed the information provided.  In addition, the Congolese Secret Service had been keeping a close watch over certain Congolese opponents in relation to the Libyan Embassy, in particular Yanga and Mangalamy frequently met with Defendant Elazragh in Brazzarille in the months before the bombing.

85.     Upon information and belief, a meeting was held at LESO's headquarters in Tripoli, Libya in September 1988 at which the bombings of UTA Flight 772 and Pan Am Flight 103 were discussed and decided upon.  Among others, defendants Abdullah Senoussi, then head of LESO, Qadhafi's brother-in-law, and

Moussa Koussa, Deputy Foreign Minister and Qadhafi's nephew, attended that meeting.

86.    On or about October 30, 1991, Judge Bruguiere issued international arrest warrants for Defendants Senoussi, Elazragh, Naeli, Musbah, charging these Libyan officials with direct involvement in the bombing. Judge Bruguiere also issued international search warrants for Moussa Koussa, Libya's Deputy Foreign Minister and Qadhafi's nephew, and Abessalam Zadma, a senior intelligence official and chief of Qadhafi's personal bodyguards, who were wanted for questioning.

87.    Following these warrants and the November 1991 indictments of two Libyan intelligence agents for the bombing of Pan Am Flight 103, the United Nations Security Council adopted Resolution 731. It demanded, among other things, that Libya take steps to end its state-sponsored terrorism, turn over the two suspects in the Pan Am bombing, pay compensation to the victims, and cooperate in the investigations of Pan Am 103 and UTA 772.

88.    In April 1992, the UN Security Council adopted Resolution 748, which imposed sanctions against Libya for its refusal to comply with the demands of UN Resolution 731. In response Libya made overtures of cooperation and gave the French the file containing the investigation conducted by the Judge of Appeal of the Supreme Court of Libya, which was undertaken in December 1991 after the arrest warrants were issued. The file contained inconsistencies with Judge Bruguiere's investigation, and the authenticity of certain documents in the file was highly questionable.

89.     In November 1993, UN Security Council Resolution 883 was adopted imposing additional sanctions on Libya in an attempt to increase the pressure for it to comply fully with the demands of Resolution 731.

90.     Despite Libya's failure to meet the proscriptions of these resolutions, the French continued their investigation of the bombing of UTA Flight 772, determined to bring justice to those responsible.

91.     In March 1996, Qadhafi wrote to French President Jacques Chirac pledging cooperation in resolving the UTA 772 bombing.  That letter stated in part:

> Libyan law, like the law of many other countries including France, does not permit the extradition of its own citizens to stand trial in foreign courts.  Accordingly, I would like us to work together to find another solution which would allow a legal investigation and trial to take place which satisfies French requirements without at the same time violating the sovereignty of the Libyan Arab Jamahiriya or its laws.

> If the French judicial system—whose objectivity we have every reason to trust—were to arrive at the conclusion that Libyan citizens are guilty in this case, nothing should then prevent it from trying them *in absentia*, provided that such a trial is permitted under French law.  The Socialist People's Libyan Arab Jamahiriya would honor its obligations under those circumstances, provided that all applicable legal requirements were satisfied.

92.     Accepting Qadhafi's invitation, Judge Bruguiere traveled to Libya in July 1996 to further his investigation.  During that trip, Judge Bruguiere interviewed numerous secret service officials.  Among them were Moussa Koussa, then Director of Libyan Intelligence Services, who at the time of the bombing was the head of Mathaba, Defendant Shibani, and Defendant Hammouda.

93.    In addition, Libyan officials gave Judge Bruguiere several documents, one of which represented that defendant Musbah had been killed in a traffic accident. This information was inconsistent with information gathered during the investigation, and it appeared that the document had been manufactured for purposes of the case. In fact, the Libyans ultimately admitted that Musbah was still alive.

94.    Libyan officials also gave Judge Bruguiere a replica of the suitcase that was used in the bombing, including the explosive pentrite and a detonator. In an awkward and transparently false attempt to prove that Libyan dissidents planted the bomb on Flight 772, the Libyans told Judge Bruguiere that the suitcase had been recovered from a thwarted attack by Libyan oppositionists. For the French, it was proof that the Libyan security services had suitcase bombs exactly like the one that exploded UTA Flight 772.

