UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

<div style="border:1px solid;">

**LA RÉUNION AÉRIENNE,**

             **Plaintiff,**

         **v.**

**THE SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, et al.,**

             **Defendants.**

</div>

Civil Action 05-01932 (HHK)

**MEMORANDUM OPINION AND ORDER**

On September 19, 1989, Union des Transports Aériens ("UTA") Flight 772 exploded in mid-air over Niger, Africa, killing all 170 people on board. Plaintiff La Réunion Aérienne ("LRA"), a French partnership representing the interests of a group of insurance companies, brings this action against the Socialist People's Libyan Arab Jamahiriya ("Libya"), the Libyan External Security Organization ("LESO"), Muammar Qadhafi in his official capacity as Libya's head of state, and six other high-ranking Libyan government officials in their personal capacities, to recover payments LRA made to compensate the bombing victims' estates and families for losses arising from the explosion.[1] Before the court are defendants' motion to dismiss for lack of jurisdiction and their motion to strike plaintiff's motion for summary judgment.

---

[1] The individual defendants are Abdallah Senoussi, Ahmed Abdallah Elazragh, Ibrahim Naeli, Abras Musbah, Issa Abdelsalam Shibani, and Abdelsalam Hammouda El Ageli. LRA's complaint brings claims against these individuals in both their personal and official capacities. As represented in its opposition, LRA now wishes to proceed against these six defendants in their personal capacities only.

Upon consideration of the motions, the oppositions thereto, and the record of this case, the court grants each motion in part and denies each motion in part.

## I. BACKGROUND

This is not the first time the parties and facts involved in this case have come before the court. In *Pugh v. Socialist People's Libyan Arab Jamjiriya*, No. 02-CV-2026 ("*Pugh*"), thirty-six individuals and Interlease, Inc. ("Interlease"), a Georgia corporation, filed a complaint on their own behalf and on behalf of the estates of the American victims of the UTA Flight 772 bombing against the same defendants named in this action.[2] In that case, summary judgment has been granted in favor of plaintiffs as to a number of claims. *See* 290 F. Supp. 2d 54 (D.D.C. 2003) ("*Pugh I*"); 2006 WL 2384915 (D.D.C. May 11, 2006) ("*Pugh II*").

LRA also sought to intervene in *Pugh*, but the court denied LRA's motion. By filing its complaint in this action, LRA now brings its claims anew before the court. Specifically, the complaint alleges that LRA paid certain survivors and estates of the bombing victims (collectively, "Payees") approximately $2 million to cover, among other things, funeral and repatriation expenses arising from the bombing. LRA also alleges it paid to Interlease the insured value of the aircraft (more than $34,000,000). By virtue of these payments and according to the insurance policies, LRA alleges it took an assignment of and is subrogated to the rights of Payees and Interlease against defendants to the extent of the monies paid. The complaint brings claims of wrongful death, conversion, trespass to chattels, indemnity, and contribution, as well as

---

[2] Interlease owned and leased to UTA the DC-10 airplane that was destroyed in the bombing.

2

statutory claims pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2331 *et seq.*, and the so-called Flatow Amendment, 28 U.S.C. § 1605 note.

## II.  ANALYSIS

Defendants move to dismiss the complaint on a number of grounds.  First, they contend that as a third-party assignee and/or subrogee of the claims of Interlease and Payees, LRA is barred from bringing its claims directly against defendants.  Second, they essentially reiterate arguments they raised previously in *Pugh* against the court's exercise of personal and subject matter jurisdiction over them and the claims arising from the bombing.

**A.**    **LRA's Third-Party Status**

    **1.**    **The State-Sponsored Terrorism Exception**

As a general rule, the Foreign Sovereign Immunities Act ("FSIA"), enacted in 1976, establishes that foreign states (including "a political subdivision of a foreign state or an agency or instrumentality of a foreign state") are immune from suit in courts in the United States. 28 U.S.C. §§ 1603(a), 1604.[3]  FSIA specifies a limited number of exceptions to this general rule of immunity.  *Id.* § 1605.  The most recent of the exceptions, and the one implicated in this case, provides that a foreign state "shall not be immune from the jurisdiction of courts of the United States or of the States in any case" wherein "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act." *Id.* § 1605(a)(7).

