IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
LA RÉUNION AÉRIENNE                         )
50 Rue Ampere                               )
Paris 75017, France                         )   Civil Action No. 1:05CV01932
                   Plaintiff,               )   Honorable Henry H. Kennedy, Jr.
        v.                                  )
                                            )
SOCIALIST PEOPLE'S LIBYAN                   )
ARAB JAMAHIRIYA, LIBYAN EXTERNAL            )   **PLAINTIFF'S**
SECURITY ORGANIZATION, MUAMMAR              )   **SUPPLEMENTAL**
QADHAFI, ABDALLAH SENOUSSI, AHMED           )   **MEMORANDUM OF LAW**
ABDALLAH ELAZRAGH, IBRAHIM NAELI,           )   **(REQUESTED BY THE COURT)**
ARBAS MUSBAH, ISSA ABDELSALAM               )
SHIBANI AND ABDELSALAM HAMMOUDA             )
EL AGELI                                    )
Ministry of Foreign Affairs                 )
Tripoli, Libya,                             )
                   Defendants.              )
_____)

In this Court's March 9, 2007, Memorandum Opinion and Order, which deals for the most part with the Defendants' motion to dismiss the Complaint, the Court invited supplemental briefing with respect to several issues arising in connection with Defendants' motion to dismiss and Plaintiff's motion for summary judgment. Specifically:

--  The Court requested, in connection with Defendants' motion to dismiss, that the parties provide briefing on the impact, if any, of the Supreme Court's recent decision in *Philip Morris USA v. Williams*, 127 S. Ct. 1057 (2007), on the availability of punitive damages for assignees and/or subrogees (Slip Op. at 8-9).

--  the Court stated that Defendants would be collaterally estopped from relitigating in this action the viability of the *Pugh* plaintiffs' claims or the Individual Defendants' adjudged liability on any of those claims to the extent LRA is able to

>   demonstrate that it is a valid partial assignee and/or subrogee to such claims (Slip Op. at 12), thereby indicating that clarification may be required with regard to LRA's standing as an assignee and/or subrogee;
>
> --   the Court stated that LRA had adequately pled that the wrongful death claims[1] arose under the laws of the states where the decedents were domiciled at the time of their deaths, but indicated that to prevail on summary judgment more particularity may be required (Slip Op. at 13).

This is LRA's response with respect to those issues.

**1.   The Effect of *Philip Morris*.**

It is the view of the Plaintiff that the decision in *Philip Morris* has little effect on the question whether an assignee or subrogee is entitled to claim punitive damages.

*Philip Morris* concerned a jury instruction on punitive damages which could have been interpreted by the jury as allowing the imposition of punitive damages as punishment for harm caused not just to the plaintiffs, but also to others not before the court.  The Supreme Court held that an instruction that lent itself to such an interpretation was improper, because it ran afoul of the Court's previously imposed guidelines for imposing punitive damages.  Those guidelines require that any system for imposing punitive damages be designed to give the defendant fair notice of the severity of the possible penalty, that there be no threat of arbitrary punishment reflecting the jury's caprice, and that in cases involving a product the damages imposed not be of such magnitude as could impose the jury's "policy choice" on whether and how the product may be marketed in other states.  Although those guidelines impact both the procedures for imposing

---

[1]   Although Plaintiff in its Complaint did refer to its claims as wrongful death damages, Plaintiff only seeks to recover its reimbursements to the decedents' families for the amounts expended as funeral expenses and the costs of repatriating the victims' remains. *See* Complaint, ¶ 18.

punitive damages and the limitations on amounts that may be imposed, *Philip Morris* concerned itself only with the why and how of procedural limitations.

The Court articulated three reasons why states are forbidden to use punitive damages to punish a defendant for injuries inflicted on non-parties. First, the Court held that the Constitution requires that an individual may not be punished without having had every opportunity to present every available defense. Slip Op. at 5-6. Yet, a defendant threatened with punishment for having injured a non-party has no opportunity to defend himself against that charge by, for example, showing that the non-party caused his own injury. That is a violation of due process.

Second, if a defendant can be punished for injury caused to non-parties, that adds a "near standardless dimension" to the punitive damages equation. Slip Op. at 6. The Court explained that because a trial will not likely answer such questions as how many non-party victims there were, or how seriously they were injured, or under what circumstances they were injured, the jury will be left to speculate. Such speculation would run directly afoul of the very due process concerns that require procedural limitations on punitive damages awards, *i.e.*, arbitrariness, uncertainty and lack of notice.

