**Exhibit H**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT L. PUGH, *et al.,*        )
)
       Plaintiffs,      )
)
     v.           )     Civil Action No. 02-2026 (HHK)
)
SOCIALIST PEOPLE'S LIBYAN  )
ARAB JAMAHIRIYA, *et al.,*    )
)
       Defendants.     )
)

## PLAINTIFFS' MEMORANDUM OUTLINING CHOICE-OF-LAW ISSUES AND STATE LAW CAUSES OF ACTION IN FURTHER SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Stuart H. Newberger, D.C. Bar No. 294793
Michael L. Martinez, D.C. Bar No. 347310
Laurel Pyke Malson, D.C. Bar No. 317776
Shari Ross Lahlou, D.C. Bar No. 476630
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500 telephone
(202) 628-5116 facsimile

May 30, 2006

## TABLE OF CONTENTS

I.  CHOICE-OF-LAW ANALYSIS ...................................................................2

II. STATE LAW CAUSES OF ACTION FOR EACH PLAINTIFF..............11

    A.  Virginia ...........................................................................................11

        1.  Wrongful Death ....................................................................12
            a.  *Applicable Law*...........................................................12
            b.  *Application to Plaintiffs*.............................................13

        2.  Intentional Infliction of Emotional Distress............................15
            a.  *Applicable Law*...........................................................15
            b.  *Application to Plaintiffs*.............................................16

        3.  Loss of Consortium/Solatium ..............................................18

        4.  Survival Actions....................................................................19

    B.  Texas.................................................................................................19

        1.  Wrongful Death ....................................................................21
            a.  *Applicable Law*...........................................................21
            b.  *Application to Plaintiffs*.............................................22

        2.  Intentional Infliction of Emotional Distress............................22
            a.  *Applicable Law*...........................................................22
            b.  *Application to Plaintiffs*.............................................23

        3.  Loss of Consortium/Solatium ..............................................24
            a.  *Applicable Law*...........................................................24
            b.  *Application to Plaintiffs*.............................................25

        4.  Survival Actions....................................................................25

    C.  New York ..........................................................................................26

        1.  Wrongful Death ....................................................................27
            a.  *Applicable Law*...........................................................27
            b.  *Application to Plaintiffs*.............................................29

        2.  Intentional Infliction of Emotional Distress............................29
            a.  *Applicable Law*...........................................................29
            b.  *Application to Plaintiffs*.............................................30

        3.  Loss of Consortium/Solatium ..............................................30

        4.  Survival Actions....................................................................31

    D.  Montana ...........................................................................................32

        1.  Wrongful Death ....................................................................33
            a.  *Applicable Law*...........................................................33

The Amended Complaint was filed on May 19, 2006. This memorandum provides the specificity regarding choice-of-law determinations and causes of action directed by the Court. After outlining the appropriate analysis for determining the applicable state law for each Plaintiff's claims, we detail the law for each of those claims. Upon a finding of liability on the applicable state law causes of action – which, given the overwhelming and undisputed record, is inevitable – the Court should enter a finding of liability regarding Libya's responsibility for the murder of 170 persons on UTA Flight 772 and the destruction of the DC-10 jumbo jet. Thereafter, Plaintiffs request that the Court promptly schedule a damages hearing so that this case can proceed to final judgment.[1]

## ARGUMENT

### I.    CHOICE-OF-LAW ANALYSIS

As the Court recognized in its May 11 Opinion, in order to determine the applicable causes of action for each Plaintiff it is first necessary to conduct a choice-of-law analysis. We provide below the framework for such an analysis and suggest that the Court can – consistent with settled choice-of-law principles – simplify its analysis in this case by looking to the four states in which the estates of the seven American victims of the bombing of UTA Flight 772 were probated: Virginia, Texas,

---

[1]    The primary focus of this memorandum is to identify choice-of-law principles and specific state law causes of action for each Plaintiff for purposes of determining the question of Libya's liability for the UTA 772 bombing. Although not relevant until the damages hearing, we nonetheless address the *types of damages* that are available under certain state law schemes as that information lends further support to the specific state law determination.

New York and Montana. Significantly, there is substantial overlap between those four states (which are also the states of domicile for the bombing victims) and the domiciles of the surviving family member Plaintiffs at the time of the bombing in September 1989. Alternatively, for those Plaintiffs for which there is no overlap, the Court may, as this Court and other Judges in this District have previously done, look to the law of the state in which each claimant was domiciled at the time of the bombing. *See Cicippio-Puleo v. Islamic Republic of Iran*, CA 01-01496 (HHK) (D.D.C. Oct. 7, 2005), Slip Op. at 21-22; *Dammarell v. Islamic Republic of Iran*, 2005 U.S. Dist. LEXIS 5343 (D.D.C. March 29, 2005), at *59; *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 133 (D.D.C. 2005).

As to which choice-of-law rules apply, there appears to be no significant conflict between District of Columbia rules[2] and the federal conflicts law set forth in the Restatement (Second) of the Conflict of Laws. Accordingly, the framework set forth in the Restatement (Second) of the Conflict of Laws may be utilized to identify the states whose substantive rules of wrongful death, survivor actions, intentional infliction of emotional distress and loss of consortium and solatium are applicable to each Plaintiff.

The basic conflicts principles are set forth in Sections 6, 145, and 175 of the Restatement, as discussed below.

---

[2]    Normally, the choice-of-law rules of the forum state apply in federal court litigation based on diversity jurisdiction. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Of course, subject matter jurisdiction here is based on the Foreign Sovereign Immunities Act, federal question jurisdiction and diversity. 28 U.S.C. §§ 1330(a), 1331, 1332.

Section 6 of the Restatement (Second) of Conflicts sets forth the general choice-of-law analysis and provides:

(1)   A court, subject to constitutional restrictions, will follow a statutory directive of its own state of choice of law.

(2)   When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a)   the needs of the interstate and the international systems,

(b)   the relevant policies of the forum,

(c)   the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d)   the protection of justified expectations,

(e)   the basic policies underlying the particular field of law,

(f)   certainty, predictability and uniformity of result, and

(g)   ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICTS § 6 (1971). Section 145 of the Restatement (Second) sets forth the analysis applicable to tort claims, building on § 6 and providing:

(1)   The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

- 4 -

(2)    Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

    (a)    the place where the injury occurred,

    (b)    the place where the conduct causing the injury occurred,

    (c)    the domicile, residence, nationality, place of incorporation and place of business of the parties, and

    (d)    the place where the relationship, if any, between the parties is centered.

RESTATEMENT (SECOND) CONFLICT OF LAWS § 145 (1971). These contacts, in turn, are to be evaluated according to their relative importance with respect to the particular issue. *Id.*

While the comments to these sections of the Restatement are instructive in evaluating which jurisdiction's substantive law should apply to Plaintiffs' claims, as Comment c to § 6 cautions, with respect to torts:

> the difficulties and complexities involved have as yet prevented the courts from formulating a precise rule, or series of rules, which provide a satisfactory accommodation of the underlying factors in all of the situations which may arise. All that can presently be done in these areas is to state a general principle, such as application of the local law 'of the state of most significant relationship' which provides some clue to the correct approach but does not furnish precise answers. In these areas, the courts must look in each case to the underlying factors themselves in order to arrive at a decision which will best accommodate them.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. c.

- 5 -

Section 6 provides useful guidance, but does not provide a definitive answer as to which state's law should apply to particular Plaintiffs' claims. The first set of factors to be examined under § 6 pertains to the relative interests of the various states involved. As Comment d to § 6 states, "the most important function of choice-of-law rules is to make the interstate and international systems work well." Restatement (Second) of Conflict of Laws § 6 cmt. d.

The next factor, discussed in Comment e to § 6, is "[r]elevant policies of the state of the forum." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. e. 28 U.S.C. § 1391(f)(4) provides that venue is appropriate "in the United States District Court for the District of Columbia if the action brought is against a foreign state or political subdivision thereof." The District of Columbia may not *per se* have a special interest in having its local laws applied to determine the substantive rules of liability in this action, and further may not have a "significant relationship" with any of the Plaintiffs. Yet, for policy reasons of uniformity and consistency, the federal district courts of the District of Columbia might well have a particular interest in applying the law of the District of Columbia to this and other such cases brought in this forum against the foreign sponsors of terrorism.