95.    As a result of his investigation in Libya, Judge Bruguiere issued two additional arrest warrants, one for Defendant Shibani, and one for Defendant Hammouda.

96.    At the end of an over eight-year exhaustive investigation, which the French officially concluded in late January 1998, the French determined that the Libyan intelligence service, LESO, was responsible for the UTA Flight 772 bombing. Specifically, the investigation revealed that Defendant Senoussi, as head of the Libyan secret service, gave instructions that the bombing be carried out and supplied the suitcase bomb; that Defendant Shibani purchased the equipment,

particularly the detonator, necessary for the bomb; that Defendant Hammouda handled the strategic follow-up and coordination of Defendants Naeli, Musbah and Elazragh, who executed the bombing plot in Brazzaville; that Defendants Naeli and Musbah inspected the explosive device in Brazzaville and gave it to Defendant Elazragh; and that Defendant Elazragh was the main perpetrator of the plot in Brazzaville and supplied the recruited Congolese man with the bomb and a ticket on UTA Flight 772.

97.    On January 29, 1998, Judge Bruguiere ordered that a statement of the evidence be delivered to the Head of the Prosecution Department of the Court of Appeal by the District Attorney.  The Public Prosecutor filed written charges with the clerk of the Grand Jury on March 27, 1998.

98.    Libya, however, steadfastly refused to extradite the six accused, and they refused to appear in France on their own accord.  The defendants were thus tried *in absentia* by a French court, a special Court of Assizes, in a three-day trial that commenced on March 8, 1999.  On March 10, 1999, a seven-judge panel of the Court convicted the six accused and sentenced them to life imprisonment.  The court also issued judgments on behalf of the civil plaintiffs for their losses stemming from the bombing.  The convictions and sentences were largely symbolic as Libya never extradited the accused, and despite overtures suggesting it would, never imposed the sentences in Libya.  Nonetheless, the French, satisfied by the extensive evidence presented at trial, viewed the convictions as a judgment against Libya for the bombing.

99.    In July 1999, the Libyan Government paid approximately $33 million to the Central Agency of the Treasury of France to satisfy the civil judgments against the 6 defendants rendered by the special court to partially compensate the 311 family members of the victims of the bombing who took part in the criminal trial as civil parties.  The money paid by Libya also went to compensate legal entities that participated as civil parties to the criminal proceeding to recoup money they had paid as a result of the bombing, as well as Air France for the commercial loss it sustained in the bombing of UTA, whose assets it had purchased.  In paying these judgments, Libya essentially admitted its complicity in the murder of the 170 passengers and crew aboard UTA Flight 772.

100.    On June 16, 1999, some of the civil parties that participated in the criminal proceeding leading to the conviction of the six accused, filed a criminal complaint and a civil claim against Qadhafi.  In support of their allegations that Qadhafi was directly involved in and aided and abetted the bombing of Flight 772, the parties point to several facts established during the investigation including:  (1) the individuals received logistical support from Libya, and LESO, directed by Qadhafi's brother in law Senoussi, was operating with Qadhafi's approval; (2) Defendant Elazragh left the Libyan Embassy in Brazzaville hurriedly in the wake of the bombing without any negative comment from the Libyan Ministry of Foreign Affairs; (3) Libya provided protection to the six accused despite warrants having been issued for their arrest; (4) Libyan officials gave incorrect files that falsely showed that one of the interested parties had lied to Judge Bruguiere during the

course of his investigation, implying a coordination among numerous Libyan departments that only Qadhafi could have achieved; and (5) two of the convicted officials were given promotions that could not have occurred without Qadhafi's approval as a reward for the bombing.

101.    After the trial and convictions of defendants Senoussi, Elazragh, Naeli, Musbah, Shibani and Hammouda, it was revealed that Libyan spies had given detailed accounts of the bombing plots for both Pan Am Flight 103 and UTA Flight 772. These spies had reported to Britain's spy agency MI6 that Qadhafi personally ordered the bombing of the Pan Am and UTA flights. One spy code-named Piebald, a senior official of LESO that Britain recruited in North Africa in 1990 when suspicions of Libya's involvement in Pan Am grew, said that the bomb plots were orchestrated by Defendant Senoussi. A second source, a member of Qadhafi's inner circle who was put in touch with Britain's secret service in 1994, said that Qadhafi told him personally in 1988 that he had ordered an attack on an American airliner because he was outraged at the American air strike in 1986 that killed his daughter. This information was never revealed during the course of the trial.