---

[3]  Section 4(a) of FSIA, 28 U.S.C. § 1604, states: "Subject to existing international agreements . . . a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."

In order for this so-called "state-sponsored terrorism exception" to apply, three criteria must be satisfied: (1) the foreign state must be designated as a state sponsor of terrorism at the time of the terrorist act or as a result of the terrorist act, (2) the foreign state must be afforded a reasonable opportunity to arbitrate the claim if the act occurred within the foreign state against which the claim has been brought, and (3) either the claimant or the victim must have been a national of the United States at the time of the terrorist act. *Id.* § 1605(a)(7)(A),(B); *see also Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1028–29 (D.C. Cir. 2004).

### 2. LRA's Nationality

Defendants' first argument — that because LRA is not a "national of the United States" it cannot sue Libya — is contradicted by the statute's plain language. The immunity waiver provision only requires that the *victim* (or the claimant) was a U.S. national at the time of the terrorist act, and there is no dispute that the victim decedents so qualified. Indeed, Congress specifically amended the state-sponsored-terrorism exception shortly after its first enactment to reject the very position advocated by defendants here. *See* Jurisdiction for Lawsuits Against Terrorist States: Technical Correction, Pub. L. No. 105-11, 111 Stat. 22 (1997) (amending the 1996 amendment by replacing the phrase "the claimant or victim was not" with "neither the claimant nor the victim was"); *see also* H.R. Rep. No. 105-48, at 2 (1997) ("The intent of the drafters was that a family should have the benefit of these provisions if either the victim of the act or the survivor who brings the claim is an American national.").

### 3. Viability of Third-Party Claims Under the Exception

Defendants' second argument fares no better. They contend that as an assignee and subrogee of Payees' claims, LRA cannot sue for personal injury or death. Such suits, they argue,

may be brought only by the victims and their estates. The court disagrees. In the first instance, FSIA explicitly contemplates third-party claims for "money damages . . . for personal injury or death" by allowing non-victim claimants to bring suit. 28 U.S.C. § 1605(a)(7). Second, defendant's argument misapprehends the nature of assignment and subrogation. An assignee or subrogee does not bring claims for direct harms to herself. Rather, either pursuant to principles of contract or equity, she steps into the shoes of a third party and brings claims for harms suffered by that third party. 6A C.J.S. Assignments § 43 (2007); Black's Law Dictionary 1427 (6th ed. 1990); *see also Dow Chem. Corp. v. Weevil-Cide Co., Inc.*, 897 F.2d 481, 484 (10th Cir. 1990) (subrogation does not create a separate cause of action from the right held by the subrogor); *City of Hope Nat'l Med. Ctr. v. HealthPlus, Inc.*, 156 F.3d 223, 228 (1st Cir. 1998) ("It is generally understood that 'the assignee acquires rights similar to those of the assignor, and is put in the same position with reference to those rights as that in which the assignor stood at the time of assignment.'" (quoting 3 Samuel Williston on Contracts § 404 (3d ed. 1960)). Thus from the court's perspective, the assignee/subrogee is the functional proxy for the assignor/subrogor and inherits her rights, including her entitlements to sue (unless, of course, some limitation on assignment or subrogation exists to prohibit that inheritance, and defendants have identified no such limitation here). Therefore, LRA's personal injury claims are, in essence, Payees' claims "for wrongful death" that fall squarely within the § 1605 waiver of sovereign immunity. 28 U.S.C. § 1605(a)(7) (allowing claims where "money damages are sought against a foreign state for personal injury or death"); *see also Dow Chem. Corp.*, 897 F.2d at 484; Annotation,

94 A.L.R. 438 (2007) (damages awarded for wrongful death claims include funeral and repatriation expenses in the majority of states).[4]

The court concludes that under the plain language of the statute, personal injury claims brought by assignees and/or subrogees of victims of terrorist acts fall within the exception. All the statute requires is that (1) the actions seek money damages from a foreign state which sponsors terrorist acts, (2) the claims are "for" personal injury or death (as are wrongful death claims brought by assignees/subrogees) arising from such acts, and (3) either the victims or the claimants are U.S. nationals. LRA's complaint satisfies these requirements.