Finally, the Court stated that it could find no authority supporting the use of punitive damages to punish a defendant for harm to others. Consequently, the Court concluded, it was constitutionally important that the jury instructions be framed in such a way as to assure that the jury understands that it cannot punish the defendant for harm caused to strangers to the case. Slip Op. at 7-8.

The third above-listed factor -- the lack of precedential authority on the issue -- is, of course, not impacted by the particular circumstances of this case. If there is no precedent, there

is no precedent. The other two factors seem to be simply inapposite. Here, we are not dealing with a possibility that damages may be imposed on a defendant because of harm to unknown victims not before the court. All of the victims are known, and their representatives have partially assigned their claims to LRA, who stands in their shoes before this Court, as we show below. Moreover, what is at issue here is a single incident, the intentional terrorist attack on one aircraft, and the punitive damages that are claimed are sought solely as punishment for the horrible act that caused that one disaster.

Unlike the situation discussed in *Philip Morris*, there is no question in this case as to the number of injuries caused or, for that matter, as to the identity of the victims, no question as to the seriousness of the injuries for which punitive damages are claimed, and no question as to the circumstances of the injuries. Thus, the concern articulated by the Supreme Court that the factfinder will be left to speculate does not exist here. Nor is there any lack of notice leading to a resulting lack of opportunity for the defendants to defend themselves, because all of the victims of this act are known.

Plaintiff recognizes that it might be contended that the victims in this case are not before the Court, insofar as it is the Plaintiff, LRA, which seeks to impose punitive damages. That argument would not be well-taken. Specifically, Pub. L. 104-208, div. A, title I § 101(c) (Sept. 30, 1996), 110 Stat. 3009-172 [reprinted at 28 U.S.C. § 1605 note] authorizes punitive damages in civil actions seeking monetary damages on account of terrorist acts. The statute provides, in pertinent part, that an official, employee or agent of a designated state sponsor of terrorism "acting within the scope of his office, employment or agency shall be liable to a United States national *or the national's legal representative* for personal injury or death caused by that official, employee, or agent … for money damages which may include economic damages, solatium, pain

and suffering, *and punitive damages*…." (emphasis added).  Thus, the Flatow Amendment expressly recognizes that a legal representative, such as subrogee LRA here, is entitled to claim punitive damages to the same extent as it is entitled to claim other types of damages..

LRA may be deemed to be a legal representative, by assignment and/or by subrogation, of those who are statutorily entitled to claim punitive damages under the state sponsored terrorism exception to FSIA.  Thus, LRA should be entitled to claim punitive damages on that basis.  Alternatively, this Court has already determined that personal injury claims by assignees and/or subrogees of victims of terrorist acts fall within the state sponsored terrorism exception to the FSIA, and that such claims are allowed.  By that very token, LRA, by assignment and/or subrogation, should be allowed to step into the shoes of the estates and other legal representatives statutorily entitled to claim punitive damages.  There is no reason to treat punitive damage claims differently than compensatory damage claims in this case, as the punitive damages claims at issue herein do not implicate the fears that lie at the heart of Supreme Court's holding in *Philip Morris*.  Rather, LRA, as it were, simply seeks to substitute itself as plaintiff in place of the victims or their estates.  But the victims are the same.  There is no claim based on injury to victims unknown to the Court, and no implication of the various due process concerns that would arise were that the case.

**2.     LRA Is the Partial Assignee and Subrogee to the Claims of Interlease and Seven of the *Pugh* Plaintiffs.**

In its Complaint, LRA asserts that it is an assignee and/or the subrogee to the rights of Interlease and the representatives of the seven American decedents in connection with their claims against Defendants arising out of the terrorist bombing of UTA flight 772.  Interlease, as well as survivors of each of the seven American decedents -- Bonnie Barnes Pugh, James E. Turlington, Sr., Margaret Elizabeth Schutzius, Patrick Wayne Huff, Donald J. Warner, Mihai

5

Alimanestianu and Mark E. Corder -- all are plaintiffs in the related action entitled *Robert L. Pugh v. Socialist People's Libyan Arab Jamahiriya, et al.*, Civ. No. 02-2026(HHK) (D.D.C.) (hereinafter "*Pugh*").