The third factor, discussed in Comment f, is "[r]elevant policies of other interested states." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. f. Generally, it is appropriate that the state whose interests are most deeply affected should have its local law applied, and that typically means application of the law of the state in which the individual injured maintains his or her primary domicile.

The domicile rule would appear to apply equally to claims by estates, particularly where, as here, the estates were also probated in the decedent's domicile state. Comment f does not, however, lend itself as easily to an assessment of which state's law applies to the claims of family members of individuals killed where those family members' domicile is different from that of the decedent.

The "[p]rotection of justified expectations" discussed in Comment g of § 6 is of little applicability in tort actions. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. g (noting that in tort actions, "the parties act without giving thought to any legal consequences of their conduct or to the law that may be applied. In such situations, the parties have no justified expectations to protect, and this factor can play no part in the decision of a choice-of-law question"). Comment h instructs courts to examine "[b]asic policies underlying a particular field of law," in making a choice of law determination, and adds that there may be good reasons for a court to apply the local law of a state which will best achieve a basic policy or policies underlying the particular field of law involved. *Id.* at cmt. h. This factor should militate in favor of this Court applying the law of that state or those states which will favor Plaintiffs in an action against terrorists when the policies of the United States are so strongly aligned against terrorists, and where the Defendants have never attempted to explain away, if they could, the actions which are being attributed to them. Finally, pursuant to Comment j, the "[e]ase in the determination and application of the law to be applied" must be examined. *Id.* at cmt. j.

Overall, the rules in § 6 are so general that they are not conclusive as to which law(s) should apply in this matter. Section 145, which states the general principles with respect to torts, is analytically more helpful. The basic principle underlying § 145 is that the local law of the state which "has the most significant relationship to the occurrence and the parties under the principles stated in § 6" should be selected. *See* RESTATEMENT (SECOND) CONFLICT OF LAWS § 145(1). Section 145(2) specifically provides that the factors to be evaluated in assessing which jurisdiction "has the most significant relationship" to the events at issue are the place where the injury occurred, the place where the conduct causing the injury occurred, the domicile, residence, and nationality of the parties, and the place where the relationship, if any, between the parties centered. *Id*. at § 145(2).

Finally, § 175 of the Restatement (Second) of the Conflict of Laws, which deals solely with wrongful death actions, creates a presumption that the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship. RESTATEMENT (SECOND) CONFLICT OF LAWS § 175 (1971). The murder of the decedents here occurred in mid-air 30,000 feet above the African country of Niger, en route from Central Africa to Paris on a scheduled intercontinental flight plan. Given these factors, it would be hard to fathom a reason for determining that Niger – where the aircraft plunged into the barren desert, killing all on board – has a more significant relationship with Plaintiffs than

any jurisdiction in the United States. Here, then, a § 175 analysis merely leads back to a consideration of the factors set forth in §§ 6 and 145.

In similar cases involving claims asserted by the victims of state-sponsored terrorism, where there is little connection between the site of the underlying incident and the people killed in the underlying act or event, courts attempting to resolve this issue have utilized, consistent with D.C. law, a "constructive blending" of the "governmental interests" analysis and the "most significant relationship" test. *See generally Dammarell*, 2005 U.S. Dist. LEXIS 5343, at *57-59 (citing *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40 (D.C. 1989)).

Based on the "constructive blending analysis," the Court in *Dammarell*, which involved claims asserted by direct survivors of, and surviving family members of U.S. citizens killed in, the April 1983 bombing of the U.S. Embassy in Beirut, determined that claims of the estates of U.S. citizens killed in the Embassy bombing are "traditionally governed by the laws of the decedent's domicile" at death. *Id.* at *67. With respect to the surviving family members of the victims of a terrorist attack, the Court indicated that it would, in the first instance, apply the law of each survivor's domicile at the time of the terrorist act in question. *Id.* at *69-70. Other courts have subsequently adopted the same approach. *See Cicippio-Puleo*, Slip Op. at 21-22 (applying law of Pennsylvania, plaintiffs' domicile state); *Price*, 384 F. Supp. 2d at 133 (applying Texas and California law, to claims of plaintiffs detained and tortured by Libya where plaintiffs were domiciled in these states at the time of Libya's terrorist actions).

Here, such an analysis, particularly with respect to the "most significant relationship" prong, could equally lead to the conclusion that the law of the state in which the bombing victim's estate was probated (which usually will also be, and in all cases here is, the state in which that victim was domiciled at the time) should govern all claims by all Plaintiffs seeking relief with respect to that victim's death. Indeed, many states – including Virginia, New York and Montana – *require* that a wrongful death action be brought by the personal representative on behalf of designated beneficiaries. Other states – such as Texas, the fourth state at issue here – permit, although do not require, either the personal representative or a particular beneficiary to bring the wrongful death claim on behalf of all designated beneficiaries. Having a single wrongful death claim proceed under a single state's law on behalf of all potential beneficiaries avoids what otherwise might be an anomalous result: different recoveries (or recovery versus no recovery at all) for similarly situated beneficiaries. This approach has its advantages, primarily a guarantee that the same law would apply to claims asserted by each individual participating in the suit due to the death of a particular decedent. Without using this convention, one child of an individual killed in the bombing of UTA Flight 772 might be able to assert and receive full recovery on certain claims while their sibling, residing in another state, would not – clearly an unconscionable result. It therefore serves the interests of justice to begin and end the choice-of-law analysis with the state in which the victim's estate was probated, at least for wrongful death claims.

For other claims the victims' surviving family members might bring, (such as intentional infliction of emotional distress and loss of consortium or solatium), there is logic for utilizing the law of the state of probate as well. Many states' wrongful death statutes provide for those types of damages. Further, such an approach for these sorts of claims – as with wrongful death – avoids the undesirable and illogical result of disparate recovery for similarly situated claimants seeking to recover for the loss of the same decedent.

Alternatively, however, applying the law of the state of the claimant's domicile, either at the time of the terrorist event (1989) or at the time of the filing of claims (2002) is also consistent with choice-of-law principles. Such an approach also vindicates each state's interest in ensuring that its respective domiciliaries receive adequate compensation. Where applicable, we have provided both alternatives here.[3]

## II.    STATE LAW CAUSES OF ACTION FOR EACH PLAINTIFF

### A.    Virginia

If the Court chooses to apply the rule that all claims by Plaintiffs seeking recovery related to a single victim's death should be governed by the law of the state in which the victim's estate was probated, Virginia law will apply to the claims of (1) the Estate of Bonnie Barnes Pugh, which was probated in Virginia; (2) Robert

---

[3]    Because, as noted above, Judges in this District have applied the rule that the law of the state of the claimant's domicile at the time of the terrorist act controls, rather than the claimant's domicile at the time of filing claims, we have used surviving family member Plaintiffs' domicile at the time of the bombing as an alternative.

Pugh, her husband; (3) Ann Carey, her daughter; (4) the Estate of Malcolm Pugh,

her son; (5) the Estate of Harvey Mills Coverley, her father; (6) the Estate of

Georgia Chisholm, her mother; and (7) Sally Chisholm Johnson, her sister.  (Am.

Compl. ¶¶ 103-109.)

        1.    Wrongful Death

           a.    *Applicable Law*

Virginia's wrongful death statute provides:

> Whenever the death of a person shall be caused by the
> wrongful act, neglect, or default of any person . . . and the
> act, neglect, or default is such as would, if death had not
> ensued, have entitled the party injured to maintain an
> action . . . then, and in every such case, the person who . .
> . would have been liable, if death had not ensued, shall be
> liable in an action for damages. . .

Va. Code Ann. § 8.01-50(A) (2005).  To be actionable, the defendant must have been

at fault in some manner – the underlying wrongful act may be intentional or

negligent – and it must be established that defendant's wrongful act caused the

decedent's death.  CHARLES E. FRIEND, PERSONAL INJURY LAW IN VIRGINIA 15.2

(2000).

     Under Virginia law, "only the decedent's personal representative may sue on

behalf of the statutorily designated wrongful death beneficiary," with wrongful

death beneficiaries not specifically authorized to initiate suits on their own behalf.