102.    The families of the victims of the terrorist bombing of UTA Flight 772 were caused to endure severe mental anguish and pain and suffering as a direct and proximate result of Defendants willful, reckless, wrongful actions. Their suffering was heightened because they could not see the perpetrators brought to justice. Despite the symbolic gratification of the French convictions, the families knew that

those convicted would never serve the imposed sentences.  To the contrary, Libya has protected the convicted, who remain at liberty.

103.  Bonnie Barnes Pugh, was the wife of Plaintiff Robert Pugh who at the time was the U.S. Ambassador to Chad.  She was on her way home to the United States to help her daughter plan her wedding.  Ms. Pugh sustained fatal injuries as a result of the bombing.

104.  Plaintiff Robert L. Pugh is the widower of Bonnie Barnes Pugh.  As a result of the bombing, Mr. Pugh suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, consortium and solatium of Bonnie Barnes Pugh.

105.  Plaintiff Malcolm R. Pugh was the son of Bonnie Barnes Pugh and Robert L. Pugh.  As a result of the bombing, Mr. Pugh suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Bonnie Barnes Pugh.

106.  Plaintiff Ann Carey is the daughter of Bonnie Barnes Pugh.  As a result of the bombing, Ms. Carey suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Bonnie Barnes Pugh.

107.  Plaintiff Harvey Mills Coverley was the father of Bonnie Barnes Pugh. As a result of the bombing, Mr. Coverley suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Bonnie Barnes Pugh.

108.   Plaintiff Sally Chisolm Johnson is the sister of Bonnie Barnes Pugh. As a result of the bombing, Ms. Johnson suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Bonnie Barnes Pugh.

109.   Georgia Mae Chisolm was the mother of Bonnie Barnes Pugh. As a result of the bombing, Ms. Chisolm suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Bonnie Barnes Pugh.

110.   James Turlington, Sr., 48, was a Senior Operations Supervisor with Esso Exploration and Production, a subsidiary of Exxon Company International.

111.   Plaintiff Deborah Vaughn Schooling is the daughter of James E. Turlington, Sr.  As a result of the bombing, Ms. Schooling suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of James E. Turlington, Sr.

112.   Plaintiff Jimmy Turlington is the son of James E. Turlington, Sr.  As a result of the bombing, Mr. Turlington suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of James E. Turlington.

113.   Plaintiff Christopher Turlington is the son of James E. Turlington, Sr. As a result of the bombing, Mr. Turlington suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of James E. Turlington, Sr.

114.   Plaintiff David Turlington is the son of James E. Turlington, Sr.  As a result of the bombing, Mr. Turlington suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of James E. Turlington, Sr.

115.   Plaintiff James Turlington, Jr. is the son of James E. Turlington, Sr. As a result of the bombing, Mr. Turlington suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of James E. Turlington, Sr.

116.   Plaintiff Eddie Turlington is the son of James E. Turlington, Sr.  As a result of the bombing, Mr. Turlington suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of James E. Turlington, Sr.

117.   Plaintiff Jana Turlington is the daughter of James E. Turlington, Sr. As a result of the bombing, Ms. Turlington suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of James E. Turlington, Sr.

118.   Plaintiff Joyce Wright is the sister of James E. Turlington, Sr.  As a result of the bombing, Ms. Wright suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of James E. Turlington, Sr.

119.   Plaintiff Russell Turlington is the brother of James E. Turlington, Sr. As a result of the bombing, Mr. Turlington suffered mental anguish, emotional pain

and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of James E. Turlington, Sr.

120.   Elvee Turlington was mother of James E. Turlington, Sr.  As a result of the bombing, Ms. Turlington suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of James E. Turlington, Sr.

121.   Margaret Schutzius, 23, was returning home after two years of service with the Peace Corps in the Congo where she worked as a secondary education teacher teaching English as a second language.  She was one of seven Peace Corp Volunteers who were the first to serve in Chad in 18 years.  Her efforts and spirit were so appreciated by the villagers she served that they named a medical dispensary after her in June 1991.

122.   Plaintiff Mary Kathryn Hassett is the mother of Margaret Schutzius. As a result of the bombing, Ms. Hassett suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Margaret Schutzius.