The state-sponsored terrorism exception's legislative history does not support a contrary conclusion. Defendants cite to a House Judiciary Committee report that states, "[i]t is expected that a lawsuit proceeding under this section will be brought either by the victim, or on behalf of the victim's estate in the case of death or mental incapacity." H.R. Rep. No. 104-383, at 62 (1995). That report, however, described an early version of the legislation which did not yet include the eventually-enacted language that contemplates suits brought by non-victim claimants. More helpful to defendants, a later report refers to non-victim claims being brought by "famil[ies]" and "survivor[s]," and fails to mention other third parties, such as insurers. H.R. Rep. No. 105-48, at 2. One could argue that this reference manifests an intent to bar third-party claims. Indeed, it would not be insensible to read the language, standing alone, as showing that the non-victim claimants contemplated by the drafters are simply (and only) the surviving family

---

[4] Throughout this opinion, the court will refer generally to accepted principles of law while noting that (1) the application of choice-of-law principles and (2) the variety of laws applicable to the different Payees may, at later stages in this litigation, impact the individual viability of LRA's many claims.

members who would, under the laws of many states, be the parties in interest in suits for wrongful death. *See* Theodore I. Koskoff, Wrongful Death Actions, 12 Am. Jur. Trials 317, § 10 (2007).

The court, however, does not adopt this view. A more comprehensive review of the legislative history confirms that Congress did not intend to bar third-party claims such as LRA's. In *Hartford Fire Insurance Co. v. Socialist People's Libyan Arab Jamahiriya*, No. 98-cv-3096, 1999 WL 33589331 (D.D.C. Sept. 23, 1999), Judge Hogan conducted such a review and determined that § 1605(7) did not bar claims for indemnity and contribution brought against Libya by insurers who had compensated victims of the bombing of Pan Am Flight 103. The court wrote that "[t]he failure to permit insurance companies to sue" would undermine the statute's aim of "deter[ring] foreign states from sponsoring terrorist activities," and concluded that "[o]nly if" third-party insurers "can step into the shoes of the victims does FSIA fulfill its statutory purpose of providing 'an important economic and financial weapon against . . . outlaw states.'" *Id.* at *3 (quoting H.R. Rep. No. 104-383, at 62).[5] Judge Hogan's analysis is persuasive. Accordingly, the court has subject matter jurisdiction over LRA's wrongful death claims against Libya.[6]

---

[5] Defendants attempt to evade the holding of *Hartford Fire* by suggesting that the decision was overruled by the D.C. Circuit in *Cicippio-Puleo*. The court disagrees. *Cicippio-Puleo* did not address the question of whether third-party claims were viable under the state-sponsored terrorism exception. Indeed, to the extent the court discussed such claims in dicta, it impliedly approved of them. *Cicippio-Puleo*, 353 F.3d at 1029–30 (discussing claims for solatium damages).

[6] The court also has jurisdiction over LRA's claims for contribution and indemnity. *Hartford Fire*, 1999 WL 33589331, at *3.