As alleged in the Complaint, LRA, acting on behalf of its member insurance companies paid out to the survivors and estates of the seven above-named decedents, the sum of $2,011,172.42, as nearly as can now be computed, and to Interlease, the owner of the aircraft, a sum of at least $34 million. In return, LRA took an assignment of rights against third parties from the survivors and estates of the seven decedents,[2] and from Interlease,[3] to the extent of its payments to them. LRA also is subrogated to these parties' rights to the extent of its payments to them, as a matter of law.[4]

On its motion for summary judgment, LRA provided some documentation of its rights, in the form of Exhibits attached to Plaintiff's Statement of Undisputed Material facts in Support of Its Motion for Summary Judgment ("Plaintiff's Statement of Undisputed Facts").

---

[2]   The Release of All Claims executed by the releasors on behalf of each American decedent provides, in pertinent part, "Releasors hereby assign, transfer, and set over way of subrogation to Releasees, their successors and assigns, all of Releasors' rights, title, and interests in and to any and all actions, causes of action, claims demands and remedies that Releasors have or may have against any and all third parties who may be liable for the above described Matter and/or the destruction of the aforesaid UTA Flight 772, to the extent of the Releasees' costs and expenses including, but not limited to, attorneys' fees) incurred in the settling of the claims herein and in obtaining any recovery against third parties."

[3]   The Proof of Loss and Release and Discharge provides, in pertinent part, "In consideration of the payment to be made hereunder, the undersigned [*i.e.*, Interlease] hereby assigns, sets over, transfers and subrogates to the Underwriters all the rights, claims, interests, causes and remedy of actions to the extent of the above amount which it may have against any party, person, corporation or governmental agency who may be liable for the loss and hereby authorizes the Underwriters, at the cost of the Underwriters, to sue, compromise or settle in its name or otherwise, and the Underwriters are hereby fully substituted in its place and subrogated to the rights which it may have to the amount so paid."

[4]   Defendants never contested that LRA is an assignee and subrogee to the rights of the decedents' representatives and Interlease. Its only contention in that regard, which the Court rejected, was that as an assignee and subrogee LRA lacked standing to assert certain claims.

Such documentary proof consisted, with respect to Interlease, of Interlease's executed Proof of Loss and Release and Discharge (Exh. 1), which acknowledges payment to be made in the amount of $34 million, as well as an executed Bill of Sale transferring all of Interlease's right title and interest in the aircraft (or whatever was left of it) in settlement of Interlease's insurance claims against LRA (Exh. 3)  In the Proof of Loss and Release and Discharge, Interlease specifically "assigns, sets over, transfers and subrogates to the Underwriters all the rights, claims, interests, causes and remedy of actions" which it may have against any party, person, corporation or governmental agency who may be liable for the loss, to the extent of the amount of the payments made by the Underwriters.  [The full relevant language is set forth in fn. 2 herein.]

With respect to the rights of the survivors or estates of the decedents, LRA provided, as an example, a Release Of All Claims executed by the son of one of the decedents, Bonnie Barnes Pugh (Exh. 2), containing an "assign[ment], transfer, and set over by way of subrogation" of all rights against the parties responsible for the aircraft destruction. [*See* fn. 1.]  LRA also submitted the Declaration of Thibaut de Mallman, a principal of its claims adjusting subsidiary, attesting to the fact that all of the seven American decedents' representatives and estates whose claims are here at issue similarly assigned their claims to the insurers represented by LRA.

Although LRA previously provided copies of a release containing an assignment with respect to a survivor of only one of the decedents, it provides herewith such proof with respect to the six other American decedents, namely James E. Turlington, Sr., Margaret Elizabeth Schutzius, Patrick Wayne Huff, Donald J. Warner, Mihai Alimanestianu and Mark E. Corder. *See* attachments to the accompanying Affidavit of Christopher B. Kende.  LRA also provides herewith a copy of the fully executed Pugh release.  *Id.*  This documentary evidence constitutes

7

irrefutable evidence of LRA's standing as subrogee of the American decedents and Interlease to assert the claims herein, to the extent of amounts paid, which are well in excess of $36,000,000. (*see* Slip Op. at 12).