*Jones v. Prince George's County*, 348 F.3d 1014, 1017 (D.C. Cir. 2003); *see* Va. Code

Ann. § 8.01-50(B).  Any amount recovered in a wrongful death action is for the

benefit of statutorily designated beneficiaries listed in Va. Code Ann. § 8.01-53(A),

including spouses, children, parents, siblings and any other relative who is

- 12 -

primarily dependant on the deceased. *Id.* In terms of the order of distribution, damages are first distributed to the surviving spouse and children of the deceased; if there are no "first tier" beneficiaries, then damages are distributed to parents and siblings of the deceased, and thereafter to any other relative who is dependent upon the deceased. *See id.*

Virginia Code § 8.01-52 prescribes the damages available in wrongful death actions, and provides for recovery for both economic and non-economic loss including:

1) Sorrow, mental anguish and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent;
2) Compensation for reasonably expected loss of income of the decedent and services, protection, care and assistance provided by the decedent;
3) Expenses for the care, treatment and hospitalization of the decedent incident to the injury resulting in death;
4) Reasonable funeral expenses; and
5) Punitive damages may be recovered for willful or wanton conduct, or such recklessness as evinces a conscious disregard for the safety of others.

Va. Code Ann. § 8.01-52 (2005).

b.    *Application to Plaintiffs*

At this point, there is no question that both the state of Libya and the individual Defendants are liable under Virginia's wrongful death statute. Based on the undisputed evidence, it is beyond doubt that Defendants are "at fault" for the 1989 bombing of UTA Flight 772, and that their undeniably "wrongful act" in planting a suitcase bomb on the flight caused the death of all the passengers aboard, including Bonnie Barnes Pugh and the other six Americans whose estates

are represented as Plaintiffs here.  If death had not ensued, the victims would have

been able to assert myriad actions, including, *inter alia,* assault and battery,

against Defendants.

Because Virginia's wrongful death statute requires that the personal

representative of the subject estate bring the claim on behalf of all beneficiaries,

Robert Pugh, Bonnie Barnes Pugh's husband and executor of her estate (Am.

Compl. ¶ 3), is the appropriate Plaintiff here to bring a claim for the death of

Bonnie Barnes Pugh in the bombing of UTA Flight 772.  He brings that claim,

however, on behalf of, and for the benefit of, all statutorily designated beneficiaries,

which include spouses, children, parents and siblings, Va. Code Ann. § 8.01-53(A)

(2005).  Thus, Mr. Pugh's wrongful death claim is for the benefit of himself, Ann

Carey, the Estate of Malcolm Pugh, the Estate of Harvey Coverley, the Estate of

Georgia Chisholm, and Sally Chisholm Johnson.[4]  Accordingly, a finding of liability

against all Defendants under Virginia's wrongful death statute should be issued in

favor of Robert Pugh, acting as personal representative of the Estate of Bonnie

Barnes Pugh, for the benefit of himself, Ann Carey, the Estate of Malcolm Pugh, the

Estate of Harvey Coverley, the Estate of Georgia Chisholm, and Sally Chisholm.

---

[4]    Although the wrongful death claim is brought on behalf of all of these
statutorily designated beneficiaries, it is unlikely that either the Estates of Harvey
Coverley and Georgia Chisholm (parents) or Sally Chisholm Johnson (sibling) will
actually recover damages for wrongful death here given that Ms. Pugh was survived
by a spouse (Robert Pugh) and children (Ann Carey and Malcolm Pugh).  *See* Va.
Code Ann. § 8.01-53(A).  These claimants, however, can independently recover
damages on their own behalf  through other claims such as intentional infliction of
emotional distress, as discussed below.

2.    Intentional Infliction of Emotional Distress

a.    *Applicable Law*

Under Virginia law, a cause of action for emotional distress will lie (whether or not accompanied by bodily impact or physical injury) provided that four elements are shown:  "(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable in that it affronts against the generally accepted standards of decency and morality; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe."  *Womack v. Eldridge*, 210 S.E. 2d 145, 148 (Va. 1974) (citing RESTATEMENT (SECOND) OF TORTS §46).  The term "emotional distress" encompasses

> 'mental suffering, mental anguish, mental or nervous shock . . . . It includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea' . . . But liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it.

*Russo v. White*, 400 S.E.2d 160, 163 (Va. 1991) (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. j).  A damages award for intentional infliction of emotional distress may include compensatory damages for both pecuniary and non-pecuniary losses. *See LeBrun v. Yakeley*, No. 209591, 2005 Va. Cir. LEXIS 12,  at 1 (Mar. 7, 2005) (discussing jury award of $25,000 in compensatory damages and $275,000 in punitive damages for IIED claim); *Anderson v. Sharma*, 38 Va. Cir. 22, 31 (1995) (discussing possible bases for damages on IIED claim).

- 15 -

b.    *Application to Plaintiffs*

The baseline facts required for a finding of liability for intentional infliction of emotional distress under Virginia law in this case clearly have been met at this stage given the undisputed factual record.  Surely the actions of Libya and its agents, in plotting and carrying out the bombing UTA Flight 772 with the resulting deaths of everyone on board, were intentional acts (as this Court already has found) that affront the "generally accepted" standards of decency and morality.  The direct impact of the killing of the passengers on their immediate family members cannot be doubted – nor can Defendants' intent to have caused such an impact.  Indeed, by definition, acts of state-sponsored terrorism such as the bombing of UTA Flight 772 are specifically designed to impact not only those killed or injured in the attack itself, but their family members as well.  Thus,

> [c]ourts have uniformly held that a terrorist attack – by its nature – is directed not only at the victims but also at the victims' families . . . . In this case, the evidence demonstrates that defendant's campaign of attacks against Westerners was intended not only to harm the victims, but to instill terror in their loved ones and others in the United States."

*Salazar v. Islamic Republic of Iran,* 370 F. Supp. 2d 105, 115 n.12  (D.D.C. 2005) (discussing April 1983 bombing of US Embassy in Beirut, and impact of attack on family member of decedent); *Cicippio-Puleo*, Slip Op. at 23-24 ("'If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents

liability.'") (quoting *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001)).[5]

Indeed, Plaintiffs here have suffered greatly over the years from the traumatic loss of a loved one in the terrorist bombing of UTA Flight 772 – a result specifically intended by Libya. (Am. Compl. ¶¶ 104-109.) Although further evidence of each Plaintiff's personal loss will be presented to the Court as part of the damages phase of this proceeding, the undisputed facts along with reasonable inferences drawn from the undisputed evidence submitted with Plaintiffs' initial motion for partial summary judgment leave no doubt that the family members have endured precisely the kind of severe emotional distress for which courts routinely have awarded damages.

Accordingly, a finding of liability against all Defendants for intentional infliction of emotional distress under Virginia law should be entered in favor of Robert Pugh, Ann Carey, the Estate of Malcolm Pugh, the Estate of Harvey Coverley, the Estate of Georgia Chisholm and Sally Chisholm Johnson.[6]

---

[5]    Thus, courts have imposed liability for intentional infliction of emotional distress in favor of family members of victims of terrorism who were not physically present for the terrorist acts even where the applicable state law typically requires such presence for a claim to lie.  This is no surprise given the speed and power of today's media channels – including live television, internet reporting and the power of modern mass media.

[6]    Should the Court choose to apply the "state of domicile at the time of the bombing" rule, a finding of liability for intentional infliction of emotional distress under Virginia law should also be entered for John Schutzius, brother of Margaret Schutzius, who was killed in the UTA bombing. (Am. Compl. ¶ 126.)

3.    Loss of Consortium/Solatium

Loss of consortium and/or solatium does not appear to be recognized as an

*independent* claim in Virginia.  Nonetheless, Plaintiffs can recover

solatium/consortium damages through their wrongful death claims.  As the

Supreme Court of Virginia has noted:

> [D]amages may be awarded not only for the pecuniary
> loss sustained by the statutory beneficiaries (including
> the probable earnings of the deceased for the duration of
> his life expectancy in view of his health, age, business
> capacity, and experience) but also for loss of deceased's
> care, attention and society, *as well as such sum as the jury*
> *may deem fair and just as a solatium to the beneficiaries*
> *for their sorrow and mental anguish caused by the death.*

*Wilson v. Whittaker*, 154 S.E.2d 124, 128 (Va. 1967) (emphasis added) (citations

omitted in original).