123.   Plaintiff William Schutzius is the father of Margaret Schutzius.  As a result of the bombing, Mr. Schutzius suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Margaret Schutzius.

124.   Plaintiff Catherine Schutzius is the sister of Margaret Schutzius.  As a result of the bombing, Ms. Schutzius suffered mental anguish, emotional pain and

suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Margaret Schutzius.

125.    Plaintiff Christopher Schutzius is the brother of Margaret Schutzius. As a result of the bombing, Ms. Schutzius suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Margaret Schutzius.

126.    Plaintiff John Schutzius is the brother of Margaret Schutzius. As a result of the bombing, Mr. Schutzius suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Margaret Schutzius.

127.    Patrick Wayne Huff, 38, was a Foreman of Rig Operations for Parker Drilling Co. He was returning home to his wife and two children after a 28-day rotation in Chad.

128.    Plaintiff Ermine Hailey is the widow of Patrick Wayne Huff. As a result of the bombing, Ms. Hailey suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, consortium and solatium of Patrick Wayne Huff.

129.    Plaintiff Jan Patillo is the sister of Patrick Wayne Huff. As a result of the bombing, Ms. Patillo suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Patrick Wayne Huff.

130.    Plaintiff James H. Huff is the father of Patrick Wayne Huff. As a result of the bombing, Mr. Huff suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Patrick Wayne Huff.

131.    Plaintiff Janice Huff is the mother of Patrick Wayne Huff. As a result of the bombing, Mrs. Huff suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Patrick Wayne Huff.

132.    Plaintiff Michael Huff is the brother of Patrick Wayne Huff. As a result of the bombing, Mr. Huff suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Patrick Wayne Huff.

133.    Plaintiff Amanda Hill is the daughter of Patrick Wayne Huff. As a result of the bombing, Ms. Hill suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Patrick Wayne Huff.

134.    Plaintiff Jared Hill is the son of Patrick Wayne Huff. As a result of the bombing, Mr. Hill suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Patrick Wayne Huff.

135.    Donald Warner, 25, was a Medic with Parker Drilling Co. who was returning home after a 28-day rotation in Chad.

136.   Plaintiff Janet Warner is the mother of Donald Warner.  As a result of the bombing, Ms. Warner suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Donald Warner.

137.   Plaintiff Susan Warner is the sister of Donald Warner.  As a result of the bombing, Ms. Warner suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Donald Warner.

138.   Plaintiff Sherry Warner is the sister of Donald Warner.  As a result of the bombing, Ms. Warner suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Donald Warner.

139.   Mihai Alimanestianu, 71, was a civil and mechanical engineer.  He was returning home after completing a construction project in Gabon, where he was a consultant to the President.

140.   Plaintiff Ioana Alimanestianu is the widow of Mihai Alimanestianu. As a result of the bombing, Ms. Alimanestianu suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, consortium and solatium of Mihai Alimanestianu.

141.   Plaintiff Irina Alimanestianu is the daughter of Mihai Alimanestianu. As a result of the bombing, Ms. Alimanestianu suffered mental anguish, emotional

pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Mihai Alimanestianu.

142.    Plaintiff Joanna Alimanestianu is the daughter of Mihai Alimanestianu.  As a result of the bombing, Ms. Alimanestianu suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Mihai Alimanestianu.

143.    Plaintiff Nicholas Alimanestianu is the son of Mihai Alimanestianu. As a result of the bombing, Mr. Alimanestianu suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Mihai Alimanestianu.

144.    Plaintiff Alexander Alimanestianu is the son of Mihai Alimanestianu. As a result of the bombing, Mr. Alimanestianu suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Mihai Alimanestianu.

145.    Plaintiff Serban Alimanestianu is the brother of Mihai Alimanestianu. As a result of the bombing, Mr. Alimanestianu suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Mihai Alimanestianu.

146.    Plaintiff Calin Alimanestianu is the brother of Mihai Alimanestianu. As a result of the bombing, Mr. Alimanestianu suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Mihai Alimanestianu.

147.    Constantin Alimanestiano was the brother of Mihai Alimanestianu. As a result of the bombing, Ms. Alimanestiano suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Mihai Alimanestianu.

148.    Mark Corder, 35, was a Senior Petroleum Engineer with Parker Drilling Co.

149.    Plaintiff Carla J. Malkiewicz is the widow of Mark E. Corder. As a result of the bombing, Ms. Malkiewicz suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, consortium and solatium of Mark E. Corder.