### 4.  Punitive Damages

Defendants' final argument related to plaintiffs' third-party status vis-à-vis the *Pugh* plaintiffs is that LRA may not seek punitive damages.[7] The general rule in many states is that a subrogee may not seek punitive damages against a defendant for harms suffered by a subrogor. *See Prudential Prop. & Cas. Co. v. Dow Chevrolet-Olds, Inc.*, 10 S.W.3d 97, 101 (Tex. App. 1999) (holding that insurer, as subrogee on single claim, was not entitled to receive punitive damages); *Utica Mut. Ins. Co. v. Denwat Corp.*, 778 F. Supp. 592, 593–94 (D. Conn. 1991) (same); *Employers Ins. of Wausau v. Dunaway*, 626 F. Supp. 1144, 1146–47 (S.D. Miss. 1986) (same); *Colonial Penn Ins. Co. v. Ford*, 411 A.2d 736, 737 (N.J. Super. Ct. Law Div. 1979) (same); *Maryland Cas. Co. v. Brown*, 321 F. Supp. 309, 312 (N.D. Ga. 1971) (same); *see also Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 133 F. Supp. 2d 162, 176–79 (E.D.N.Y. 2001) (allowing subrogee insurer to seek punitive damages where "many individual claims would not [otherwise] be brought or would not be fully vindicated to cover the total costs of a defendant's delicts to society"). The court need not and will decline to determine, however, whether that rule applies here, for two reasons: First, the question depends in some respects on choice-of-law issues that cannot be resolved based on the allegations in LRA's current complaint and therefore are better suited to resolution on motions for summary judgment. Second, the court will decline to address the question until it has heard from the parties regarding what impact, if

---

[7] Plaintiffs concede that punitive damages are available, if at all, only against the individual defendants sued in their personal capacities. The court also notes that numerous other arguments raised by defendants have been conceded by plaintiffs, including those regarding (1) the unavailability of punitive damages against a foreign state, (2) the non-viability of claims against foreign sovereigns under the Flatow Amendment, (3) the unavailability of treble damages under ATA as against foreign states, and (4) the unavailability of claims for trespass to chattels and conversion against foreign states.

any, the United States Supreme Court's recent decision in *Philip Morris USA v. Williams*, No. 05-1256, 549 U.S. __, 127 S. Ct. 1057 (2007), has on the availability of punitive damages for assignees and/or subrogees.

**B.      Viability of Interlease Claims**

The governmental defendants further argue that sovereign immunity bars any Interlease-related claims against them because the state-sponsored terrorism exception does not encompass property claims. Plaintiffs disagree, contending that the statute covers a wider range of claims than just those "for money damages . . . for personal injury or death." 28 U.S.C. § 1605(a)(7). Plaintiffs point to the language of the statute, which waives foreign states' sovereign immunity "in any case" in which such claims are brought. *Id.* § 1605(a), (a)(7). Congress's intent, they argue, was to incorporate the principles of supplemental jurisdiction into the limited waiver created by FSIA: pursuant to fundamental principles of law, the term "case" describes any civil action as a whole, including all of its subsidiary "claims." Thus, where a given case is one "in which money damages are sought against a foreign state for personal injury or death," additional claims against foreign sovereigns are encompassed by the waiver, as well, so long as they satisfy the requirements of the supplemental jurisdiction statute.[8]

---

[8] The statute provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).

9

The court agrees with defendants. Though the phrase "in any case" gives the court brief pause, the language throughout FSIA, as well as the Act's legislative history, confirms that Congress only intended to waive the sovereign immunity of state sponsors of terrorism as to the claims specified in § 1605(a)(7).

First, the statute provides for jurisdiction "in" any case in which the claims specified in the statute are brought, rather than "over" any such case. *Id.* § 1605. Moreover, § 4(a) of the Act provides that a foreign state shall be liable "[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity," thus impliedly limiting the extent of the liability of the foreign state to the Act's articulated claims, rather than to cases in which such claims are brought. *Id.* § 1606. Likewise, § 2(a) confers original jurisdiction on the district courts over "any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity." *Id.* § 1330(a). The House Report of the Act similarly describes the extent of the jurisdiction conferred on the district courts as reaching "any claim with respect to which the foreign state is not entitled to immunity." H.R. Rep. No. 94-1487, at 13 (1976). The implication of these statements, one could reasonably conclude, is that in enacting FSIA, Congress was concerned primarily with waiving immunity as to particular claims, not as to cases.[9]

More to the point, the legislative history of the state-sponsored terrorism immunity waiver at issue here contains no discussion of either supplemental claims generally or of property

---

[9] Of course, even with this oft-repeated language, the logic of the statute remains maddeningly circular: the references to "any claim with respect to which the foreign state is not entitled to immunity" arguably do nothing but direct the reader back to § 1605, the original source of the troublesome phrase "in any case."