**3.    The State Law Sources of LRA's Wrongful Death Cause of Action.**

The Court already has before it a great deal of the choice of analysis that is required in order to determine which jurisdictions' laws apply to the wrongful death causes of action, and that analysis need not be repeated here. *See* Memorandum dated May 30, 2006 and entitled "Plaintiffs' Memorandum Outlining Choice-of-Law Issues and State Law Causes of Action in Further Support of Their Motion for Partial Summary Judgment" submitted in *Pugh* (the "*Pugh* Memorandum," copy appended to the Kende Affidavit). The Court also issued an Order in *Pugh*, filed April 9, 2007, determining that the law to be applied in that matter to the various state law claims is the law of the state where each plaintiff is (or in the case of claims brought by a decedents' estate, where the plaintiff was) domiciled. To the extent set forth below, LRA adopts and incorporates parts of the Court's Order as well as *Pugh* Memorandum analysis herein. By so doing, LRA avoids any conflict between its position and the April 9, 2007 Order, as well as the position taken by the very parties who assigned certain rights to LRA, or to whose rights LRA is subrogated.

In this Court's Memorandum Opinion and Order herein, the Court stated that LRA's Complaint incompletely identified the domiciles of the decedents. Their domiciles at the time of their deaths were as follows:

--Bonnie Barnes Pugh, not clear, possibly Chad (*see* Plaintiffs' Statement of Undisputed Facts, Exh. H)

--James E. Turlington, Sr., Bellville, Texas (*Id.*, Exh. H)

---Margaret Elizabeth Schutzius, Dallas, Texas (*Id.,* Exh. H)

8

    --Patrick Wayne Huff, Franklin, Texas (*Id.,* Exh. H)

    --Donald J. Warner, Terry, Montana (*Id.,* Exh. H)

    --Mihai Alimanestianu, New York, New York (*Id.,* Exh. G)

    --Mark E. Corder, Houston, Texas (*Id.,* Exh. H)

In its recent Order in *Pugh*, the Court ruled that the governing law would be the law of the victims' domiciles, as previously was held in *Dammarell v. Islamic Republic of* Iran, 2005 U.S. Dist. Lexis 5343 (D.D.C. March 29, 2005). Applying such law -- besides preventing any conflict between this case and *Pugh* -- also has the salutary effect of preventing the anomalous result that different survivors of the same victim who happened to live in different states might be treated differently. LRA concurs with and adopts that position.

Thus, the Court should apply the rule that all claims relating to any victim's death are governed by the law of the state of the victim's last domicile. Thus, it will be necessary to determine if and how wrongful death claims are recognized under the laws of Texas, New York and Montana, as well as either Chad[5] or more likely Virginia.

As set forth in the *Pugh* Memorandum, wrongful death claims are recognized under the laws of Texas (Tex Civ. Prac. & Rem. Code § 71.002, *et al.*), New York (N.Y. Est. Powers & Trusts L. § 5-4.1(1)), Montana (Mont. Code Ann. § 27-1-513), and Virginia (Va. Code Ann. § 8.01-50(A), *et seq.*). LRA respectfully refers the Court to the *Pugh* Memorandum, at pp. 12-14, 21-22, 27-29 and 33-35, for the application of these four jurisdictions' laws to the wrongful death claims at issue. This Court has already determined that it has subject matter jurisdiction

---

[5]     Plaintiff have not been able to determine whether Chad recognizes an action for wrongful death, but believes that insofar as Ms. Pugh was, at best, a temporary resident of Chad and her estate was probated in Virginia, and Virginia also is the domicile of the survivor who assigned those claims to LRA (*see* Plaintiff's Statement of Undisputed Facts, Exh. 2), it is most appropriate to apply Virginia law to the wrongful death claims arising out of Ms. Pugh's death. *See Dammarell*, 2005 U.S. Dist. Lexis 5343 at *70.

over LRA's wrongful death claims, whether they gained them by assignment or by subrogation. Slip Op. at 7.

**Conclusion.**

LRA's motion for summary judgment should be granted, just as the motion brought by the *Pugh* plaintiffs was granted, for all the reasons set forth by the Court in its Orders in that matter as well as the additional reasons set forth in the Court's March 9, 2007 Memorandum Opinion and Order herein and in LRA's initial papers on its summary judgment motion.

LRA urges, in that regard, that it would be appropriate for it to participate in the August hearing on damages involving the *Pugh* plaintiffs who are LRA's assignors and subrogors. That would avoid any inconsistencies in the remedies afforded.

Date:  April 13, 2007

                                      Respectfully submitted,

                                       /S/ Christopher B. Kende
                                      Christopher B. Kende, Esquire (D.C. 416487)
                                      COZEN O'CONNOR
                                      1627 I Street, NW
                                      11th Floor
                                      Washington, D.C. 20006
                                      (202) 912-4800
                                      (202) 912-4830 (facsimile)
                                      *Attorneys for Plaintiff*