Indeed, the Virginia Code provides that wrongful death damages *shall*

include "[s]orrow, mental anguish, and solace which may include society,

companionship, comfort, guidance, kindly offices and advice of the decedent."  Va.

Code Ann. § 8.01-52(1); *see Rice v. Charles*, 532 S.E.2d 318, 324 (Va. 2000) (finding

jury verdict to be inadequate as matter of law because it failed to compensate

wrongful death plaintiff for "non-monetary elements of damage, such as sorrow,

mental anguish, and loss of solace").  In fact, evidence of sorrow, mental anguish,

and solace – even in the absence of evidence regarding loss of income and expenses

incurred – can be sufficient to support a jury's award in a wrongful death action.

*Shepard v. Capitol Foundry of Va., Inc.*, 554 S.E.2d 72, 76 (Va. 2001); *see Jan Paul*

*Fruiterman, M.D. & Assocs. v. Waziri*, 525 S.E.2d 552, 555 (Va. 2000).

4.    Survival Actions

Virginia's survival statute provides:

> Every cause of action whether legal or equitable, which is
> cognizable in the Commonwealth of Virginia, shall
> survive either the death of the person against whom the
> cause of action is or may be asserted, or the death of the
> person in whose favor the cause of action existed. . . .

Va. Code Ann. § 8.01-25 (2005). Here, had she survived, Bonnie Barnes Pugh would

have had numerous claims against Defendants, including assault and battery, and

intentional infliction of emotional distress. Accordingly, a finding of liability

against all Defendants pursuant to Virginia's survival statute should be entered in

favor of the Estate of Bonnie Barnes Pugh.[7]

**B.    Texas**

If the Court chooses to apply the rule that all claims by Plaintiffs seeking

recovery related to a single victim's death should be governed by the law of the state

in which the victim's estate was probated, Texas law will apply to the claims of four

of the seven American families affected by the UTA 772 bombing. Specifically, it

---

[7]    Under Virginia law, there may not be recovery for the same injury under both
the survival statute and the wrongful death statute. *Hendrix v. Daugherty*, 457
S.E.2d 71, 75 (Va. 1995) (holding that litigants would have to choose whether to
proceed under wrongful death or survival provision). Rather, pursuant to Va. Code
§ 8.01-56, "[i]f death resulted from the injury for which the action was originally
brought" under Virginia's survival statute, the relevant pleadings are to be
amended "so as to conform to an action under § 8.01-50 [wrongful death provision]"
as "there shall be but one recovery for the same injury." *Hendrix*, 457 S.E.2d at 75,
*quoting* Va. Code Ann. § 8.01-56. Because Virginia's wrongful death statute
provides for comprehensive damages, including loss of income of the decedent, the
Court might determine at the damages phase that Bonnie Barnes Pugh's Estate's
survival claim effectively merges with the wrongful death action, and that only the
latter provides a basis for awarding damages.

- 19 -

will apply to (1) the Estate of James Turlington, Sr., (2) the Estate of Margaret Schutzius, (3) the Estate of Patrick Huff, and (4) the Estate of Mark Corder, all of which were probated in Texas, as well as the claims of their surviving family members.  (Am. Compl. ¶¶ 110, 121, 127, 149.)

The Plaintiff family members of James Turlington, Sr. are (a) Deborah Vaughn Schooling, his daughter and administrator of his estate; (b) Jana Turlington, his daughter; (c) Jimmy Turlington, his son; (d) Christopher Turlington, his son; (e) Christopher Turlington, his son; (f) David Turlington, his son; (g) James Turlington, Jr., his son; (h) Eddie Turlington, his son; (i) the Estate of Elvee Turlington, his mother; (j) Joyce Wright, his sister; and (k) Russell Turlington, his brother.  (Am. Compl. ¶¶ 110, 121, 127, 149.)

The Plaintiff family members of Margaret Schutzius are (a) Mary Hassett, her mother and administrator of her estate; (b) William Schutzius, her father; (c) Catherine Schutzius, her sister; (d) Christopher Schutzius, her brother; and (e) John Schutzius, her brother.  (Am. Compl. ¶¶ 122-126.)

The Plaintiff family members of Patrick Huff are (a) Ermine Hailey, his wife and administrator of his estate; (b) the Estate of James Huff, his father; (c) the Estate of Janice Huff, his mother; (d) Jan Patillo, his sister; (e) Michael Huff, his brother; (f) Amanda Hill, his step-daughter; and (g) Jared Hill, his step-son.  (Am. Compl. ¶¶ 128-134.)

The Plaintiff family members of Mark Corder are (a) Carla Malkiewicz, his wife and administrator of his estate; (b) the Estate of Edward Corder, his father; (c)

Therese Coddington, his sister; and (d) Michael Corder, his brother.  (Am. Compl. ¶¶ 150-153.)

      1.     Wrongful Death

          a.    *Applicable Law*

The Texas wrongful death statute provides in part:

> A person is liable for damages arising from an injury that causes an individual's death if the injury was caused by the person's or his agent's or servant's wrongful act, neglect, carelessness, unskillfulness, or default.

Tex. Civ. Prac. & Rem. Code § 71.002.  An action to recover damages for wrongful death is for the exclusive benefit of the deceased's surviving spouse, children, and parents.  *See id.* § 71.004(a); *Shepherd v. Ledford,* 962 S.W.2d 28, 31 (Tex. 1998). The action may be brought by any or all of these beneficiaries individually, or by any one of them on behalf of the others.  "If none of the individuals entitled to bring an action have begun the action within three calendar months after the death of the injured individual, his executor or administrator shall bring and prosecute the action unless requested not to by all those individuals."  Tex. Civ. Prac. & Rem. Code § 71.004(c).

"The measure of recovery for wrongful death has nothing to do with the injuries sustained by the decedent, but is rather the monetary value of the benefit that the plaintiff reasonably expected to receive from the decedent had he not been killed."  *Johnson v. Houston*, 813 S.W.2d 227 (Tex. 1991).  A wrongful death action, however, does not survive the beneficiary under Texas law.  *See id.* at 229-30.

b.    *Application to Plaintiffs*

There is no question that the evidence establishes Defendants' liability under the Texas wrongful death statute – their "wrongful act[s]" caused the death of all aboard UTA Flight 772, including the seven Americans whose estates are represented as Plaintiffs in this case. Thus, the surviving spouse, children and parents of James Turlington, Sr., Margaret Schutzius, Patrick Huff, and Mark Corder, all of whom were domiciled in Texas at the time of the bombing and whose estates were probated there, have claims arising under Texas law. Because a wrongful death claim does not survive under Texas law, however, those family members who passed away prior to the filing of this lawsuit will be precluded from recovery under this statute. *See Johnson*, 813 S.W.2d at 229-30. Accordingly, a finding of liability under Texas's wrongful death statute should be issued against all Defendants in favor of Deborah Schooling, Jana Turlington, Jimmy Turlington, Christopher Turlington, David Turlington, James Turlington, Jr., Eddie Turlington, Mary Hassett, William Schutzius, Ermine Hailey, and Carla Malkiewicz.