150.    Plaintiff Therese Coddington is the sister of Mark E. Corder. As a result of the bombing, Ms. Coddington suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Mark E. Corder.

151.    Plaintiff Michael J. Corder is the brother of Mark E. Corder. As a result of the bombing, Mr. Corder suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Mark E. Corder.

152.    Edward A. Corder was the father of Mark E. Corder. As a result of the bombing, Mr. Corder suffered mental anguish, emotional pain and suffering, and economic loss, and was deprived of the assistance, society, companionship, and solatium of Mark E. Corder.

## COUNT I

## WRONGFUL DEATH

153.    Paragraphs 1 through 152 are incorporated herein as if fully set forth.

154.    As a direct and proximate result of the willful, wrongful, intentional and reckless acts of Defendants, the 7 U.S. citizens  named herein were killed in the bombing.

155.    As a direct and proximate result of these acts, the individual Plaintiffs have been injured as described above.

WHEREFORE, the individual Plaintiffs demand judgment be entered, jointly and severally, against the Defendants in the amount of SIX HUNDRED MILLION DOLLARS ($600,000,000).

## COUNT II

## SURVIVAL DAMAGES

156.    Paragraphs 1 through 155 are incorporated herein as if fully set forth.

157.    As a direct result and proximate result of the willful, wrongful, intentional and reckless acts of Defendants, the victims suffered extreme physical and mental pain and suffering, entitling the individual Plaintiffs to compensatory damages.

WHEREFORE, the individual Plaintiffs demand judgment be entered, jointly and severally, against the Defendants, in the amount of FIVE HUNDRED MILLION DOLLARS ($500,000,000).

## COUNT III

## ECONOMIC DAMAGES

158.    Paragraphs 1 through 157 are incorporated herein as if fully set forth.

159.    As a direct result and proximate result of the willful, wrongful, intentional and reckless acts of Defendants, the individual Plaintiffs incurred economic damages through deprivation of victims' income.

WHEREFORE, the individual Plaintiffs demand judgment be entered, jointly and severally, against the Defendants in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000).

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

160.    Paragraphs 1 through 159 are incorporated herein as if fully set forth.

161.    The act of bombing UTA Flight 772 constituted extreme and outrageous conduct on the part of Defendants.

162.    As a direct result and proximate result of the willful, wrongful, intentional and reckless acts of Defendants, the individual Plaintiffs were caused to suffer severe emotional distress.

WHEREFORE, the individual Plaintiffs demand judgment be entered, jointly and severally, against the Defendants in the amount of FIVE HUNDRED MILLION DOLLARS ($500,000,000).

## COUNT V

## LOSS OF SOLATIUM

163.    Paragraphs 1 through 162 are incorporated herein as if fully set forth.

164.    As a direct result and proximate result of the willful, wrongful, intentional and reckless acts of Defendants, the individual Plaintiffs suffered extreme mental anguish, emotional pain and suffering, in the loss of the society and companionship of victims, and the victims similarly suffered from the deprivation of their family's companionship.

WHEREFORE, the individual Plaintiffs demand judgment be entered, jointly and severally, against the Defendants, in the amount of FIVE HUNDRED MILLION DOLLARS ($500,000,000).

## COUNT VI

## LOSS OF CONSORTIUM

165.    Paragraphs 1 through 164 are incorporated herein as if fully set forth.

166.    As a direct result and proximate result of the willful, wrongful, intentional, and reckless acts of Defendants, Plaintiffs Robert L. Pugh, Ermine Hailey, Ioana Alimanestianu, and Carla J. Malkiewicz, suffered extreme mental anguish, emotional pain and suffering, in the loss of the society and companionship of their respective spouses, and the victims similarly suffered from the deprivation of their spouse's companionship.

WHEREFORE, Plaintiffs Robert L. Pugh, Ermine Hailey, Ioana Alimanestianu, and Carla J. Malkiewicz, demand judgment be entered, jointly and

severally, against the Defendants, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000).

## COUNT VII

## CONVERSION

167.    Paragraphs 1 through 166 are incorporated herein as if fully set forth.

168.    As a direct and proximate result of the willful, wrongful, intentional and reckless acts of Defendants, Plaintiff Interlease was permanently deprived of its property, the DC-10 airliner.