10

claims such as those brought here by LRA. To the contrary, Congress's pronouncements focused solely on claims for wrongful death and personal injury. H.R. Rep. No. 104-383, at 62; H.R. Rep. No. 105-48, at 2. Indeed, the Conference Report explicitly limits the exception's coverage to the claims specified in the statute: according to the report, the statute "permits U.S. federal courts to hear *claims* seeking money damages for personal injury or death against such nations and arising from terrorist acts they commit, or direct to be committed." H.R. Conf. Rep. No. 104-518, at 112 (1996) (emphasis added). For all these reasons, the court concludes that LRA's Interlease-related claims against Libya and LESO are barred. *See Pugh I*, 290 F. Supp. 2d at 60–61; *Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq*, 79 F. Supp. 2d 374, 387 (S.D.N.Y. 2000) ("The jurisdiction conferred on the district courts by the FSIA may not be expanded by application of Section 1367(a) and the doctrine of supplemental jurisdiction.").

**C.     Viability of the Underlying Claims: Issues Previously Litigated**

As LRA steps into the shoes of Payees and Interlease vis-à-vis defendants by virtue of its assignee/subrogee status, its claims are, in large measure, identical to the claims brought in *Pugh*. Many of defendants' remaining arguments — raised previously in *Pugh* — already have been rejected (and defendants have failed to persuade the court here that its prior decision was in error). Other arguments from defendants run contrary to settled D.C. Circuit law. Accordingly, and incorporating by reference the legal analysis of the court's May 11, 2006 opinion and order in *Pugh*, the court makes the following determinations:

1. Pursuant to FSIA, the court has subject matter jurisdiction over LRA's claims against Libya and LESO for wrongful death. *See Pugh II*, 2006 WL 2384915, at *12–*15.

2. The court has subject matter jurisdiction over LRA's claims against Libya notwithstanding the fact that it is no longer designated as a state sponsor of terrorism. *See* 28 U.S.C. § 1605(a)(7).

3. The court may exercise personal jurisdiction over the individual defendants for claims against them in their personal capacities. *See Pugh II*, 2006 WL 2384915, at *2 n.6.

4. The court may exercise personal jurisdiction over Libya. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95–100 (D.C. Cir. 2002).

5. To the extent LRA successfully demonstrates at summary judgment or trial that it is a valid partial assingee and/or subrogee to (1) Payees' claims against the individual defendants in their personal capacity under the Flatow Amendment, 28 U.S.C. § 1605 note, and to (2) Interlease's and Payees' personal capacity claims against the individual defendants under ATA, the doctrine of collateral estoppel bars defendants from relitigating either the legal viability of the *Pugh* plaintiffs' claims or defendants' adjudged liability as to those claims. *See Pugh II*, 2006 WL 2384915, at *8–*10; *Jack Faucett Assocs. v. AT&T*, 744 F.2d 118, 125 (D.C. Cir. 1984). The court has carefully considered the offensive application of the doctrine and concludes that such application is warranted here. *See id.* at 125–26; *Parklane Hosiery Co. v. Shore*, 429 U.S. 322, 328–32 (1979).[10]

**D.    Sources of Law**

A suit against a state sponsor of terrorism pursuant to FSIA "must identify a particular cause of action arising out of a specific source of law," *Acree v. Republic of Iraq*, 370 F.3d 41,

---

[10] Defendants have not challenged the viability of assignee/subrogee claims under these statutes. The court nonetheless concludes that such claims, which do not involve considerations of sovereign immunity, are not barred.

59 (D.C. Cir. 2004), which may "includ[e] state law," *Cicippio-Puleo*, 353 F.3d at 1036. Defendants argue that LRA has merely alleged generic common law causes of action and therefore has failed to satisfy this requirement. The court disagrees.