2.    Intentional Infliction of Emotional Distress

a.    *Applicable Law*

Texas has adopted the elements of the Restatement (Second) of Torts § 46 for the tort of intentional infliction of emotional distress. *See Twyman v. Twyman*, 855 S.W.2d 619, 621-22 (Tex. 1993). To recover under the tort, a plaintiff must show that "1) the defendant acted intentionally or recklessly, 2) the conduct was 'extreme and outrageous,' 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the resulting emotional distress was severe." *Standard Fruit &*

*Veg. Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998) (citing *Twyman*, 855 S.W.2d at 621-22). A claimant must, however, "show more than mere worry, anxiety, vexation, embarrassment, or anger." *Star Houston, Inc. v. Shevack*, 886 S.W.2d 414, 418 (Tex. App. – Houston 1994) (citations omitted). "The law intervenes only where emotional distress inflicted is so severe that no reasonable person could be expected to endure it; the intensity and the duration of the distress are factors to be considered in determining its severity." *Gonzales v. Willis*, 995 S.W.2d 729, 736 (Tex. App. – San Antonio 1999). Manifestations of severe emotional distress may include the "mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and public humiliation." *Gant v. Dumas Glass and Mirror, Inc.*, 935 S.W.2d 202, 209 (Tex. App. – Amarillo 1996).

      b.    *Application to Plaintiffs*

As under Virginia law, there can be no question that the elements of intentional infliction of emotional distress under Texas law are satisfied here. Defendants' intentional acts in blowing up an airliner with 170 persons aboard were surely "extreme and outrageous," and indeed – as with most terrorist acts – were carried out for the very purpose of inflicting severe emotional distress and anguish on the family members of the bombing victims. Without doubt, the family members did indeed suffer such severe distress and anguish. (Am. Compl. ¶¶ 111-120, 122-126, 128-134, 150-153.) Accordingly, a finding of liability for intentional infliction of emotional distress under Texas law should be issued against all Defendants in favor of Deborah Vaughn Schooling, Jana Turlington, Jimmy Turlington, Christopher

- 23 -

Turlington, Christopher Turlington, David Turlington, James Turlington, Jr., Eddie

Turlington, the Estate of Elvee Turlington, Joyce Wright, Russell Turlington, Mary

Hassett, William Schutzius, Catherine Schutzius, Christopher Schutzius, John

Schutzius, Ermine Hailey, the Estate of James Huff, the Estate of Janice Huff, Jan

Patillo, Michael Huff, Amanda Hill, Jared Hill, Carla Malkiewicz, the Estate of

Edward Corder, Therese Coddington, and Michael Corder.

       3.    Loss of Consortium/Solatium

       a.    *Applicable Law*

Although Texas does not recognize an independent cause of action for loss of

solatium, it does recognize claims for loss of consortium, which is defined:

> to include the mutual right of the husband and wife to
> that affection, solace, comfort, companionship, society,
> assistance, and sexual relations necessary to a successful
> marriage. This definition primarily consists of the
> emotional or intangible elements of the marital
> relationship. In Texas, it does not include the "services"
> rendered by a spouse to the marriage. These elements
> have been referred to as a conceptualistic unity, and the
> action accrues upon the substantial impairment of them.

*Whittlesey v. Miller*, 572 S.W.2d 665, 666 (Tex. 1978) (citations omitted). The Texas

Supreme Court also noted that:

> The phrase "loss of consortium" is more accurately
> described as an element of damage rather than a cause of
> action. But courts have so frequently used the phrase to
> denote those actions in which loss of consortium is the
> major element of damage that "loss of consortium" has
> come to be referred to as a cause of action.

*Id.* The loss of consortium can arise from either the intentional or negligent conduct

of a third party. *Id.* at 666.

- 24 -

Significantly, although traditionally loss of consortium was only available between spouses, Texas also has recognized a claim for loss of consortium between parents and children (including adult children).  *See Reagan v. Vaughn,* 804 S.W.2d 463 (Tex. 1990) (holding that most children are dependent on their parents for emotional sustenance).

   b. *Application to Plaintiffs*

Here, the spouses, children and parents of the Texas domiciliary victims of the bombing clearly have lost the affection, solace, comfort, companionship, society, and assistance (and sexual relations with respect to spouses) of their loved one who was killed.  Accordingly, a finding of liability for intentional infliction of emotional distress under Texas law should be issued against all Defendants in favor of Deborah Vaughn Schooling, Jana Turlington, Jimmy Turlington, Christopher Turlington, Christopher Turlington, David Turlington, James Turlington, Jr., Eddie Turlington, the Estate of Elvee Turlington, Mary Hassett, William Schutzius, Ermine Hailey, the Estate of James Huff, the Estate of Janice Huff, Carla Malkiewicz and the Estate of Edward Corder.

   4. Survival Actions

Texas's survival statute states:

> (a) A cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person or because of the death of a person liable for the injury.
> (b) A personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person. The action survives against the liable person and the person's legal representatives.

- 25 -

(c) The suit may be instituted and prosecuted as if the liable person were alive.

Tex. Civ. Prac. & Rem. Code § 71.021.

"The survival action, as it is sometimes called, is wholly derivative of the decedent's rights.  The actionable wrong is that which the decedent suffered before his death.  The damages recoverable are those which he himself sustained while he was alive and not any damages claimed independently by the survival action plaintiffs (except that funeral expenses may also be recovered if they were not awarded in a wrongful death action)." *Russell v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 345 (Tex. 1992).  Therefore, in a survival action, "the heirs or legal representatives of a decedent's estate may recover for the physical pain, suffering, and property damage sustained by the decedent before death, as well as for medical expenses and other damages." *Borth v. Charley's Concrete Co.*, 139 S.W.3d 391, 395 (Tex. App. 2004).

Thus, the estates of the four Texas domiciliary victims of the UTA bombing have causes of action in their own right for the injuries they sustained as a result of Defendants' terrorist acts.  Accordingly, a finding of liability pursuant to Texas's survival statute should be issued against all Defendants in favor of the Estates of James Turlington, Sr., Margaret Schutzius, Patrick Huff and Mark Corder.

**C.    New York**

If the Court chooses to apply the rule that all claims by Plaintiffs seeking recovery related to a single victim's death should be governed by the law of the state in which the victim's estate was probated, New York law will apply to the claims of

- 26 -

(1) the Estate of Mihai Alimanestianu, which was probated in New York; (2) Ioana

Alimanestianu, his wife and administrator of his estate; (3) Irina Alimanestianu,

his daughter; (4) Joanna Alimanestianu, his daughter; (5) Nicholas Alimanestianu,

his son; (6) Alexander Alimanestianu, his son; (7) Serban Alimanestianu, his

brother; (8) Calin Alimanestianu, his brother; and (9) Constantin Alimanestianu,

his brother.  (Am. Compl. ¶¶ 140-148.)[8]

        1.    Wrongful Death

          a.   *Applicable Law*

New York's wrongful death statute provides that:

> [t]he personal representative, duly appointed in this state
> or any other jurisdiction, of a decedent who is survived by
> distributees may maintain an action to recover damages
> for a wrongful act, neglect or default which caused the
> decedent's death against a person who would have been
> liable to the decedent by reason of such wrongful conduct
> if death had not ensued.

N.Y. Est. Powers & Trusts Law § 5-4.1(1).  Wrongful death actions are not brought

on behalf of the decedent's estate, but rather on behalf of the decedent's

distributees.  *Green v. Kamalian*, 530 N.Y.S.2d 288, 289 (App. Div. 1988).

    The elements of a wrongful death action are: (1) the death of a human being;

(2) the wrongful act, neglect or default of defendant by which the decedent's death

was caused; (3) the survival of distributees who suffered pecuniary loss by reason of

---

[8]    Although Plaintiffs' Amended Complaint states that "upon information and
belief" Serban Alimanestianu was domiciled in Massachusetts at the time of the
UTA bombing, counsel has subsequently learned that he was actually domiciled in
New York in 1989, and his claims should therefore be based on that state's
substantive law.

the death of the decedent; and (4) the appointment of a personal representative of the decedent. *Pratt v. George Spalty Sons, Inc.*, 516 N.Y.S.2d 433, 436 (Sup. Ct. 1987). The appointment of a qualified administrator is essential to the maintenance of an action for wrongful death; the statutory right to recover for wrongful death does not even arise until an administrator has been named through issuance of letters of administration. *Dawson v. Langner*, 484 N.Y.S.2d 743, 744 (App. Div. 1985).

Certain damages may be awarded to a plaintiff in a wrongful death action:

> The damages awarded to the plaintiff may be such sum as the jury or, where issues of fact are tried without a jury, the court or referee deems to be fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought. In every such action, in addition to any other lawful element of recoverable damages, the reasonable expenses of medical aid, nursing and attention incident to the injury causing death and the reasonable funeral expenses of the decedent paid by the distributees, or for the payment of which any distributee is responsible, shall also be proper elements of damage.