169.    In addition to the loss of the value of the airliner, Interlease was permanently deprived of the remaining lease payments of UTA as well as any future lease payments that it could have procured.

WHEREFORE, Plaintiff Interlease demands judgment be entered, jointly and severally, against the Defendants in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000) and an additional amount for prejudgment interest on commercial losses suffered by Interlease.

## COUNT VIII

## TORTIOUS INTERFERENCE

170.    Paragraphs 1 through 169 are incorporated herein as if fully set forth.

171.    The act of bombing UTA Flight 772 by Defendants constituted an intentional act that tortiously interfered with Plaintiff Interlease's

contracts, business relations, leases, and other business operations and opportunities.

172.    As a direct and proximate result of the willful, wrongful, intentional and reckless acts of Defendants, Plaintiff Interlease was permanently deprived of the income from various contracts, leases, and other business operations and opportunities.

173.    Also as a direct and proximate cause of the willful, wrongful, intentional and reckless acts of Defendants, Plaintiff Interlease suffered damage to its business reputation, damage to its credit rating, and the loss of business contracts, leases, and other business opportunities.

WHEREFORE, Plaintiff Interlease demands judgment be entered, jointly and severally, against the Defendants in the amount of THREE HUNDRED MILLION DOLLARS ($300,000,000), and an additional amount for prejudgment interest on commercial losses suffered by Interlease.

## COUNT IX

### VIOLATION OF 18 U.S.C. § 2333(a)

174.    Paragraphs 1 through 173 are incorporated herein as if fully set forth.

175.    As an alternative to Count VIII, Plaintiff Interlease demands relief pursuant to 28 U.S.C. § 2333(a), including treble damages and attorneys fees as provided in the statute, against Defendants to the extent they are

deemed to have acted outside the scope of their official capacity or outside the color of legal authority.

176.    As a direct and proximate result of the willful, wrongful, intentional and reckless acts of the individual Defendants, Plaintiff Interlease was permanently deprived of the income from various contracts, leases, and other business operations and opportunities.

177.    Also as a direct and proximate cause of the willful, wrongful, intentional and reckless acts of Defendants, Plaintiff Interlease suffered damage to its business reputation, damage to its credit rating, and the loss of business contracts, leases, and other business opportunities.

WHEREFORE, Plaintiff Interlease demands judgment be entered, jointly and severally, against the Defendants in the amount of THREE HUNDRED MILLION DOLLARS ($300,000,000), and said amount trebled, and an additional amount for prejudgment interest on commercial losses suffered by Interlease.

## COUNT X

## PUNITIVE DAMAGES

178.    Paragraphs 1 through 177 are incorporated herein as if fully set forth.

179.    The actions of LESO and the Individual Defendants who unlawfully, willfully, and violently killed the victims were intentional and malicious and in willful, wanton and reckless disregard of the victims' rights.

180.    Pursuant to section 589 of the 1997 Omnibus Consolidated Appropriations Act, P.L. 104-208, Div. A., Title 1 § 101(c) (September 20, 1996), 110 Stat. 3009-172 reprinted at 29 U.S.C. § 1605 note, which specifically authorizes a cause of action for punitive damages in civil actions for money damages resulting from terrorist acts, LESO and the individual defendants is liable for punitive damages in an amount to be determined by the court.

WHEREFORE, all Plaintiffs demand judgment be entered, jointly and severally, against the Defendants in an appropriate amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant Plaintiffs judgment in their favor and against Defendants on Counts I through X -- and grant Plaintiffs:

A.    Compensatory damages against Defendants, jointly and severally, in the amount of THREE BILLION DOLLARS ($3,000,000,000);

B.    Punitive damages against Defendants LESO and each of the individual defendants in an appropriate amount to be determined at trial;

C.    Reasonable costs and expenses;

D.    Reasonable attorneys' fees; and

E.    Such other and further relief which the Court may determine to be just and equitable under the circumstances.

Respectfully submitted,

Stuart H. Newberger, D.C. Bar No. 294793
Laurel Pyke Malson, D.C. Bar No. 317776
Michael L. Martinez, D.C. Bar No. 347310
Shari Ross Lahlou, D.C. Bar No. 476630
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500 telephone
(202) 626-5116 facsimile

Counsel for Plaintiffs

October 16, 2002

1945539