The court recently assessed this argument in a similarly-postured FSIA case and repeats its discussion of this requirement from that decision:

> [P]laintiffs need not set forth their *choice of law* contentions in their complaint. *Dammarell v. Islamic Republic of Iran*, 370 F. Supp. 2d 218, 221 (D.D.C. 2005) (noting that the court is "unaware of any law, either in the FSIA setting or out, that would require" plaintiffs to "include the choice of law determination in the Complaint itself"). Under *Cicippio-Puleo* and *Acree*, plaintiffs are required to identify "whether these claims are based in state law (or some other source of law), or whether they arise out of the common law or a particular statute," but they need not specify in the complaint a particular state out of which each claim arises. *Dammarell*, 370 F. Supp. 2d at 221 (internal quotation marks omitted). In order to survive a motion to dismiss, a plaintiff must give a defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 223 (citing *Modderno v. King*, 82 F. 3d 1059, 1063 (D.C. Cir. 1996). She need not specify every theory under which she might proceed, however. *See Hanson v. Hoffman*, 628 F.2d 42, 53 (D.C. Cir. 1980) ("The liberal concepts of notice pleading embodied in the Federal Rules do not require the pleading of legal theories."). Choice of law is a legal determination that the court will make under its choice-of-law rules.

*Hurst v. Socialist People's Libyan Arab Jamahiriya*, No. 02-cv-2147, __ F. Supp. 2d __, 2007 WL 274321, at *4 (D.D.C. Feb. 1, 2007).

Here, the complaint identifies (albeit incompletely) the domiciles of the decedents and then states that LRA asserts wrongful death claims as assignee and subrogee "against the Defendants for wrongful death under the laws of the States where [the decedents] were domiciled at the time of their deaths." Compl. ¶¶ 3, 17. This articulation satisfies LRA's pleading obligation.

**E.     Head-of-State Immunity**

Defendant Qadhafi also argues he is entitled to head-of-state immunity. The parties agree, and the court concurs, that whether defendant Qadhafi enjoys immunity is a question that should be resolved only after the Executive Branch has offered its views on the question. Pending submission of these views, LRA's claims as to Qadhafi are stayed.[11]

**E.     Forum Non Conveniens, Insufficiency of Service, and Defendants' Motion to Strike**

Finally, defendants contend that service has not been properly effected and that the case should be dismissed pursuant to the doctrine of *forum non conveniens*. The court rejects these arguments. *See* Fed. R. Civ. P. 4(f)(3); *Pugh I*, 290 F. Supp. 2d at 57 (rejecting a similar *forum non conveniens* argument by the same defendants).

Defendants have also moved to strike LRA's motion for summary judgment, or, in the alternative, to stay the motion. They argue that the motion should be stricken because the principles of sovereign immunity, which protect states against "trial and the attendant burdens of litigation," *Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990), insulate defendants from the obligation to respond to the motion, at least until the threshold issues of jurisdiction and immunity are resolved. Defendants move in the alternative for a stay of the motion, pending resolution of the motion to dismiss. While the court will not strike the summary judgment motion, defendants' alternative request for a stay (now rendered moot by the issuance of this opinion) is justified.

---

[11] Similar requests for the Executive Branch's views have been made, and are currently pending, in *Collett v. Socialist People's Libyan Arab Jamahiriya*, No. 01-cv-2103, and in *Pugh*.

### III.  CONCLUSION

For the foregoing reasons, it is this 9th day of March, 2007, hereby

**ORDERED** that defendants' motion to dismiss [#13] is granted in part and denied in part as set forth in this memorandum opinion; and it is further

**ORDERED** that defendants' motion to strike [#17] is granted in part and denied in part as set forth in this memorandum opinion; and it is further

**ORDERED** that the Clerk of the Court shall inform the Attorney General that he may advise the court of his views regarding the application of the head-of-state immunity doctrine to this case on or before April 13, 2007; and it is further

**ORDERED** that on or before April 13, 2007, LRA shall file supplemental briefing addressing issues raised by this opinion and not addressed in its summary judgment motion.[12] Defendants shall file any opposition to the motion for summary judgment, as supplemented, on or before April 27, 2007, and LRA may file a reply memorandum on or before May 2, 2007.

                                                    Henry H. Kennedy, Jr.
                                                    United States District Judge

---

[12] LRA is not precluded, of course, from voluntarily dismissing the original motion and filing a revised motion in light of this opinion.