N.Y. Est. Powers & Trusts Law § 5-4.3(a). In addition to recompense for such items as medical and funeral expenses, a wrongful death claimant can seek compensation for loss of support and assistance (*i.e.*, lost future earnings), loss of parental care and guidance, and the possibility of inheritance. *Sand v. Chapin*, 656 N.Y.S.2d 700, 701 (App. Div. 1997); *Gonzalez v. New York City Hous. Auth.*, 572 N.E.2d 598, 601 (N.Y. 1991). Also, "punitive damages may be awarded if such damages would have been recoverable had the decedent survived." N.Y. Est. Powers & Trusts Law § 5-4.3(b); *see, e.g., Adelman v. Adelman*, 741 N.Y.S.2d 841, 844-45 (Sup. Ct. 2002).

Recovery is not available for one's grief or loss of society or companionship suffered as the result of decedent's death; nor can plaintiff recover for the decedent's loss of enjoyment of life. *Sand*, 656 N.Y.S.2d at 701-02. Any damages recovered shall be distributed to the decedent's distributees or, if decedent has no spouse or children, decedent's parents. N.Y. Est. Powers & Trusts Law § 5-4.4(a).

        b.    *Application to Plaintiffs*

Because, as in Virginia, the proper (and only) claimant for wrongful death in New York is the personal representative of the estate, Ioana Alimanestianu, administrator of Mihai Alimanestianu's estate, brings this claim on behalf of all designated beneficiaries, which as applicable here are Mr. Alimanestianu's widow and children. Again, the elements of wrongful death under New York law are readily satisfied here. Accordingly, a finding of liability should be issued against all Defendants in favor of Ioana Alimanestianu, acting as personal representative of the Estate of Mihai Alimanestianu, for the benefit of herself, Irina Alimanestianu, Joanna Alimanestianu, Nicholas Alimanestianu and Alexander Alimanestianu.

        2.    Intentional Infliction of Emotional Distress

        a.    *Applicable Law*

Under New York law, the tort of intentional infliction of emotional distress has four elements:

> (i) extreme and outrageous conduct; (ii) intention to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.

*Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993). The standard for liability is to be broadly defined, as "[t]he tort is as limitless as the human capacity for cruelty." *Id.* Thus, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Murphy v. American Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983). At the same time, liability may be found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Howell*, 612 N.E.2d at 702.

    b.  *Application to Plaintiffs*

  As discussed above, Defendants' conduct here amply meets the "extreme and outrageous" standard, and the consequent – and intended – severe emotional distress inflicted on the family members of the bombing victims cannot be denied. (Am. Compl. ¶¶ 141-148.) Accordingly, a finding of liability for intentional infliction of emotional distress under New York law should be issued against all Defendants in favor of Ioana Alimanestianu, Irina Alimanestianu, Joanna Alimanestianu, Nicholas Alimanestianu, Alexander Alimanestianu, Serban Alimanestianu, Calin Alimanestianu and the Estate of Constantin Alimanestianu.

    3.  Loss of Consortium/Solatium

  Although loss of solatium does not appear to be an independent claim in New York, New York courts recognize a cause of action for either surviving spouse for loss of consortium. *Millington v. Southeastern Elevator Co.*, 239 N.E.2d 897, 902-03 (N.Y. 1968). The concept of consortium includes not only loss of support or services,

but it also embraces such elements as love, companionship, affection, society, sexual relations, solace and more. *Id.* at 899. In fact, a plaintiff may assert a claim for punitive damages in an action wherein plaintiff seeks compensatory damages for loss of consortium. *Young v. Robertshaw Controls Co.*, 474 N.Y.S.2d 886, 892 (Sup. Ct. 1983).

Because there is no recovery for loss of consortium as part of a wrongful death action, *Kaplan v. Sparks*, 596 N.Y.S.2d 279, 280 (App. Div. 1993), plaintiff spouses can bring separate actions for loss of consortium. *See Delosovic v. New York*, 541 N.Y.S.2d 685, 692 (Sup. Ct. 1989) (recognizing loss of consortium action, despite no physical harm to plaintiff arising from husband's injuries). Accordingly, a finding of liability for loss of consortium under New York law should be issued against all Defendants in favor of Ioana Alimanestianu.

    4.    Survival Actions

No cause of action for injury to person or property is lost because of the death of the person in whose favor the cause of action existed; for any injury an action may be brought or continued by the personal representative of the decedent. N.Y. Est. Powers & Trusts Law § 11-3.2(b); *see also* N.Y. Est. Powers & Trusts Law § 11-3.1 (allowing personal representative to maintain "any action . . . as such action might have been maintained by . . . his decedent"); *Mingone v. State*, 474 N.Y.S.2d 557, 560 (App. Div. 1984) (concluding that personal representative who has received letters of administration of decedent's estate is "the only party who is authorized to bring" either survival action or wrongful death action).

Recoverable survival damages are limited to those that accrued before death and do not include any damages for or by reason of death, other than the decedent's reasonable funeral expenses. N.Y. Est. Powers & Trusts Law § 11-3.3(a). Thus, recovery in a survival action is limited to "damages for pain and suffering endured by the deceased, for expenses incurred, and for loss of earnings up to the time of death." *Sand*, 656 N.Y.S.2d at 701 (quoting *Kordonsky v. Andrst*, 568 N.Y.S.2d 117, 119 (App. Div. 1991)). Any damages recovered become part of the decedent's estate. N.Y. Est. Powers & Trusts Law § 11-3.3(a).

Because wrongful death actions and survival actions protect the rights of different classes of persons and involve different damages, a plaintiff may assert one independently of and without the necessity of asserting the other. *See Adelman*, 741 N.Y.S.2d at 847. That said, a wrongful death action and survival action may be prosecuted in a single action. N.Y. Est. Powers & Trusts Law § 11-3.3(b)(1).

Thus, the Estate of Mihai Alimanestianu has a cause of action in its own right for the injuries he sustained as a result of Defendants' terrorist acts. Accordingly, a finding of liability pursuant to New York's survival statute should be issued against all Defendants in favor of the Estate of Mihai Alimanestianu.

**D.     Montana**

If the Court chooses to apply the rule that all claims by Plaintiffs seeking recovery related to a single victim's death should be governed by the law of the state in which the victim's estate was probated, Montana law will apply to the claims of (1) the Estate of Donald Warner; (2) Janet Warner, his mother and administrator of

his estate; (3) the Estate of Alvin Warner, his father; (4) Susan Warner, his sister;

and (5) Sherry Warner, his sister.  (Am. Compl. ¶¶ 135-139.)

### 1.   Wrongful Death

#### a.   *Applicable Law*

Montana's wrongful death statute provides:

> When injuries to and the death of one person are caused
> by the wrongful act or negligence of another, the personal
> representative of the decedent's estate may maintain an
> action for damages against the person causing the death
> or, if such person be employed by another person who is
> responsible for his conduct, then also against such other
> person.

Mont. Code Ann. § 27-1-513.  A wrongful death action "is personal to the decedent's

heirs and independent of any cause of action available to the decedent's estate."

*Payne v. Eighth Jud. Dist. Ct.*,  60 P.3d 469, 472 (Mont. 2002).  As noted in § 27-1-

513, the personal representative of the decedent's estate is authorized to pursue a

wrongful death claim.  Mont. Code Ann. § 27-1-513; *see Hern v. Safeco Ins. Co. of

Ill.*, 125 P.3d 597, 606 (Mont. 2005).  The personal representative then "holds the

proceeds of any damage award for the heirs of the decedent."  *Id.*[9]

The term "heirs" has been defined under Montana law as "those persons

entitled to the property of a decedent under the statutes of intestate succession."  *In

re Northwest Capital Mgmt. & Trust Co.*, 607 P.2d 924, 931 (Mont. 1985).  Under

---

[9]     Thus, while there may be multiple beneficiaries to a wrongful death claim,
Montana's wrongful death statute, like Virginia's, has "been interpreted to mean
that only one wrongful death action arising out of a wrongful death may be brought
and the decedent's representative is the only person who may bring such an action."
*Hern*, 128 P.3d at 606.

Montana's intestate succession statute, if (as here) there is no surviving spouse then the estate "passes in the following order:"

<blockquote>
(a)    to the decedent's descendants by representation:

(b)    if there is no surviving descendant, to the decedent's parents equally if both survive or to the surviving parent;

(c)    if there is no surviving descendant or parent, to the descendents of the decedent's parents [siblings] or either of them by representation.
</blockquote>

Mont. Code Ann. § 72-2-113.

Damages under Montana's wrongful death scheme are "non-specific" and may "be given as under all the circumstances of the case may be just." Mont. Code Ann. § 27-1-323; *see Hern*, 125 P.3d at 604. In a wrongful death case, damages are designed "to compensate the heirs for the harm or damages that they personally suffered as a result of the decedent's death." *Payne*, 60 P.3d at 472; *see Swanson v. Champion Int'l Corp.*, 646 P.2d 1166, 1170 (Mont. 1982). Such damages "generally ... will include loss of consortium by a spouse, loss of comfort and society of the decedent suffered by the surviving heirs, and the reasonable value of the contributions in money that the decedent would reasonably have made for the support, education, training and care of the heirs had she lived." *Hern*, 125 P.3d at 605 (quoting *Swanson,* 646 P.2d at 1170). This "loss of comfort and society" encompasses emotional loss, as under Montana law "[i]t is well established that a [trier of fact] may award 'reasonable compensation for grief, sorrow and mental anguish' in wrongful death actions." *Hern*, 125 P.3d at 609 (citing *Busta v. Columbus Hosp. Corp.,* 916 P.2d 122, 129 (Mont. 1996)).

b.    *Application to Plaintiffs*

Janet Warner, the personal representative of Donald Warner's estate, is the appropriate claimant under Montana's wrongful death regime.  She brings that claim on behalf of all designated beneficiaries, which as applicable here are herself, the Estate of Alvin Warner, Sherry Warner and Susan Warner.[10]  Accordingly, a finding of liability pursuant to Montana's wrongful death statute should be issued against all Defendants in favor of Janet Warner acting as personal representative of the Estate of Donald Warner, for the benefit of herself; the Estate of Alvin Warner, Sherry Warner and Susan Warner.

2.    Intentional Infliction of Emotional Distress

a.    *Applicable Law*

The Montana Supreme Court recognized intentional infliction of emotional distress as an independent cause of action in *Sacco v. High Country Indep. Press, Inc. See Sacco*, 896 P.2d 411, 426-29 (Mont. 1995).  Under *Sacco* and its progeny, "an independent cause of action for intentional infliction of emotional distress will arise under circumstances where serious or severe emotional distress to the plaintiff was the reasonably foreseeable consequence of the defendant's intentional act or omission." *Id.* at 428; *see Pospisil v. First Nat'l Bank of Lewiston*, 37 P.3d 704, 708 (Mont. 2001).[11]  "Serious or severe" emotional distress, in turn, "includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation,

---

[10]    Since there are surviving parents, Mr. Warner's sisters, Sherry Warner and Susan Warner, are not likely to actually recover damages pursuant to a wrongful death claim.  They are entitled to damages, however, under intentional infliction of emotional distress.

embarrassment, anger, chagrin, disappointment, worry and nausea." *Maloney v. Home & Inv. Ctr.*, 994 P.2d 1124, 1135 (Mont. 2000) (citing Restatement (Second) of Torts § 46 comment j).

The emotional and psychological injuries encompassed in an action for intentional infliction of emotional distress "are independent of physical injury and independently compensable in tort law if the emotional injury is sufficiently severe." *Jacobsen v. Farmers Union Mut. Ins. Co.*, 87 P.3d 995, 999 (Mont. 2004). The damages available for intentional infliction of emotional distress "are compensatory, and therefore the focus should be on the reasonable foreseeability that plaintiffs' serious or severe emotional distress was the consequence of the defendant's act or omission." *Sacco*, 896 P.2d at 428.[12]

    b.    *Application to Plaintiffs*

There is no doubt in this case that "serious or severe emotional distress" to the family members of the victims of the UTA Flight 772 bombing was a "reasonably foreseeable consequence" of Defendants' wrongful acts in causing the

---

[11]    As discussed above, because of the peculiar nature of terrorist acts, a particular aim of which is to inflict emotional pain on family members, courts have routinely excused any presence requirement for intentional infliction of emotional distress claims. *See, e.g., Cicippio-Puleo*, Slip Op. at 23-24. It is worth noting, however, that Montana has specifically abandoned a presence requirement in other contexts as well. *See Wages v. First Nat'l Ins. Co. of Am.*, 79 P.3d 1095, 1100 (Mont. 2003).

[12]    Given the focus on defendants' culpability when determining intentional infliction of emotional distress damages, the *Sacco* court stated, '[w]e conclude that an award of punitive damages is the proper method of addressing the culpability and intentional nature of the defendant's conduct in an intentional infliction of emotional distress case." *Sacco*, 896 P.2d at 429.

bombing. Nor is there any doubt that the family members of the bombing victims actually suffered severe emotional distress. (Am. Compl. ¶¶ 136-139.) Accordingly, a finding of liability for intentional infliction of emotional distress under Montana law should be issued against all Defendants in favor of Janet Warner, the Estate of Alvin Warner, Susan Warner and Sherry Warner.

      3.    Loss of Consortium/Solatium

In *Hern*, the Montana Supreme Court recognized that courts may, under certain circumstances, award loss of consortium damages to the parents of a deceased adult child. *See Hern*, 125 P.3d 606-09. In so doing, the Supreme Court noted that "courts have continued to regard loss of consortium to embrace all of those values – tangible and intangible – inherent in the family relationship," and have expanded the notion of consortium to "avoid[] the narrow construction connoting this right derives primarily from the sexual relationship incident to marriage." *Id.* at 606. The Supreme Court specifically cited to the 2002 decision in *Bear Medicine v. U.S.*, 192 F. Supp. 2d 1053 (D. Mont. 2002), where the federal district court "speculated . . . that the Montana Supreme Court would adopt a cause of action [for consortium] for parents of adult children," and in fact permitted recovery for loss of consortium of an adult child. *Id.* at 607; *see Bear Medicine*, 192 F. Supp. 2d at 1059-50, 1067-69. Based on its analysis of *Bear Medicine*, the Montana Supreme Court in *Hern* held:

> that under certain circumstances such as those evidenced
> by the relationship [in Bear Medicine], the bond between
> parents and an adult child, and the loss experienced by
> the parents at the death of or serious injury to their child,

- 37 -

> may be of such a quality as to warrant recovery by the
> parents for loss of consortium.

*Id.* at 608.  Accordingly, a finding of liability for loss of consortium pursuant to

Montana law should be issued against all Defendants in favor of Janet Warner and

the Estate of Alvin Warner.

    4.  Survival Actions

Montana's survival statute provides:

 (1) An action, cause of action, or defense does not abate
   because of the death or disability of a party or the
   transfer of any interest therein, but whenever the cause of
   action or defense arose in favor of such party prior to his
   death or disability of transfer of interest therein, it
   survives and may be maintained by his representatives or
   successors in interest.  If the action has not been begun or
   defense interposed, the action may be begun or defense
   interposed in the name of his representatives or
   successors in interest.  If the action has been begun or
   defense imposed, the action or proceeding may be
   continued as provided in Rule 25, M.R. Civ. P.

 (2) Actions brought under this section and 27-1-513 must be
   combined in one legal action, and any element of damages
   may be recovered only once.

Mont. Code Ann. § 27-1-501.

   A survival action "belongs to the decedent's estate and allows recovery for the

injury to the deceased from the action causing death." *Payne*, 60 P.3d at 472.  Thus,

the damages recoverable in a survival action "are personal to the decedent and the

estate's right to recovery is identical to the decedent's had he or she lived." *Payne*,

60 P.3d at 472; *see Swanson*, 646 P.2d at 1169.  These damages include "lost

earnings from the time of injury to death, the present value of reasonable earnings

during the decedent's remaining life expectancy, medical and funeral expenses,

- 38 -

reasonable compensation for pain and suffering, and other special damages." *Hern*,

125 P.3d at 604 (quoting *Swanson*, 646 P.2d at 1169) (citations omitted).  Separate

wrongful death and survival claims may be asserted, so long as there is not double

recovery of a particular element of damages.  *See* id. at 605  ("primary purpose"

behind amendment of § 27-1-501 to add second clause "was to prohibit double

recovery in wrongful death and survivor actions").  Accordingly, a finding of

liability pursuant to Montana's survival statute should be issued against all

Defendants in favor of the Estate of Donald Warner.

*     *     *

Should the Court choose instead to apply the choice-of-law rule that applies

the law of the state of domicile at the time of the bombing for each Plaintiff, the

laws discussed below would be applicable.  In all cases, however, the result of a

finding of liability for each Plaintiff against all Defendants for at least one claim is

the same.

### E.    California

Under the rule of the claimant's domicile at the time of the terrorist bombing,

California law would govern the claims of the Estates of Harvey Coverley and

Georgia Chisoholm, Bonnie Barnes Pugh's parents, Sally Chisholm Johnson, Bonnie

Barnes Pugh's sister, and Susan Warner, Donald Warner's sister.  (Am. Compl.

¶¶ 107, 108, 109, 138.)

Under California law, "the elements of a prima facie case for the tort of

intentional infliction of emotional distress are: (1) extreme and outrageous conduct

by the defendant with the intention of causing, or reckless disregard of the

- 39 -

probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; (3) and actual and proximate causation of the emotional distress by the defendant's outrageous conduct. *Cervantez v. J. C. Penney Co.*, 595 P.2d 975, 983 (Cal. 1979). Adopting the Restatement (Second) standard for outrageousness, California courts hold that conduct "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. d ).

As discussed above, the essential elements of this claim are amply satisfied here. Accordingly, should the Court follow the domicile of claimant rule, a finding of liability for intentional infliction of emotional distress pursuant to California law should be entered against all Defendants in favor of the Estate of Harvey Coverley, the Estate of Georgia Chisoholm, Sally Chisholm Johnson, and Susan Warner.

**F.     Ohio**

Under the rule of the claimant's domicile at the time of the terrorist bombing, Ohio law would govern the claims of William Schutzius, Margaret Schutzius's father, and Catherine Schutzius, Margaret Schutzius's sister. (Am. Compl. ¶¶ 123, 124.)

      1.     Wrongful Death

Under Ohio's wrongful death statute:

> When the death of a person is caused by wrongful act, neglect, or default which would have entitled the party injured to maintain an action and recover damages if death had not ensued, the person who would have been liable if death had not ensued, or the administrator or executor of the estate of such person, as such administrator or executor, shall be liable in an action for

> damages, notwithstanding the death of the person injured
> and although the death was caused under circumstances
> which make it aggravated murder, murder, or
> manslaughter.

Ohio Rev. Code Ann. § 2125.01 (2005)

A wrongful death action may be brought by "the surviving spouse, the

children, and the parents of the decedent, all of whom are rebuttably presumed to

have suffered damages by reason of the wrongful death, and for the exclusive

benefit of the other next of kin of the decedent." *Id.* § 2125.02 (A)(1).

Accordingly, should the Court follow the domicile of claimant rule, a finding

of liability pursuant to Ohio's wrongful death statute should be entered against all

Defendants in favor of William Schutzius.

2.     Intentional Infliction of Emotional Distress

Ohio recognized the tort of intentional infliction of emotional distress in

*Yeager v. Local Union 20*, 453 N.E.2d 666 (Ohio 1983), where the Ohio Supreme

adopted the statement set forth in Section 46 of the Restatement (Second), such

that, "[o]ne who by extreme and outrageous conduct intentionally or recklessly

causes severe emotional distress to another is subject to liability for such emotional

distress, and if bodily harm to the other results from it, for such bodily harm." *Id.*

at 671 (quoting Restatement (Second) of Torts § 46(1)). The Ohio court expressly

rejected "any requirement that the emotional distress manifest itself in the form of

some physical injury." *Yeager*, 453 N.E.2d at 671. "Liability has been found only

where the conduct has been so outrageous in character, and so extreme in degree, as

to go beyond all possible bounds of decency, and to be regarded as atrocious, and

- 41 -

utterly intolerable in a civilized community." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 comment d).

As discussed above, the essential elements of this claim are amply satisfied here. Accordingly, should the Court follow the domicile of claimant rule, a finding of liability for intentional infliction of emotional distress pursuant to Ohio law should be entered against all Defendants in favor of William Schutzius and Catherine Schutzius.

### G.    Indiana

Under the rule of the claimant's domicile at the time of the terrorist bombing, Indiana law would govern the claims of the Estate of Edward Corder, Mark Corder's father, Therese Coddington, Mark Corder's sister, and Michael Corder, Mark Corder's brother. (Am. Compl. ¶¶ 151-153.)

Under Indiana law, to establish liability for intentional infliction of emotional distress or "outrage," a plaintiff must demonstrate that a defendant, "(1) engaged in 'extreme and outrageous' conduct that (2) intentionally or recklessly (3) caused (4) severe emotional distress." *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 691 (Ind. 1997); *see also Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) (citing RESTATEMENT (SECOND) OF TORTS § 46); *Higginbotham,* 103 F. Supp. 2d at 1090.

As discussed above, the essential elements of this claim are amply satisfied here. Accordingly, should the Court follow the domicile of claimant rule, a finding of liability for intentional infliction of emotional distress pursuant to Indiana law should be entered against all Defendants in favor of the Estate of Edward Corder, Therese Coddington and Michael Corder.

## H.    Florida

Under the rule of the claimant's domicile at the time of the terrorist bombing, Florida law would govern the claims of Calin Alimanestianu, Mihai Alimanestianu's brother.  (Am. Compl. ¶ 147.)

Florida law recognizes the tort of intentional infliction of emotional distress, following the Restatement (Second) of Torts § 46 in imposing liability for emotional distress caused by "extreme or outrageous conduct intentionally or recklessly caus[ing] severe emotional distress to another."  *M.M v. M.P.S.*, 556 So. 2d 1140, 1140-41 (Fla. 3d DCA 1989).  Florida does not require that the plaintiff demonstrate any "physical harm" in conjunction with emotional distress as a result of the conduct.  *Williams v. City of Minneola*, 575 So. 2d 683, 690, 693 (Fla. 5th DCA 1991).  The underlying conduct must, however, be "regarded as atrocious, and utterly intolerable in a civilized society."  *Id.* at 690.

As discussed above, the essential elements of this claim are amply satisfied here.  Accordingly, should the Court follow the domicile of claimant rule, a finding of liability for intentional infliction of emotional distress pursuant to Florida law should be entered against all Defendants in favor of Calin Alimanestianu.

## I.    North Carolina

Under the rule of the claimant's domicile at the time of the terrorist bombing, North Carolina law would govern the claims of the Estate of Constantin Alimanestianu, Mihai Alimanestianu's brother.  (Am. Compl. ¶ 148.)

Under North Carolina law, "[t]he essential elements of a claim for intentional infliction of emotional distress are 1) extreme and outrageous conduct by the

- 43 -

defendant 2) which is intended to and does in fact cause 3) severe emotional distress." *Holloway v. Wachovia Bank & Trust Co.*, 452 S.E.2d 233, 240 (N.C. 1993) (quoting *Dickens v. Puryear*, 276 S.E.2d 325, 335 (N.C. 1981)). The "severe emotional distress" required for intentional infliction of emotional distress has, in turn, been defined as:

> [A]ny emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.

*Johnson v. Ruark Obstetrics & Gynecology Assoc.*, 395 S.E.2d 85, 97, *reh'g denied*, 399 S.E.2d 133 (N.C. 1990).

As discussed above, the essential elements of this claim are amply satisfied here. Accordingly, should the Court follow the domicile of claimant rule, a finding of liability for intentional infliction of emotional distress pursuant to Florida law should be entered against all Defendants in favor of Constantin Alimanestianu.

## CONCLUSION

Regardless of whether the Court chooses to apply a choice-of-law rule that looks to the law of the state of probate for all related claims, or the law of domicile of the claimant, every Plaintiff here has at least one claim under a specific state's laws for which liability against Libya and its agents should be entered. Accordingly, partial summary judgment should be entered against Libya as a matter of law. In addition, the Court should rule that the six individual Defendants are also liable under the applicable state laws.

Respectfully submitted,


　/s/　Stuart H. Newberger
Stuart H. Newberger, D.C. Bar No. 294793
Michael L. Martinez, D.C. Bar No. 347310
Laurel Pyke Malson, D.C. Bar No. 317776
Shari Ross Lahlou, D.C. Bar No. 476630
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500 telephone
(202) 628-5116 facsimile

*Attorneys for Plaintiffs*

May 30, 2006